**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)**

| | | |
|---|---|---|
| OLES ENVELOPE, LLC, <u>et al.</u>, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. WMN 02-2017 |
| GTD COMPANY, INC., <u>et al.</u>, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS'
AMENDED COMPLAINT AND FOR SUMMARY JUDGMENT ON
COUNTS I, II AND IV OF COUNTERCLAIMANTS' COUNTERCLAIM OR,
<u>IN THE ALTERNATIVE, AN ORDER PURSUANT TO RULE 56(d)</u>**

Jefferson V. Wright
Federal Bar No. 00990
Tessa Laspia Frederick
Federal Bar No. 25374
Brian D. Craig
Federal Bar No. 25710
Miles & Stockbridge, at P.C.
10 Light Street
Baltimore, Maryland 21202
(410) 727-6464

Attorneys for Defendants, GTD Company,
Inc., Harold T. Robinson and David Oechsle

# TABLE OF CONTENTS

TABLE OF CONTENTS …………………………………………………...  i

TABLE OF AUTHORITIES ……………………………………………..  ii

I.    INTRODUCTION…………………………………………………  1

II.   BRIEF STATEMENT OF PROCEDURAL POSTURE ……………………  2

III.  STATEMENT OF UNDISPUTED FACTS …………………………………  3

   A.   The Parties and Businesses at Issue …………………………………  3
   B.   The Purchase Agreement and Related Agreements …………………………  5
   C.   Post-Closing Events and Chronology ………………………………..  6

IV.   ARGUMENT ……………………………………………………...  11

   A.   Legal Standard …………………………………………………  11
   B.   This Court Should Grant Summary Judgment or Relief Under
        Rule 56(d) on Specific Factual Allegations …………………………  12
   C.   Plaintiffs' Allegations of Defendants' Wrongdoing …………………………  13
        1.   RO Express Expenses …………………………………………  13
        2.   Time Spent on RO Express Business ………………………………...  14
        3.   Improper Personal Expense Reimbursements ………………………..  15
        4.   Use of "RO Envelope" Name…………………………………………  19
        5.   The Embezzlement Scheme …………………………………………..  21
        6.   Destruction of Company Records ………………………………………  26
        7.   Diversion of Customers to Rite Envelope ………………………………  27
        8.   Kimberly Robinson's Employment With Rite Envelope ……………..  28
        9.   Enticement of Customers to Rite Envelope …………………………  28
        10.  Lack of Good Faith Efforts ………………………………………..  29
   D.   This Court Should Grant Summary Judgment in Favor of Defendants
        on All Legal Claims in the Complaint ………………………………..  31
   E.   This Court Should Grant Summary Judgment in Favor of Defendants
        on Counts I, II and IV of Their Counterclaims …………………………  48

V.    CONCLUSION …………………………………………………  50

## TABLE OF AUTHORITIES

Advanced Power Systems, Inc. v. Hi-Tech Systems, Inc., Civ. No. 90-7952,
1994 WL 116121 at *11 (E.D. Pa. March 21, 1994) …………………………………..45

Anderson v. Liberty Lobby, Inc., 447 U.S. 242, 248 (1986) …………………………..12

Atacs Corp. v. Trans World Communications, Inc., 155 F.3d 659, 669
(3rd Cir. 1998) …………………………………………………………………………..45

Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) …………………………………….12

Bland v. Norfolk & Southern RR, 406 F.2d 863, 866 (4th Cir. 1969) …………………11

Castle v. Cohen, 676 F. Supp. 620, 627 (E.D. Pa. 1987) ……………………………...32

Caudill Seed and Warehouse Co., Inc. v. Prophet 21, Inc., 126 F. Supp.2d 937,
938 (E.D. Pa. 2001) ……………………………………………………………………40

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) …………………………………...12

Chan v. Epley, No. 93-4263, 1994 U.S. Dist. LEXIS 10107, at 41 (E.D. Pa.
July 21, 1994) …………………………………………………………………………..33

Cohen v. Bd. of Trustees, 867 F.2d 1455, 1463 (3rd Cir. 1989) …………………………12

Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc., 94 F.2d 589, 595-96
(E.D. Pa. 1999) ………………………………………………………………………...31, 32

Cottman Trans. v. Melody, 851 F. Supp. 660 (E.D. Pa. 1994) …………………………37

Delahanty v. First Pennsylvania Bank, 464 A.2d 1243, 1258
(Pa. Super. Ct. 1983) …………………………………………………………………..45, 48

Drewitt v. Pratt, 888 F.2d 774, 778 (4th Cir. 1993) ……………………………………..12

Electron Energy Corp. v. Short, 597 A.2d 175 (Pa. Super. Ct. 1991),
aff'd without opinion, 618 A. 2d 395 (Pa. 1993) ………………………………………37

Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) …………………12

Fichera v. Gording, 227 A.2d 642, 643-44 (Pa. 1967) ………………………………35, 36

Gorwara v. AEL, 784 F. Supp. 239 (E.D. Pa. 1992) ……………………………………44

Hayes v. Hambruch, 841 F. Supp. 706, 708 (D. Md. 1994) ……………………………12

Keenheel v. Securities Comm'n, 579 A.2d 1358, 1361 (Pa. Commw. Ct. 1990) ……..31, 35, 36

McDermott v. Party City Corp., 11 F.Supp.2d 612, 626 N. 18 (E.D. Pa. 1998) ………41

National Fire Ins. Co. v. Fortune Conatr. Co., Inc., 320 F.3d 1260, 1276
(11th Cir. 2003) …………………………………………………………………………49

Prudential Ins. Co. of America v. Stella, 994 F. Supp. 318, 321-322
(E.D. Pa. 1998) …………………………………………………………………………37

RGI, Inc. v. Unified Indus., Inc., 963 F.2d 658, 661 (4th Cir. 1992) ……………………45

Scobell Inc. v. Schade, 688 A.2d 715, 719 (Pa. Super. 1997) …………………………..45

Sixsmith v. Martsolf, 196 A.2d 662, 663 (Pa. 1964) ……………………………………35, 36

Spang & Coe v. U.S. Steele Corp., 545 A.2d 861, 866 (Pa. 1988) ……………………..44, 45

Stone v. Liberty Mutual Ins. Co., 105 F.3d 188, 190 (4th Cir. 1997) …………………11

Stout v. Home Life Ins. Co., 651 F. Supp. 28, 31 (D. Md. 1986), aff'd,
818 F.2d 29 (4th Cir. 1987) ……………………………………………………………….    11

Sullivan v. Allegheny Ford Truck Sales, Inc., 423 A.2d 1292 (Pa. Super. 1980) …………...    34

Vrabel v. Scholler, 85 A.2d 858, 860 (Pa. 1952) ……………………………………………    34

Wolgin v. Smith, 1996 WL 355338 at *3 (E.D. Pa. 1996) …………………………………..    36

Wooldridge v. Exxon Corp., 473 A.2d 1254, 1257 (Conn. Super. Ct. 1984) ………………...    33


10A Wright, Miller and Kane, Federal Practice and Procedure § 2737,
at pp. 457-58 (1983) ……………………………………………………………………….    43

Black's Law Dictionary 1301 (6th ed. 1990) …………………………………………………    40

**MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS'**
**AMENDED COMPLAINT AND FOR SUMMARY JUDGMENT ON**
**COUNTS I, II AND IV OF COUNTERCLAIMANTS' COUNTERCLAIM OR,**
<u>**IN THE ALTERNATIVE, AN ORDER PURSUANT TO RULE 56(d)**</u>

Defendants, GTD Company, Inc., Harold Robinson and David Oechsle (collectively, the "Defendants"), by their undersigned counsel, hereby submit this Memorandum in Support of Defendants' Motion for Summary Judgment on Plaintiff's Amended Complaint and for Summary Judgment on Counts I, II and IV of Counterclaimants' Counterclaim or, in the alternative, for an Order pursuant to F.R. Civ. P. 56(d).

## I.    <u>INTRODUCTION</u>

This action arises from the sale in 1999 of the assets of a company owned by Defendants, Harold T. Robinson and David Oechsle, to Plaintiff, Oles Envelope, LLC, a subsidiary of Plaintiff, Oles Envelope Corporation (collectively, the "Plaintiffs"). In a bold attempt to avoid paying the bulk of the purchase price (almost all of which was deferred), Plaintiffs filed this action seeking rescission of several of the agreements entered into between the parties at the time of the closing of the sale, and damages for alleged breaches of contract and fiduciary duty by Defendants Robinson and Oechsle. Defendants filed a Counterclaim seeking damages for Plaintiffs' failure to pay the remainder of the purchase price and other breaches of contract.

It is important for the Court to recognize the gravamen and context of Plaintiffs' allegations and claims. Plaintiffs seek to be excused from their obligation to pay about three-quarters (3/4) of the uncontingent purchase price they agreed in 1999 to pay for RO Envelope's business (through the rescission claim) or, in the alternative, damages for an amount far in excess of the unpaid purchase price. To justify these extraordinary claims, Plaintiffs have suggested, quite literally, a litany of wrongdoing by Defendants – numbering 10 factual allegations in all – to support each of the 4 claims asserted in the

1

Amended Complaint.  Moreover, they then claim that this panoply of supposed misconduct caused the destruction of this business and the loss of what Plaintiffs say is the "equity value" that they "expected" to receive from the business if everything had turned out perfectly in accordance with Plaintiffs' admittedly "sketchy" pre-acquisition business projections and hopes.[1]

A careful analysis of the extensive record created with this Motion demonstrates that the claims regarding Defendants' wrongdoings are made out of whole cloth:  Plaintiffs have <u>no</u> <u>evidence</u> to support nearly all of these allegations.  Just as importantly, Plaintiffs are able to point to <u>no</u> <u>evidence</u> to support their fundamental theory that the Oles LLC business was destroyed because of anything Defendants did. Because of the dearth of evidence, Defendants request the Court to enter summary judgment on each of the legal claims, or, in the alternative, to determine pursuant to Rule 56(d) that 9 of the 10 factual underpinnings to Plaintiffs' claims are wholly unsupported and without substantial controversy.[2] Defendants also request that the Court determine that the Plaintiffs' claim for an award of their "expectation damages" is unsupported by any causation evidence, is wholly speculative, is not in legitimate controversy and, thus, is not recoverable.  This relief will greatly simplify this case for trial, extract from the case the many allegations which have not been and cannot be adequately supported by Plaintiffs, and place this litigation in a posture where settlement is possible.

## II.    BRIEF STATEMENT OF PROCEDURAL POSTURE

On May 10, 2002, Oles LLC filed a Complaint against Defendants in the Circuit Court for Baltimore City seeking rescission of the Asset Purchase Agreement, Employment Agreements and a

---

[1] Plaintiffs do not claim particularized or actual damages caused by each alleged wrong.  Instead, they claim as damages the entire value of what they expected to receive from the acquisition, as measured by a set of pre-acquisition projections and assumptions.  Plaintiffs' expert was asked to <u>assume</u> that the wrongs alleged in the Amended Complaint in fact occurred and that such wrongs caused the failure of the business.  In point of fact, as argued in Section IV.D.4 of this Memorandum, Plaintiffs have not and cannot establish a causal relationship between the wrongs alleged and the closure of the business, and their damage theory is fundamentally ungrounded and flawed.

[2] As detailed below, a factual dispute still exists with respect to the parties' respective claim and counterclaim (Count II) related to a few thousand dollars of expense account payments and reimbursements.

promissory note (each described below) and alleging claims for breach of contract and breach of fiduciary duty.  This action was removed by the Defendants to this Court on June 14, 2002.  On or about October 28, 2002, Plaintiffs filed a First Amended Complaint (the "Amended Complaint") adding Oles Envelope Corporation as a Co-Plaintiff and a single breach of contract claim by Oles Envelope Corporation against the Defendants.  On October 30, 2002, Defendants filed a four-count Counterclaim against Plaintiffs alleging damages for various breaches of contract.  On December 11, 2002, the Court filed a Memorandum and Order dismissing the Oles LLC's breach of fiduciary duty claim against Defendant, GTD Company, Inc.  Discovery has now been completed and the parties' respective claims are now ripe for dispositive motions.

## III.  STATEMENT OF UNDISPUTED FACTS

An overview of the parties and significant witnesses, the acquisition-related documents, and the significant events and timeline which occurred after acquisition is set forth here.  More particular, undisputed facts relating to the Plaintiffs' 10 specific factual allegations of Defendants' alleged wrongdoing are set forth in the Argument section below.

### A.    The Parties and Businesses at Issue.

Plaintiff, Oles Envelope, LLC (hereinafter "Oles LLC"), is a Maryland limited liability company, formed for the purpose of purchasing and owning the assets of the individual Defendants' former business, RO Envelope Co., Inc. [3]  Am. Compl., at ¶ 1.  Oles LLC is a wholly-owned subsidiary of Plaintiff, Oles Envelope Corporation ("OEC").  Id.  OEC is a Maryland corporation in the business of manufacturing and selling envelopes.  Id. at ¶ 2.  John R. ("Jay") Young ("Jay Young") is the President

---

[3] Oles LLC was originally incorporated as RO Envelope, LLC,  Am. Compl., at ¶ 1, and its name was not changed to Oles LLC by Plaintiffs until early 2002.  The "RO Envelope" name was used until approximately January 2002.  See Relevant portions of the Deposition of Vicki Young, attached hereto as **Exhibit 1** and incorporated herein by reference, at p. 60.  In order to avoid confusion in this Memorandum, "Oles LLC" generally will be used to describe the entity that purchased the assets of RO Envelope Co., Inc. on October 1, 1999 and ran the jet shop business out of the Exton, PA facility subsequent to that date.

and Chief Executive Officer of Plaintiffs.[4]  Mark Moderacki ("Moderacki") is the current Vice President

of Finance and Chief Financial Officer of OEC,[5] having joined OEC in approximately November 2000,

more than a year after the purchase.  Steve Stacharowski ("Stacharowski") was, until March 2003 when

his employment was terminated, the Vice President of Human Resources of OEC.[6]  Vicki Young

("Vicki Young") is the daughter of Jay Young.  She has held various positions within OEC and,

beginning on April 1, 2001, was promoted to Vice President and General Manager of Oles LLC with

management responsibility over that entity until it was shut down by Plaintiffs in July 2002.[7]

Defendants, Harold T. Robinson ("Robinson") (known as Robbie Robinson) and David Oechsle

("Oechsle"), are Pennsylvania residents.  Robinson and Oechsle are the former sole stockholders of RO

Envelope Co., Inc. ("RO Envelope"), a Pennsylvania corporation, which was, until the Purchase

Agreement was consummated, in the business of printing and selling envelopes out of a facility in

Exton, Pennsylvania (commonly referred to as a "jet printing" business or a "jet shop").  Am. Compl., at

¶¶ 3-6.  Defendant, GTD Co., Inc., is a Pennsylvania corporation owned by Robinson and Oechsle, and

is the successor-in-interest by name change to RO Envelope.  Id. at ¶ 3.  RO Express, Inc. ("RO

Express") is a now-closed freight or delivery business, which was owned and operated by Robinson and

Oechsle out of the Exton, PA facility until approximately February 2001, and thereafter out of a

different location through mid-2002.[8]  Subsequent to the acquisition and through 2000, RO Express

---

[4] See Relevant portions of the Deposition of Jay Young, attached hereto as **Exhibit 2** and incorporated herein by reference, at pp. 3-5.

[5] See Relevant portions of the Deposition of Mark Moderacki, attached hereto as **Exhibit 3** and incorporated herein by reference, at p. 9.

[6] See Relevant portions of the Deposition of Steve Stacharowski, attached hereto as **Exhibit 4** and incorporated herein by reference, at p. 4.

[7] Vicki Young Depo., Exh. 1, at pp. 31-33.

[8] See Relevant portions of the Deposition of Harold Robinson, attached hereto as **Exhibit 5** and incorporated herein by reference, at pp. 261-62 ,and relevant portions of Deposition of David Oechsle, attached hereto as **Exhibit 6**, at p. 227.

provided freight or delivery services to Oles LLC, which was its largest customer.  Oechsle depo., Exh. 6, at pp. 276-77.

      **B.**      **The Purchase Agreement and Related Agreements.**

On September 30, 1999, Plaintiff Oles LLC (through its predecessor, RO Envelope LLC) entered into an Asset Purchase Agreement (the "Purchase Agreement") with Defendants Robinson and Oechsle, and their company, RO Envelope.[9]  Am. Compl. at ¶ 11.  Under the Purchase Agreement, Plaintiffs agreed to purchase the assets and goodwill of RO Envelope for $2,000,000, plus the assumption of its debt.  Am. Compl. at ¶¶ 13, 14; Exhibit 7 at §1.04.  In accordance with the Purchase Agreement, a small portion of the purchase price ($175,000) was paid at closing to Defendants Robinson and Oechsle.  Id. at ¶ 15; Exhibit 7 at §1.05.  Oles LLC executed a Promissory Note in the amount of $1,825,000.00 in favor of RO Envelope, which provided for the payment to RO Envelope of the remainder of the purchase price, through five (5) annual payments, to be made to RO Envelope from 2000 through 2004.[10]  Am. Compl. at ¶ 19.  While it is undisputed that the parties discussed the possibility of an "earn-out" during the negotiations (*i.e.*, making part of the purchase price contingent or conditional on the business later achieving certain financial performance), see Jay Young depo., Exh. 2, at pp. 22-24, the possibility was rejected by Defendants.  Thus, the acquisition documents provide that the deferred purchase price was not contingent or conditional on any particular subsequent financial performance.  See Promissory Note, Exh. 8.

---

[9] A true and correct copy of the Purchase Agreement is attached as **Exhibit 7** and is incorporated herein by reference.

[10] A true and correct copy of the Promissory Note is attached as **Exhibit 8** and is incorporated herein by reference.  The Purchase Agreement and Promissory Note require the payment of the following sums on the indicated dates:
                      $200,000.00 – 10/1/2000
                      $200,000.00 – 10/1/2001
                      $400,000.00 – 10/1/2002
                      $500,000.00 – 10/1/2003
                      $525,000.00 – 10/1/2004.
The 2000 and 2001 payments were made by Oles LLC, but Mr. Robinson's portion of the 10/01/2001 payment was accelerated to June 2001 to correspond to his retirement.  Robinson Affidavit, attached hereto as **Exhibit 9**, ¶ 7.

Oles LLC also executed an Assumption Agreement at closing on October 1, 1999, by which it assumed and agreed to pay various debts, liabilities and obligations of RO Envelope.[11]  One of the listed assumed liabilities is the Equipment Finance Agreement with American Express Capital Finance L.L.C. previously entered into by RO Envelope to finance the purchase of certain main frame computer equipment.  See Exhibit 10, Schedule A, at paragraph 7.  There is no dispute that this debt was assumed. See Jay Young depo, Exh. 2 at pp. 74-76, and Moderacki depo, Exh. 3, at pp. 60-61.

In connection with the purchase of RO Envelope, Oles LLC's parent, Plaintiff OEC, executed a Guaranty Agreement in favor of Defendants in which OEC guaranteed the payment to Defendants of the deferred purchase price payable over the five (5) annual payments in the amount of $1,825,000.[12]

Defendants Robinson and Oechsle also executed individual Executive Employment Agreements (the "Employment Agreements").[13]     Am. Compl. at ¶¶ 22; Exh. 7 at § 4.01(a)(iii).  Pursuant to the Employment Agreements, Robinson was employed as the President of Oles LLC for a term of two (2) years and Oechsle was employed as Vice President of Oles LLC for a term of four (4) years, each effective as of October 1, 1999.  Am. Compl. at ¶ 23; Exh. 11 and 12 at ¶ 1.

### C.    Post-Closing Events and Chronology.

After the closing of the acquisition of Oles LLC on October 1, 1999, Robinson and Oechsle, acting as President and Vice President, respectively, continued to run what had previously been their business, operating as RO Envelope.  See Robinson depo., Exh. 5, at pp. 63-64.  They participated in regular meetings with the President and Chief Executive Officer of the company's new owner, Jay

---

[11] A true and correct copy of the Assumption Agreement is attached as **Exhibit 10** and is incorporated herein by reference.

[12] A true and correct copy of the Guaranty Agreement is attached as **Exhibit 11** and is incorporated herein by reference, at ¶ 1.

[13] True and correct copies of Robinson's and Oechsle's Employment Agreements are attached hereto as **Exhibits 12** and **13**, respectively, and are incorporated herein by reference.

Young, to review the financial results and other aspects of the company. See Jay Young depo., Exh. 2, at p. 84.

In the months after the purchase, in 2000, both OEC's President (Dennis Stewart) and its Chief Financial Officer (John Hutson) resigned. Jay Young depo. Exh. 2, at pp. 82-83. Both Mr. Stewart and Mr. Hutson had been heavily involved in the negotiations for the purchase of RO Envelope. Robinson depo., Exh. 5, at pp. 25-26.[14]

In January 2001, Oles LLC's and RO Express' bookkeeper, Joseph O'Brien, resigned suddenly, after which it was immediately discovered that he was embezzling funds from RO Envelope and RO Express. Oechsle depo., Exh. 6, at p. 136, Robinson depo., Exh. 5, at pp. 155-58. While the facts relating to the embezzlement scheme are set forth with more particularity below, in sum, O'Brien had separately opened up an unauthorized account in the name of RO Express and diverted checks made payable to RO Envelope into that account, as well as into an existing account for RO Express, and O'Brien ultimately pled guilty to a charge of criminal theft for these activities. All of this was done, indisputably, without the knowledge of either Robinson or Oechsle.[15]

On February 14, 2001, approximately one month after O'Brien resigned, Defendant Oechsle met with Stacharowski and Jay Young to discuss certain expenses Oechsle had submitted for payment or reimbursement over the prior seventeen (17) months since the acquisition, which Plaintiffs challenged as improper. Moderacki depo., Exh. 3 at p. 274; Stacharowski depo., Exh. 4, at p. 75; see Defendant David Oechsle Answers to Oles LLC's Interrogatories, attached hereto as **Exhibit 15**, at No. 3. The challenged expenses totaled in the aggregate $4,826.32, and Mr. Oechsle disputed Plaintiffs' claims that the expenses were not legitimately payable in many respects. Moderacki depo., Exh. 3 at p. 137, 145;

---

[14] See also Oechsle depo., Exh. 6, at p. 10; Jay Young depo., Exh. 2, at pp. 17, 21.

[15] See also Relevant portions of the Deposition of Joseph O'Brien, attached hereto as **Exhibit 14** and incorporated herein by reference, at pp. 179-189; 205, 212; see also Oechsle depo., Exh. 6, at p. 144-45. Facts relating to the GTD account are described below, at Section IV, C, 5.

Stacharowski depo., Exh. 4, at p. 80-81.[16]  About a week later on February 23, 2001, Oechsle resigned, at the request of Plaintiffs, as a result of the challenged expenses.

Jay Young placed his daughter, Vicki Young, in the position of Vice President and General Manager of Oles LLC, effective April 1, 2001, in advance of Mr. Robinson's impending retirement.  Jay Young depo., Exh. 2, at p. 186.  Ms. Young had never run a jet shop or printing business before, had never been a general manager of any company, and had no management experience with regard to running a print production shop.  Id., at pp. 297-298, 300.  Mr. Young also decided to accelerate Mr. Robinson's retirement date (which would have been September 30, 2001), by a few months such that Robinson would retire on June 30, 2001.  Id., at pp. 17, 187; Robinson depo., Exh. 5, at pp. 206-207.[17] Charlotte Robinson (Robbie Robinson's spouse), who performed various administrative functions for Oles LLC, including customer service, job entry and invoicing, retired from Oles LLC on June 1, 2001. Charlotte Robinson depo., Exh. 17, at pp. 6, 16. In addition, Kimberly Robinson (Robbie Robinson's daughter) resigned from Oles LLC in early September 2001.  Kimberly Robinson had been a salesperson with Oles LLC for 16 years, and was the leading salesperson at Oles, in charge of several of the company's largest customer relationships.  See Deposition of Kimberly Robinson, relevant portions of which are attached hereto as **Exhibit 19**, at p. 4; Robinson Affidavit, Exh. 9, at ¶ 11.  Thus, in the months leading up to September 2001, four long-time key employees (Mr. Robinson, Oechsle, Charlotte Robinson, and Kimberly Robinson), as well as the bookkeeper (Joseph O'Brien), had left Oles LLC.

With Kimberly Robinson's departure in September, only one salesperson was left in the operation, Al Applebaum (another salesperson had previously been fired by Oles LLC over Mr. Robinson's objection in March 2001 and not replaced).  Vicki Young depo. Exh. 1, at pp. 188-90, 231-

---

[16] A true and accurate copy of the list of challenged expenses is attached hereto as **Exhibit 16**, and is incorporated herein by reference (see portion of document under heading "Oechsle Expenses").

[17] See also relevant portions of the Deposition of Charlotte Robinson, Defendant Robinson's wife, attached hereto as **Exhibit 17** and incorporated herein by reference, at p. 91-92; and relevant portions of the Deposition of Linda Tipton, a long-time employee of Ro Envelope and Oles LLC, attached hereto as **Exhibit 18** and incorporated herein by reference, at p. 98.

33.  Al Applebaum was fired in January 2002 by Vicki Young for lack of productivity, which she testified had been a problem since the Fall of 2001.  Id.. pp. 331-32.  Oles LLC, by Vicki Young's own admission, did not have a single productive salesperson on site for at least five months after Kimberly Robinson's departure.[18]

After Mr. Robinson retired at the end of June 2001, Vicki Young was responsible for operating RO Envelope on a day-to-day basis, including, having "overall responsibility for all activities of Oles [LLC] including quoting, pricing, production, sales, customer relations, purchasing, warehousing and shipping."[19]  Ms. Young admitted that she had no experience in quoting, pricing, running a production operation, or running a jet shop.  Vicki Young depo., Exh. 4, at pp. 178-179.  Moreover, she had no experience in the purchasing, warehousing or the shipping aspects of an envelope production or printing business.  Id., at p. 181.  Ms. Young had always worked at OEC, the family business, except for brief stints as an evening receptionist and part-time faculty member at Villa Julie College.  Id., at pp.12-13.

Ms. Young presided as Vice President and General Manager of Oles LLC for approximately nine months from April 1, 2001 through December 2001, and continued as Vice President of Oles LLC until the business was shut down in July 2002.  Id., at p.31.  In December 2001, Oles LLC, through Vicki Young, hired Wendy Jones as General Manager of Oles LLC, and Vicki Young continued in her position as Vice President with management responsibility for Oles LLC.  Although the business was clearly in trouble, Ms. Young testified that Ms. Jones was hired because Ms. Young wanted to stop commuting and return home to Baltimore.  Vicki Young depo., Exh. 1, at pp. 309-10; 350.  After the hiring of Ms. Jones, Vicki Young significantly decreased her presence in the Exton facility.  Id. at p. 33,

---

[18] Another salesperson was hired in October 2001 and fired about a week later, Vicki Young depo., at pp. 190 (for reasons Ms. Young could not remember), and John Weghorst was hired in mid-November, but his subsequent sales performance was disappointing as well.  Id. at 335.

[19] See Oles LLC's Answers to Oechsle's Interrogatories, Answer to Interrogatory No. 4, attached hereto as **Exhibit 20**, and incorporated herein by reference; see also Vicki Young depo., Exh. 1, at p. 158-160; Jay Young depo., Exh. 2, at p. 317.

308; Deposition of Wendy Jones, relevant portions of which are attached hereto as **Exhibit 21**, at pp. 7-8, 11.  On April 10, 2002, Ms. Young prepared a performance evaluation of Ms. Jones.[20]  In the evaluation, Ms. Young states that "[a]t this point the major problem of the organization which has been causing the company to lose money is lack of sales volume."  Exh. 22, at p. 2.[21]

During the time that Ms. Young ran Oles LLC, sales decreased very significantly.  Vicki Young depo., at pp. 186-187.  Mr. Young admitted that Ms. Young was responsible for increasing the sales of Oles LLC and that, during her tenure at Oles LLC, sales in fact did not increase.  Jay Young depo., Exh. 2, at p. 301.  OEC's chief financial officer testified that, by 2002, Oles LLC's "profits had eroded because sales had eroded [and] [s]ales had decreased so greatly" and that "there was a fairly precipitous drop . . . [in sales in] the late summer, early fall of 2001."  Moderacki depo., Exh. 3, at p. 375.  In fact, Oles LLC's sales suffered a huge drop from September 2001 through the time the business was closed, representing a 56.2% decrease from the prior year when Robinson and Oechsle were still running the business.  Supplemental Expert Report of Stephen W. Oliner, attached hereto as **Exhibit 23** at p. 4.  The drop in sales volume began in the late summer of 2001, shortly after Robbie Robinson's retirement and upon Kimberly Robinson's resignation.  See Exh. 23, at Tab 1 (chart showing monthly sales for Oles LLC).  Vicki Young concedes that the reasons for the drop in sales included the recession in the national economy, the September 11 terrorist attacks, the anthrax scare, lack of any productive salespeople in the Exton operation (Applebaum and Weghorst), Kimberly Robinson's departure and taking of many of her customers to her new employer, and the failure to transition house accounts.  Vicki Young depo., at pp. 187, 190, 231-33, 331-35.

---

[20] A copy of the evaluation is attached hereto as **Exhibit 22** and is incorporated herein by reference.

[21] Ms. Young also states in the evaluation, which was provided to Ms. Jones, that "[w]e have an exciting future and I look forward to working with you to build this organization into a top notch jet shop…."  Id.  In point of fact, however, about nine or ten months prior to the actual closure of Oles LLC (i.e., September or October, 2001), OEC and Oles LLC's management had begun discussions about the shutdown of Oles LLC.  Moderacki depo., Exh. 3, at p. 374.

On or about July 22, 2002, over two months after Plaintiff Oles LLC filed its complaint in this action, and over a year after Robinson and seventeen months after Oechsle had left the company, Oles LLC ceased operations.  Mr. Young made the final decision to shut down operations in early July 2002. Vicki Young depo., Exh. 1,  at p. 313-14; Plaintiff OEC's Answers to Oechsle's Interrogatories, attached hereto as **Exhibit 24,** at No. 12; Jay Young depo., Exh. 2, at p. 387; Jones depo., Exh. 21, at p. 101; Moderacki depo., Exh. 3, at p. 372-73.  Plaintiffs concede that the reason the business was shut down was because "of its loss of customers, poor business environment and nonprofitable operations." OEC's Answers to Interrogatories, Exhibit 24, Answer No. 6; Jay Young depo., Exhibit 2, at pp. 386-390.

## IV.    ARGUMENT

### A.    Legal Standard.

Summary judgment is proper when the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). As this Court has explained:

> One of the purposes of Rule 56 is to require a plaintiff, in advance of trial and after a motion for summary judgment has been filed by a defendant and properly supported, to come forward with some minimal facts to show that the defendant may be liable under the claim alleged.  In the absence of such a minimal showing, a defendant should not be required to undergo the considerable expense of preparing for and participating in the trial of those issues addressed in a motion for summary judgment.

Stout v. Home Life Ins. Co., 651 F. Supp. 28, 31 (D. Md. 1986), aff'd, 818 F.2d 29 (4th Cir. 1987).  If there is no genuine dispute as to any material fact, the Court should grant summary judgment "to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition."  Id. at 31 (citing Bland v. Norfolk & Southern RR, 406 F.2d 863, 866 (4th Cir. 1969)).  A party cannot simply "create a genuine issue of material fact through mere speculation of the building of one inference upon the other."  Stone v. Liberty Mutual Ins. Co., 105 F.3d 188, 190

(4th Cir. 1997) (citing Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).  A fact is material only if it affects the outcome of the lawsuit under the governing substantive law.  Anderson v. Liberty Lobby, Inc., 447 U.S. 242, 248 (1986).  Factual disputes that are irrelevant or unnecessary will not be counted. Id.

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact.  Id. at 248-49.  The Supreme Court has held that trial courts should enter summary judgment "against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Drewitt v. Pratt, 999 F.2d 774, 778 (4th Cir. 1993).  Where the plaintiff fails to meet this burden, "a defendant should not be required to undergo the considerable expense of preparing for and participating in a trial." Hayes v. Hambruch, 841 F. Supp. 706, 708 (D. Md. 1994).  The Fourth Circuit has emphasized that trial judges have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial."  Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987); see also Hayes v. Hambruch, 841 F. Supp. 706, 708 (D. Md. 1994).

> **B.** **This Court Should Grant Summary Judgment or Relief Under Rule 56(d) on Specific Factual Allegations.**

Federal Rule of Civil Procedure 56(d) provides that the Court:

> by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted.  It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just.  Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

The purpose of Rule 56(d) is to enable "the Court to withdraw some issues from the case and to specify those facts that really cannot be controverted."  Cohen v. Bd. of Trustees, 867 F.2d 1455, 1463 (3rd Cir.

1989) (quoting 10A Wright, Miller and Kane, Federal Practice and Procedure § 2737, at pp. 457-58

(1983)).

C.    **Plaintiffs' Allegations of Defendants' Wrongdoing.**

The following is a discussion of all the major factual allegations that provide the underpinnings

for the four claims in the Amended Complaint.  After each allegation, Defendants have supplied the

Court with key evidence from Plaintiffs' depositions, discovery responses, documents and other

evidence, which prove that Plaintiffs' factual allegations (and claims arising from such allegations) have

no evidentiary support in the record, with the sole exception of a small dispute related to the expense

account allegations (item 3 below).

1.    **RO Express Expenses**.  Paragraph 31 of the Amended Complaint states that "Robinson

and Oechsle charged RO Express expenses to Oles LLC."  See also Am. Compl., at ¶¶ 46, 54, 63, and

74.  Plaintiffs have been able to identify only four expenses relating to RO Express about which they

complain, each for repairs allegedly to RO Express trucks or vans, totaling in the aggregate $1,463.39.

Oles has failed to produce any backup documentation related to two of these.  See Robinson Affidavit,

Exh. 9, ¶ 3; see also Oechsle Affidavit, attached hereto as **Exhibit 25**.  The two expense items for which

Oles LLC has any backup at all were reimbursed to Oles LLC in October 2001, and, as it turns out, in at

least one case Oles did not originally pay the expense.[22]  Messrs. Robinson and Oechsle deny that any

RO Express expenses which were paid by Oles LLC remain unpaid, and Oles LLC cannot prove

---

[22] The four items are credit card reimbursements for vehicle related service at Faulkner GMC, totaling in the aggregate $1,463.39.  See Document Bates No. H1112, attached hereto as **Exhibit 26** (Moderacki's list of disputed expenses) (under "Vehicle Repairs").  Oles LLC has failed to produce any backup documentation for the last two expenses of $287.66 and $744.41 and thus has no basis to claim that the services rendered were for a RO Express vehicle as opposed to one of the Oles LLC's vehicles, which was also serviced at Faulkner GMC.  Robinson Affidavit, ¶ 3.  The first two expenses, for $276.45 and $154.86, were paid back to Oles LLC by its unilateral reduction of the deferred purchase price payment in October 2001 to Oechsle.  Moderacki depo., at pp. 145-148; Robinson Affidavit, Exh. 9, ¶ 3.  Amazingly, the documents produced by Oles LLC establish that Oles LLC's repayment of itself for the second of these sums is improper.  Oles never paid the $154.86 expense in the first place.  See Robinson Affidavit, ¶ 3 and American Express bill and RO Envelope check, attached hereto as **Exhibit 27** (showing that $154.86 charge was deducted from total actually paid by Oles LLC).  Because Oles LLC paid itself for these items, no sums are owed to Oles LLC (and in fact it has been overpaid for at least one expense it did not pay in the first place).

otherwise.  See Robinson Affidavit, Exh. 9, ¶ 3; Oechsle Affidavit, Exh. 25, ¶ 3.  There is no factual basis for this claim, and this Court should grant judgment in favor of Defendants on the allegations made in paragraph 31 of the Complaint, or issue an order pursuant to Rule 56(d) that there is no controversy with respect to these allegations.

2.     **Time Spent on RO Express Business**.  Paragraph 32 of the Complaint baldly states that "Robinson and Oechsle also spent the majority of business hours operating RO Express, to the detriment of Oles LLC."  As a threshold matter, the Court should know that the existence of RO Express (a separate freight or delivery company owned by Robinson and Oechsle) was well known to Plaintiffs prior to the acquisition.  Indeed, Oles agreed as a part of the acquisition to utilize the services of RO Express for delivery of its printed products to customers for a 15-month period from the closing through December 31, 2000.[23]  These facts are not in dispute.  In addition, and with specific relevance to this particular factual allegation, Plaintiffs expressly permitted Messrs. Robinson and Oechsle, in their Employment Agreements, "to manage and operate RO Express, Inc. . . . so long as such activities do not unreasonably interfere with [their] duties under [the] Agreement."  Exhibits 12 and 13, at ¶ 7.2.

Defendants in reality spent very little time operating RO Express – only a few minutes a day and usually during their lunch hour or before their workday at Oles LLC began (the uncontroverted testimony was that Oechsle typically arrived at the office in the early morning hours).[24]  Oles LLC's receptionist and customer service representative, Linda Tipton, testified that the Nextel mobile phones Defendants used for RO Express did not ring often and that "the only time [Robinson and Oechsle] were to get calls [was] if a driver had a question or if there was another job coming up."[25]  She also testified

---

[23] See letter agreement dated September 30, 1999, attached hereto and incorporated herein as **Exhibit 28**.

[24] See Harold Robinson's Answers to Oles LLC's Interrogatories, attached hereto as **Exhibit 29**, at No. 6; Oechsle's Answer to Oles LLC's Interrogatory No. 4; Robinson Affidavit, Exh. 9, ¶ 4; Oechsle Affidavit, Exh. 25, ¶ 4.

[25] Tipton depo., Exh. 18, at p. 41.

that Oechsle only received about three to five calls a day and that Robinson "didn't get a whole lot of Ro Express calls." Id. The large majority of the calls that were received were very short in duration, and related to deliveries being made to Oles LLC customers. Robinson Affidavit, Exh. 9, ¶ 4; Oechsle Affidavit, Exh. 25, ¶ 4. Finally, Joseph O'Brien, a RO Express employee and Oles LLC bookkeeper, admitted that he personally "spent more time on RO Express business by far than either . . . Oechsle or . . . Robinson did." O'Brien depo., Exh. 14, at p. 184.

Importantly, none of the Plaintiffs' witnesses could quantify any specific or significant amount of time spent by Robinson or Oechsle in running RO Express during their workday at Oles LLC. Plaintiffs could not testify and cannot prove that the few calls Robinson or Oechsle received and activities witnessed by Plaintiffs when visiting occasionally Oles LLC were not, in fact, work done in connection with Oles LLC deliveries.[26] Moderacki depo., Ex. 3, at p. 394, 402; Stacharowski depo., Exh. 4, at p. 104-05; Jay Young depo., at p. 407. Finally, Plaintiffs admit that no one at Oles LLC or OEC ever notified or complained to Defendants that they were spending too much time operating RO Express in violation of their Employment Agreements. Moderacki depo., Exh. 3, at pp. 399, 405. Plaintiffs are simply unable to support the allegation that Defendants spent anything more than a minimal amount of time on RO Expense business or that the small amount of time they did devote to RO Express interfered with or caused a loss to the RO Envelope business. Therefore, this Court should grant summary judgment in favor of Defendants on the allegations made in paragraph 32 of the Complaint, or find pursuant to Rule 56(d) that this allegation is not in legitimate dispute.

3.    **Improper Personal Expense Reimbursements**. Paragraph 33 of the Amended Complaint alleges "Robinson and Oechsle charged numerous illegitimate personal expenses to Oles LLC and/or Oles Corporation." The record establishes that this claim, even viewed in the light most

favorable to Plaintiffs, is for a very small sum indeed, and cannot possibly support Plaintiffs' theory that the business was destroyed as a result. There is a factual dispute with respect to this claim, as well as Oechsle's related counterclaim (Count II) – each for only a few thousand dollars – and the Court should issue a Rule 56(d) order limiting the dispute accordingly.

As an initial matter, and Plaintiffs' allegations notwithstanding, Plaintiffs have failed to produce any evidence that Robinson was involved in submitting any improper personal expense charges to Oles LLC. Stacharowski depo., Exh. 4, at pp. 85-86; Moderacki depo., Exh. , 3, at p. 259; see also Robinson Affidavit, Exh. 9. ¶ 5 (denying the allegation). This Court should grant judgment in favor of Defendants with respect to the allegations made in paragraph 33 of the Amended Complaint as they relate to Robinson.

With respect to alleged improper expenses by Oechsle, the great bulk of the so-called expense account "abuses" as alleged by Plaintiffs were, in fact, legitimate and consistent with Oles' internal protocols, and the few that remain were not wrongfully submitted by Oechsle, but were in the nature of charges placed on the wrong credit card, all of which was explained to Plaintiffs during a meeting in February 2001. Oles LLC already unilaterally (but in many respects incorrectly) repaid itself for the expenses it at the time claimed were improper. At most, what is legitimately left is a dispute over about $2,100.00 in expenses Plaintiffs still claim. Plaintiffs cannot credibly assert that this *de minimis* dispute brought on the failure of the Oles LLC business (causing about $4,000,000.00 in "lost expectation" damages), and a Rule 56(d) finding to this effect is appropriate. The facts of record are described below.

In late January, Moderacki and Vicki Young began reviewing the documentation relating to Oechsle's expenses paid over the prior seventeen (17) months. Moderacki depo., Exh. 3, at pp. 221-22.

---

[26] Oles LLC was RO Express' largest customer. Thus, fielding calls from customers regarding, for instance, the timing of the delivery or readying the envelopes on pallets to be delivered, was very much part of Oles LLC's business. Robinson Affidavit, ¶ 4.

Moderacki then prepared a memorandum containing a list of expenses, totaling $4,826.32, to be discussed with Oechsle on February 14, 2001.[27]  Id. at p. 253-54.  Mr. Stacharowski and Mr. Young confronted Oechsle on February 14 with the challenged expenses.  Id., at pp. 225-26; Stacharowski depo., Exh. 4, at p. 60.  It is undisputed that this was the first time, in the seventeen (17) months since the acquisition, that Oles had questioned any expenses submitted for payment or reimbursement by Oechsle (or Robinson), notwithstanding the fact that documentation relating to such payments (i.e., credit card statements, keyed to accounting categories) were submitted to Oles in Baltimore for approval and payment.  Robinson Affidavit, Exh. 9, ¶ 5.  Oechsle explained why many of the challenged expenses were legitimate, but after that meeting, OEC nonetheless made the decision to ask for Oechsle's resignation.  Moderacki depo., Exh. 3, at p. 261, Vicki Young depo. Exh. 1, at p. 122.  It did so one week later on February 23, 2001, and Oechsle resigned from Oles LLC after agreeing to severance terms with Stacharowski.  Stacharowski depo., Exh. 4, at p. 75; Oles LLC's Answer to Oechsle Interrogatory No. 3, Exh. 20; Moderacki depo., Exh. 3, at p. 274.

Plaintiffs (as it appears now from the documents produced, in some cases improperly) reimbursed themselves for the expense amounts they believed were improperly submitted to the company by Oechsle.  Moderacki unilaterally made the decision to deduct the full amount of the challenged expenses ($4,826.32), without regard to Oechsle's explanations, from Oechsle's next deferred purchase price payment, made in October 2001.  Moderacki depo., Exh. 3, at pp. 146-47; Stacharowski depo., Exh. 4, at pp. 80-81.[28]

---

[27] A copy of the February 14, 2001 memorandum is attached hereto as **Exhibit 30** and incorporated herein by reference.  The memorandum is entitled "D.O. Expense Points" – the "D.O." meaning Defendant Oechsle.  Moderacki depo., Exh. 3, at p. 256.

[28] Stacharowski prepared a letter to Oechsle outlining the terms of his resignation.  Stacharowski depo., Exh. 4, at pp. 77-78.  See Letter dated March 1, 2001 to Oechsle from Stacharowski, attached hereto as **Exhibit 31**, and incorporated herein by reference.  Stacharowski claims that, at the February 23, 2001 meeting, Oechsle also agreed to repay Oles LLC for the disputed expenses.  Id., at pp. 78-79.  Stacharowski could not explain why that key point was not outlined in, and instead is conspicuously absent from, his March 1, 2001 letter, which otherwise memorializes the terms of the resignation.  Id., at p. 79.  In contrast, Oechsle maintains that he was promised at the meeting that, if he resigned, the company would not pursue him

After the Amended Complaint was filed, Plaintiffs compiled what purports to be an expanded list of disputed expenses.[29]  The aggregate disputed amount on this new list totals $20,016.43 (and indisputably <u>includes</u> the $4,826.32 in expenses identified when Oechsle was asked to resign, and already repaid through Oles LLC's reduction of the subsequent purchase price payment).  <u>Compare</u> Exhibit 26 <u>with</u> Exhibit 16.  Almost the entire additional amount on the list is made up of company automobile and meal expenses, the legitimacy of which cannot be disputed on this record.

With respect to the charges for gas used for the company car and other automobile operation, maintenance and service related expenses, and remarkably, Stacharowski and Vicki Young each testified during their depositions that the cost of gas and all other automobile-related expenses are legitimate, reimbursable expenses under Oles' policies.  Each of them, in fact, obtain reimbursement for such expenses for their company cars.  <u>See</u> Stacharowski depo., Exh. 4, at pp. 58, 71; Vicki Young depo., Exh. 1, at pp. 104-06.

The expanded list includes allegedly improper meal expenses in the amount of $8,300, incurred over 17 months.  <u>See</u> Exhibit 26.  Like the automobile expenses, most of these expenses (because they were charged to the company credit card) were reviewed, approved and paid by Oles in Baltimore over the 17-month period without so much as a comment.  Moreover, the uncontroverted record establishes that business meetings for Oles LLC (on a revolving basis, with office personnel, production personnel, sales staff, and with customers) were almost always held over lunch on a virtual daily basis and that Oechsle almost always paid the bill, and internal business meetings during other working hours were

---

for any disputed expenses.  Oechsle depo., Exh. 6, at pp. 321-22, and Mr. Robinson has the same recollection.  Robinson Affidavit, Exh. 9, ¶ 6.  As the record demonstrates different recollections with regard to what, exactly, was agreed to at the February 23, 2001 meeting, there is a material fact dispute with respect to Oles LLC's remaining claim for a few thousand dollars in expenses and Mr. Oechsle's counterclaim (Count II) which seeks recovery of Oles LLC's unilateral repayment of $4,826.32, which prevents the entry of summary judgment on those particular counts.

[29] Oechsle Interrogatory No. 7 to Oles LLC requests a detailed description of all information related to the alleged expense account abuses.  Exh. 19.  The response states, in part, that "[i]nappropriate charges were identified (OLES H 00112)."  <u>See</u> Exhibit 26.

kept to a minimum. Oechsle depo., Exh. 25, at pp. 290-92. This is consistent with Defendants' practice with respect to meetings prior to the acquisition, and it is uncontroverted that they were told by the President of Oles LLC (Dennis Stewart) around the time of the acquisition that they should continue to use company credit cards in the same manner as they had prior to the closing. Id., at p. 315.

Oechsle also explained most of the remaining expenses on the expanded list in his deposition, and Plaintiffs have no basis to contest the legitimacy of these reimbursements (even though they paid themselves back for many of them). Oechsle depo., Exh. 25, at pp. 296-312.[30] Thus, there is or can be no good faith dispute over at least $13,000.00 of $20,016.43 listed on Plaintiffs' post-litigation list, and of the $6,916.43 which remains, Plaintiffs admit that $4,826.32 was repaid in 2001. Plaintiffs' claim then, at most, amounts to one for about $2,100.00.

The bottom line with respect to Oles' "expense abuse" allegations is that Plaintiffs repaid themselves at the time of Mr. Oechsle's resignation for all of those expenses they believed at the time were incorrectly submitted (but which Oechsle correctly disputed in many cases). Plaintiffs do not seriously contest and, in any event, cannot prove that the *de minimis* remaining dispute over about $2,100.00 of expenses, or even any of the expense account activity in the aggregate amount of about $20,000.00, caused the demise of Oles LLC and the loss of millions in "lost expectation" damages. The Court should grant summary judgment or Rule 56(d) relief on this claim, limiting Plaintiffs to, at most, recovery for the actual expenses which Plaintiffs can contest and prove were not proper for reimbursement (and which Plaintiffs have not already been paid).

4.    **Use of "RO Envelope" Name**. Paragraph 34 of the Complaint alleges that "Robinson and Oechsle intentionally continued to use the 'RO' name to confuse Oles LLC's customers and banks."

---

[30] The additional charges explained by Oechsle, and unanswered by Plaintiffs, include: (i) an Enterprise rental car expense incurred while his company car was being repaired; (ii) car washes for the company car; (iii) cell phone charges for the company cell phones; (iv) AOL charges for an Oles employee, who took an online computer course relating to his employment; and (v) Land's End shirts with Oles LLC's logo for the office personnel. Oechsle depo., Exh. 25, at pp. 296-300.

There has been no testimony in this case and no evidence presented by Plaintiffs to support these allegations, or to tie them to any unreimbursed loss suffered by Plaintiffs.[31] "RO Envelope, LLC" was the original name of the entity that Plaintiffs formed to purchase Defendants' company. Am. Compl. at ¶ 1. The name was one of the assets of Defendants which Oles LLC purchased in the Purchase Agreement. Defendants obviously did not choose this name; Plaintiffs did. Robinson Affidavit, Exh. 9, at ¶ 8. Indeed, the RO Envelope name was used as a trade name for well over two years after the purchase of the company. The name was changed only in January 2002 to Oles Envelope, LLC, long after Robinson and Oechsle had left the company. Jones depo., Exh. 21, at p.57; Vicki Young depo., Exh. 1, at p. 60. At no time did the Plaintiffs ever request Defendants to change the name of the company or the name under which it traded. See Robinson Affidavit, Exh. 9, ¶ 8; Oechsle Affidavit, Exh. 25, ¶ 10.[32]

In sum, Plaintiffs can point to no contractual obligation on the part of Defendants to use a name other than RO (because there is none), and they never asked Defendants to do so. The allegation that Robinson and Oechsle intentionally used the "RO" name to confuse customers and banks is not supported by any evidence in the record. Nor is there any evidence which proves or which even gives rise to an inference that Oles LLC was caused to be shut down by the continued use of the RO name. This Court should find that there is no factual basis to support the allegations made in paragraph 34 of the Amended Complaint and enter summary judgment accordingly, or order pursuant to Rule 56(d) that these allegations are not in legitimate dispute.

---

[31] The exact basis for this claim remains obscure to Defendants. If Plaintiffs rely upon O'Brien's embezzlement scheme to support this allegation, then Defendants refer the Court to their response to those allegations (item 5 infra).

[32] In actuality, the uncontroverted record establishes that Oles LLC actually benefited from the use of the "RO" name, as it allowed Oles LLC to purchase envelopes from major, direct competitors of OEC at prices that were often better than those of OEC. Wendy Jones, General Manager of Oles LLC from December 2001 to July 2002, testified that after the name was changed Oles LLC lost the ability to make critical envelope stock purchases from those competitors and to use information regarding the pricing set by those competitors to keep Oles LLC's prices in line with the market. Jones depo., Exh. 21, at pp. 57-59.

5.     **The Embezzlement Scheme**.  Paragraph 35 alleges that "Robinson and Oechsle commenced an embezzlement scheme, under which they took checks payable to Oles LLC and deposited them into accounts for RO Express and GTD, the successor to RO."  Plaintiffs have failed to provide concrete evidence of Defendants' culpable participation in the embezzlement scheme which Oles LLC's and RO Express' bookkeeper, Joseph O'Brien, admits he perpetrated and for which he pled guilty to criminal theft.  While the facts relating to the scheme are somewhat intricate, no <u>material</u> facts relating to it are in dispute.  Because of the prominence of this scheme in Plaintiffs' allegations, a summary of the facts related to O'Brien's conduct (and what Plaintiffs allege to be Mr. Oechsle's related actions) is warranted.

As a threshold matter, Plaintiffs again have developed no evidence that Robinson was involved in the improper deposit of any checks into any accounts.  There is no evidence that Robinson knew where any of the diverted checks were deposited and there is no evidence that he was involved in making the decision to deposit the checks into the GTD account, upon which Plaintiffs primarily focus. Oechsle depo., Exh. 6, at p. 36; Robinson depo., Exh. 5, at pp. 104-05; Robinson Affidavit, Exh. 9, at ¶ 7.  Moreover, his writing or endorsement does not appear on any of the checks.  The claim as to him is meritless, and the inclusion of Robinson in these allegations is reckless.

O'Brien's embezzlement was achieved through four (4) separate means:

(i)     the opening of an unauthorized account at First Union Bank in the name of RO Express (through O'Brien falsely pretending to be an officer of RO Express), and the subsequent deposit of checks made payable to RO Envelope into that account and the use of those diverted funds for purposes related to RO Express (and O'Brien's personal purposes).  O'Brien depo., Exh. 14, at pp. 178-185;

(ii)     the diversion of checks made payable to RO Envelope into the RO Express operating account (a legitimate account).  Id., at pp. 205-222;

(iii)     the deposit of checks payable to RO Envelope into an account in the name of GTD, Inc., which was the successor by name change to RO Envelope Co., Inc. (the operating company of the Defendants before the acquisition).  Id., at pp. 160-

178.  The GTD, Inc. account was intended in part to be (and in fact was) the account into which Oles LLC paid the deferred purchase price payments that were made; and

(iv)     the theft of money from both RO Envelope and RO Express by cashing checks made payable to "Cash" drawn on these accounts and using the resulting funds for purposes other than petty cash, and by drawing checks on the bogus account to pay personal debts of O'Brien's.  Id., at pp. 188-192, 221.

It cannot be contested in good faith that O'Brien acted <u>completely</u> <u>alone</u> with respect to the thefts which occurred as described in items (i), (ii) and (iv) above.  The record clearly establishes that the Defendants were as much duped in these schemes as were the Plaintiffs, and that, in fact, Mr. O'Brien acted to hide his activities from Defendants.  <u>See</u> O'Brien depo., Exh. 14, at pp. 178-185, 205-222, 190-192, and 221; Robinson Affidavit, Exh. 9, at ¶ 7; Oechsle Affidavit, Exh. 25, at ¶ 5.  As explained by Mr. O'Brien in deposition, he committed these thefts because Messrs. Robinson and Oechsle left the management of RO Express almost exclusively to him and he acted to keep the business from failing and to avoid the loss of the jobs of its employees.  O'Brien depo., Exh. 14, at pp. 183-185.  Completely unbeknownst to Defendants, O'Brien in 2000 had failed to pay withholding taxes for RO Express to the IRS, and when the IRS sought payment, O'Brien surreptitiously met with the IRS agent – pretending to be the owner of RO Express – and negotiated the payment of the withholding taxes.  Id. at p. 198-204.  At this time, O'Brien opened the First Union "bogus" account under false pretenses, and used a post office address to ensure that the statements would not come to the Exton facility.  Id., at pp. 179-180.  O'Brien diverted money into the bogus account in an effort to pay this tax liability to the IRS, to cover up the existence of the tax liability from Messrs. Oechsle and Robertson and to pay some of its other expenses.  Id., at pp. 185 and 202-204.  Of the forty-one (41) checks, totaling approximately $175,000.00, which Oles alleges were diverted in total from RO Envelope, these two schemes involving the bogus account and the legitimate RO Express account (i.e., items (i) and (ii)) involve checks totaling

$104,181.20. Plaintiffs have no credible basis to continue to allege that either Robinson or Oechsle had any knowledge or involvement with, or culpability for, O'Brien's embezzlement in this regard.

The facts relating to the GTD account fall into a somewhat different category. O'Brien, who the bookkeeper for both RO Envelope and RO Express, kept the accounts receivable information for both companies in his office and tracked such information against payments made by customers. Id., at pp. 167-169. O'Brien on occasion reported to Oechsle that some of the checks payable to RO Envelope received from customers actually contained sums owed to both RO Envelope (for printing services or envelopes) and RO Express (for delivery or freight). Id. at 161-171. An operating protocol developed to deposit these checks into the GTD account and, where appropriate because a portion of the check was in payment of a RO Envelope invoice, a separate check would immediately be written back to RO Envelope and forwarded to Baltimore for deposit into RO Envelope's operating account. Id., at pp. 171-175. There were occasions when O'Brien indicated that the entire face amount of a check was actually payable to RO Express, and no contemporaneous check back to RO Envelope was written. Id., at pp. 176-177. Oechsle freely admitted that he authorized the deposit of certain RO Envelope checks into the GTD bank account, and the evidence and testimony clearly shows that these deposits were made only because O'Brien told Oechsle, based on what Oechsle understood to be his review of the open accounts receivable information, that the checks contained a portion of funds which were payable to RO Express for freight charges. Id., at pp. 169-174, 177; Oechsle depo., Exh. 6, at pp. 37-39. Other employees in the office overheard O'Brien tell Oechsle that some checks made payable to Oles LLC contained a portion for payment of RO Express freight charges, and O'Brien admits that he would inform Oechsle when he believed freight was on a check. O'Brien depo., Exh. 14, at pp. 167-171. Robinson depo., Exh. 5, at pp. 102-103; Tipton depo, Exh., 18, at p. 44. Based upon this information, Oechsle understood that these checks would be deposited into the GTD account in order to "split" the check.

Oechsle depo., Exh. 6, at p. 35. A check would then be drawn back to RO Envelope for the balance. Id., at p. 54; O'Brien depo., Exh. 14, at pp. 170-174; see also Oechsle Affidavit, Exh. 25, at ¶ 5. O'Brien actually made virtually all of the deposits. Id., at pp. 161-162.

In all, there are twenty-three (23) checks payable to RO Envelope which were deposited into the GTD account (in the aggregate face amount of $71,310.01), and of this sum, $54,305.37 was paid over immediately to RO Envelope, through checks drawn back to RO Envelope and sent to Oles in Baltimore for deposit, based on the "split" that O'Brien calculated. Oechsle Affidavit, Exh. 25, at ¶ 5. Thus, a net amount of $17,004.64 remained in GTD's account for anything more than a momentary period of time.

Mr. Oechsle understood this protocol as a simple way to "split" checks which O'Brien told him reflected sums both to RO Envelope and RO Express. At no time did he intend to take RO Envelope's money for RO Express improperly, as would seem to be obvious from the fact that he caused the bulk of the money represented by these "split" checks to be paid over to RO Envelope immediately (for what he thought was the portion owed to RO Envelope). Id. The situation is confused by the fact that, in some instances, Mr. O'Brien (by his own admission) told Mr. Oechsle that the entire check represented payment to RO Express, when, in some cases at least, this was not correct. O'Brien depo., at pp. 176-178.

Importantly, Plaintiffs admittedly have been fully paid back for their loss in the embezzlement scheme of O'Brien, whether related to deposits into the bogus account, the RO Express account, or the GTD account. Both RO Envelope and RO Express (and, through it, Messrs. Robinson and Oechsle) lost money at the hands of O'Brien and were victims of his actions.[33] Yet, upon discovery of the scheme, Defendants believed it appropriate to pay back Oles for what Moderacki, Oles' CFO, determined to be

---

[33] O'Brien specifically testified that he stole some of the money obtained by cashing checks payable to cash and that he wrote several checks to his personal creditors, and Defendants clearly suffered these losses. O'Brien depo., Exh. 14, at pp. 188, 190, and 221. In addition, since Defendants repaid Oles LLC in 2001 for its losses as a result of O'Brien's embezzlement, it is Robinson and Oechsle who have suffered the ultimate loss in the amount of about $70,000, not including whatever cash O'Brien stole. Robinson Affidavit, Exh. 9, at ¶ 7; Oechsle Affidavit, Exh. 25, at ¶ 6.

its loss, since of the money was diverted by O'Brien into RO Express' accounts (bogus and legitimate) and some money remained in the GTD account.  Robinson Affidavit, Exh. 9, at ¶ 7; Oechsle Affidavit, Exh. 25, at  ¶¶ 5-6.  Oles LLC was repaid in 2001 through an agreed-upon reduction in the deferred purchase price payments made in June and October 2001 to Robinson and Oechsle, and paid a further $16,000.00, subsequently.  Id.  Thus, Plaintiffs have no remaining actual losses for which they have yet to be compensated in connection with any of O'Brien's activities.  Id.

Plaintiffs take these facts and contort them into something which is barely recognizable.  First, they blur O'Brien's admittedly criminal conduct with Oechsle's activities on the GTD account, and attempt to paint them with the same brush.  The record simply does not support the conclusion that Oechsle engaged in intentionally wrongful conduct on the GTD account.

Second, Plaintiffs attempt to lump Oechsle and Robinson together, when the record is devoid of any support that Robinson even knew of the deposits into the GTD account, no less caused or participated in the deposits.

Third, Plaintiffs apparently aver – with no factual support whatsoever – that Oles LLC (even though it was repaid) was mortally wounded by Oechsle's alleged misconduct, such that it had to close its doors some seventeen (17) months later, during most of which time Plaintiffs themselves ran the business.  Plaintiffs concede and the factual record is clear that the business was closed because of a large decrease in sales volume in late 2001 and first six months of 2002.  Yet, they are unable to point to even one customer which left RO Envelope or one sale which was lost because of anything related to O'Brien's activities.  Robinson Affidavit, Exh. 9, at ¶ 10; Oechsle Affidavit, Exh. 25, at ¶ 9.  Nor do Plaintiffs have any evidence that the temporary, undetected loss over time of the funds diverted by O'Brien caused the downfall of the RO Envelope business much later.  Moreover, the record establishes that the deprivation of these monies for a business of this size is not material to the business, and did not

lead to its failure, and this opinion is uncontroverted.  See Oliner Supplemental Report, Exh. 23, at pp. 8 and 11.  While Oles may have felt violated by its incorrect perception that Oechsle's involvement with the GTD account was wrongful, its position in this litigation that RO Envelope was destroyed by O'Brien's embezzlement scheme or anything that Oechsle did is feigned and the stuff of fairy tales.

Because there is no competent evidence of an embezzlement scheme created by Defendants, this Court should grant summary judgment or a Rule 56(d) determination in favor of the Defendants on this claim.  In the alternative, Robinson seeks summary judgment or an order on the allegation that he was involved in any aspect of the embezzlement scheme.  Moreover, since it is undisputed that the Oles LLC has been paid back for the full amount of the funds embezzled through O'Brien's activities, Plaintiffs have no unrecovered losses to recoup and cannot prove that the even total amount of diversions caused by O'Brien were material to its financial health.  The embezzlement remains utterly unconnected to the Plaintiffs' closure of Oles LLC almost a year and a half later.

For all of these reasons, summary judgment or a Rule 56(d) order is appropriate on the claims as they relate to the embezzlement scheme.

6.    **Destruction of Company Records**.  Paragraph 36 states "upon information and belief, in order to conceal the fraudulent scheme, Robinson and Oechsle altered and destroyed company records.  Their activities included erasing invoices from the computer system and/or issuing false credit memos for legitimate invoices."  All of Plaintiffs' witnesses admitted that they have no direct evidence to support the allegation that either Robinson or Oechsle are responsible for any missing or deleted records or false credit memos.  Nor can Plaintiffs prove that any missing records relate to any effort to hide any transaction, or relate in any way to any loss suffered by Oles LLC.  Stacharowski depo., Exh. 4, at pp. 72-74; Jay Young depo., Exh. 2, at p. 271; Vicki Young depo., Exh. 1, at p. 330; Moderacki depo., Exh.

26

3, at pp. 86, 89-90; 97-98.[34]  Robinson and Oechsle flatly deny the allegations, as does Tipton.

Robinson Affidavit, Exh. 9, at ¶ 12; Oechsle Affidavit, Exh. 25, at ¶ 7; Tipton depo., Exh. 18, at pp. 64-

65, 134-35.  Therefore, this Court should grant judgment in favor of Defendants or issue a Rule 56(d)

order with respect to the allegations made in paragraph 36 of the Complaint

       7.    **Diversion of Customers to Rite Envelope**.  Paragraph 39 states "that after July 2001,

Robinson and Oechsle embarked upon a scheme to entice customers away from Oles LLC to a major

competitor, Rite Envelope."  This allegation (and the related ones addressed in items 8 and 9 below) are

key to the Amended Complaint because they are the <u>only</u> allegations that tie directly to the reason the

company failed:  a large decrease in sales volume.  Again, there is no evidence (either in deposition

testimony or in any documentary evidence that has been produced in this case) that either Robinson or

Oechsle diverted any customers away from Oles LLC to Rite Envelope.  Mr. Young and Vicki Young

admitted that they had no evidence of such a scheme.  Jay Young depo., Exh. 2, at pp. 274-278; Vicki

Young depo., Exh. 1, at pp. 339-40.  Plaintiffs have been unable to identify even one customer or one

sale that was diverted, and there are none.  Robinson Affidavit, Exh. 9, at ¶ 10.  Rite Envelope's

President, Harold Newman, testified that no such diversion of customers to his company by either

Robinson or Oechsle ever occurred.  <u>See</u> Deposition of Harold Newman, attached hereto as **Exhibit 32**,

at pp. 37, 48-49.  Defendants deny that any diversions took place.  Robinson Affidavit, Exh. 9, ¶ 10;

Oechsle Affidavit, Exh. 25, ¶ 9.

       There being a complete void of any factual support for this claim, this Court should grant

judgment in favor of Defendants on the allegations made in paragraph 39 of the Complaint, or order that

this issue is not in dispute pursuant to Rule 56(d).

---

[34] The evidence relating to deletion of invoices from the computer system establishes that it was Mr. Moderacki himself who deleted invoices, even though he has accused Defendants (under oath) of having done so.  <u>See</u> Tipton depo., Exh. 18, at pp. 65-66, 73-76.

8.    **Kimberly Robinson's Employment With Rite Envelope**.  Paragraph 42 states "that upon information and belief, Robinson assisted his daughter in obtaining employment with Rite Envelope."  Plaintiffs once again have generated <u>no</u> evidence to support this allegation.  There is no documentary or testimonial evidence from Plaintiffs' witnesses or any other person that Robinson helped his daughter get a job at Rite Envelope.  Kimberly Robinson had approximately sixteen years of sales experience and was RO Envelope's most productive salesperson when she resigned from Oles, LLC in September 2001.  Robinson Affidavit, Exh. 9, at ¶11.  Kimberly Robinson depo., Exh. 19, at pp. 5-6, 43.  Rite Envelope's President, Harold Newman, personally hired Ms. Robinson at a time when his company had been advertising for a sales representative and he had heard that she was interviewing with one of his competitors.  Newman depo., Exh., 32, at p. 20.  He called her at home and solicited her employment.  <u>Id.</u>, at pp. 19 and 22.  He testified that he did not receive any contact from Mr. Robinson with regard to hiring Kimberly  Robinson.  <u>Id.</u> at p. 37.  Robinson and his daughter also flatly denied the allegation.  Kimberly Robinson depo., Exh. 19, at p. 79; Robinson depo., Exh. 5, at pp. 313-315; Robinson Affidavit, Exh. 9, ¶ 10.  The allegation is devoid of any truth, and this Court should determine that there is no dispute of fact with respect to this claim of wrongdoing.

9.    **Enticement of Customers to Rite Envelope**.  Paragraph 43 states "that upon information and belief, Robinson assisted his daughter in enticing Oles LLC customers to do business with Rite Envelope."  Plaintiffs have testified that they have no evidence in support of this allegation. Jay Young depo., Exh. 2, at pp. 277-78; Vicki Young depo., Exh. 1, at pp. 339-40.  Mr. Newman testified that Mr. Robinson never referred business to Rite, never engaged in any kind of customer relation activity with Rite, and that Kimberly Robinson never engaged Mr. Robinson on her behalf to convince customers to do business with Rite.  Newman depo., Exh. 32, at p. 49.  Robinson testified that he had no contact with Oles, LLC customers after he retired.  Robinson depo., Exh. 5, at p. 317;

Robinson Affidavit, at ¶ 10. There is, quite simply, a complete failure to proof to support this allegation. In the absence of such proof, there is no triable issue, and the Court should grant judgment in favor of Defendants or a Rule 56(d) order on the allegations made in paragraph 43 of the Amended Complaint.

10. **Lack of Good Faith Efforts**. Finally, an additional factual allegation, although not specifically alleged in the factual portion of the Plaintiffs' Amended Complaint, is included in each count thereof. The allegation is that Defendants "fail[ed] to work in good faith to increase the sales of Oles, LLC, fail[ed] in good faith to execute the business plan for Oles, LLC, and work[ed] against Oles, LLC and in their own individual interests." See Am. Compl. at ¶¶ 49, 56, 64 and 75. This factual allegation is also without merit.

To a large degree, these allegations are generic, at best, and rely for their specifics on the other more particular factual allegations in their Amended Complaint (all of which are addressed above). As each of the preceding specific allegations lack grounding in reality, these generic allegations are similarly insufficient and unsupported.

A brief specific reply to these allegations is nonetheless appropriate. First, as an initial matter, the claim is legally insufficient. Plaintiffs fail to point the Court to any contractual or other legal obligation on the part of Defendants which required them to "increase the sales of Oles LLC" or to "execute the business plan" (which, as noted below, the record establishes did not even exist). There are no such obligations, and Jay Young concedes that the Purchase Agreement contains no standards or benchmarks for performance (or for payment of the purchase price). See Jay Young depo., Exh. 2, at pp. 63, 67. Plaintiffs are forced instead to retreat to vague claims that Defendants, in essence, failed to work hard enough or effectively enough to achieve unspecified goals. These vague claims lack a legal basis, and are insufficient as a matter of law.

Second, the evidence is uniformly in contradiction to these allegations.  The record, in multiple places, establishes that Messrs. Robinson and Oechsle worked very hard, and very long days (on the order of 10 to 12 hours a day), to make the business grow and succeed.  Oechsle Affidavit, Exh. 25, at ¶ 4; Charlotte Robinson depo., Exh. 17, at pp. 76-77; O'Brien depo., Exh. 14, at pp. 244-246.  Indeed, the evidence is uncontroverted that they worked longer days at Oles LLC <u>after</u> the acquisition than before. O'Brien depo., Exh. 14, at pp. 244-246.  Plaintiffs do not and cannot controvert the facts that establish Robinson's and Oechsle's work ethic.

Moreover, and remarkably, Plaintiffs did not even have a written "business plan" for Oles LLC. Robinson Affidavit, Exh. 9, at ¶ 13.[35]  Plaintiffs produced a set of pre-closing projections dated in April and September 1999, before the closing, which Plaintiffs prepared and which no one testified were actually given to Defendants.  Jay Young depo., Exh. 2, at pp. 240-255.  Defendants never saw these projections (or the assumptions built into them) until after this litigation was commenced.  Robinson Affidavit, Exh. 9, at ¶ 13; Oechsle Affidavit, Exh. 25, ¶ 8.  Without a business plan that Defendants somehow contractually bound themselves to (indeed, without a business plan <u>at all</u>), this allegation fails.

Finally, the undisputed record establishes (to the extent it matters, since no contractual obligation bound them to make the company perform at any particular level) that Defendants' substantial efforts paid off.  Sales at Oles LLC in fact increased 3.5% in the first year and 20.9% in the second year after the purchase.  <u>See</u> Exhibit 23, at p. 4.  This was at a time (as conceded by Oles) when the U.S. economy as a whole, and the paper and printing industries in particular, were in recession.  It was also at a time when Oles Envelope (<i>i.</i>e., the Baltimore operation), in stark contrast, suffered a drop in revenue of 14.6% and suffered an operating loss of almost $900,000.00 (for FYE 9/01).  <u>Id.</u>  Robinson and Oechsle make no apologies for the performance of Oles LLC from October 1, 1999 to June 2001 and stand by

---

[35] The only document Plaintiffs could point to that could even be suggested to be a business plan was a preliminary draft of financial projections created in February 2000.  Robinson Affidavit, Exh. 9, ¶ 13.

the financial results.  Their failure to meet some unspecified and undisclosed higher standard which may have been in Jay Young's mind simply gives rise to no cognizable claim.

     **D.**     **This Court Should Grant Summary Judgment in Favor of Defendants on All Legal Claims in the Complaint.**

          **1.**     **Plaintiff, Oles LLC's Claim for Rescission of the Agreements Must Fail.**

Count I of the Complaint seeks rescission of the Purchase Agreement, Employment Agreements and the promissory note.  The Count also seeks restitutionary damages in the amount of $600,000.  The Court will note that Plaintiffs do <u>not</u> claim that there were any misrepresentations in the representations, warranties or covenants made in connection with the acquisition, and do not assert that they were fraudulently induced into consummating the transaction.  Rather, Plaintiffs complain solely about what they allege is post-closing conduct.

Pursuant to their terms, Pennsylvania law governs the construction, validity and interpretation of the Purchase Agreement and Employment Agreements.  Exhibit 7 at § 7.12; Exhibits 12 and 13 at § 13.5.  Thus, it is appropriate to analyze claims for rescission of these agreements under the law of that jurisdiction.

Under Pennsylvania law, rescission is described as,

> the unmaking of a contract, and is not merely a termination of the rights and obligations of the parties towards each other, but is an abrogation of all rights and responsibilities of the parties towards each other from the inception of the contract.  The purpose of an equitable rescission is to return the parties as nearly as possible to their original positions with regard to the subject matter of the contract.  ***One who wishes to rescind a contract must restore or tender a return of the property or security, which was the subject matter of the contract***.

<u>Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc.</u>, 94 F. Supp.2d 589, 595-96 (E.D. Pa. 1999) (emphasis supplied) (quoting <u>Keenheel v. Securities Comm'n</u>, 579 A.2d 1358, 1361 (Pa. Commw. Ct. 1990)).  "[U]nlike a breach of contract seeking money damages, rescission comes in to play only when a

party is attacking the validity of the agreement, that is, challenging whether there was ever a meeting of the minds.  Rescission is a remedy in equity to void a contract *ab initio* and to return the parties to their positions prior to the execution of the writing or to do so to the extent possible."  <u>Coram Healthcare Corp.</u>, 94 F. Supp. 2d at 596.  Rescission is "appropriate only under *extraordinary circumstances* when the complaining party has suffered a *breach of such a fundamental and material nature* that it *affects the very essence of the contract* and serves to defeat the object of the parties."  <u>Castle v. Cohen</u>, 676 F. Supp. 620, 627 (E.D. Pa. 1987) (emphasis supplied).

Based on the applicable law, Oles LLC's claim for rescission must fail for three (3) reasons.  First, the extraordinary remedy of rescission is not appropriate here because the evidence in the record demonstrates that any breach by Defendants, which without dispute concerned matters that occurred after the sale of RO Envelope, was not so fundamental and material in nature that it affected the very essence of the contract.  Second, Oles LLC cannot return the parties to their original positions.  Third, Oles LLC's failure to timely notify Defendants of its intent to rescind the agreements at issue establishes its affirmance of those agreements.

**(a)    There is no evidence of any extraordinary circumstances to warrant rescission.**

The evidence of record does not support Plaintiffs' claim for rescission because, as set forth in detail above, Plaintiffs are unable to establish any significant breaches of duty.  Moreover, the alleged breaches, even if true, are not "so fundamental and material" that they affect the very essence of the contract.  The factual allegations that form the basis for Plaintiffs' claim for rescission are the allegations that Defendants improperly charged personal expenses and RO Express expenses to Plaintiffs; embezzled funds from Plaintiffs; diverted customers away from Plaintiffs; and failed in good faith to increase sales and execute the business plan of Plaintiffs.  As addressed *supra*, there is no evidence in the record to support the allegation that Defendants diverted any customers away from

32

Plaintiffs. There is also a lack of any evidence that Defendants breached duties owed to Plaintiffs by failing to increase sales and to execute a business plan of Plaintiffs. In any event, with respect to the these particular claims, Plaintiffs are not legally entitled to "obtain rescission to relieve [themselves] of a bargain 'freely negotiated, which has proved less attractive than was hoped.'" Chan v. Epley, No. 93-4263, 1994 U.S. Dist. LEXIS 10107, at 41 (E.D. Pa. July 21, 1994) (citing Wooldridge v. Exxon Corp., 473 A.2d 1254, 1257 (Conn. Super. Ct. 1984) ("mistakes in predicting the future . . . cannot form the basis for rescinding a contract")).

As for the remaining claims of breach, even if the allegations were true, they do not warrant the extraordinary remedy of rescission. With respect to the allegations relating to the alleged improper expenses, there is no evidence whatsoever in the record that Mr. Robinson improperly charged any expenses to Plaintiffs. The only issue of fact relating to expenses not already reimbursed is whether Oechsle improperly charged about $2,100.00 in expenses to Plaintiffs. However, even assuming that Oechsle breached some agreement with Plaintiffs by improperly charging $2,100 in expenses to Plaintiffs (or, for that matter, even the entire $20,000.00 of expenses they have identified), such alleged breach, as a matter of law, is not so fundamental and material that it warrants the extraordinary remedy of rescission of the acquisition and all its related agreements. To argue that an acquisition of a business should be rescinded because of alleged expense account improprieties over the year and a half following the deal borders on the absurd.

Similarly, the claim that Defendants breached the agreements when they allegedly embezzled funds from Plaintiffs is insufficient to warrant rescission of the Purchase Agreement. As addressed above, Defendants had no involvement in O'Brien's embezzlement scheme and, thus, the embezzlement scheme cannot form the basis for any breach by Defendants of any of the agreements. At most, there is a dispute of fact as to whether Oechsle participated in one component of Mr. O'Brien's multifaceted

scheme when he in good faith authorized the deposit of certain checks payable to RO Envelope into the GTD account. Even if one were to assume that Oechsle's actions were accompanied by wrongful intent (a conclusion Defendants vigorously contest and submit is not possible on this record), the net amount improperly diverted from Plaintiffs as a result of that component of Mr. O'Brien's embezzlement scheme is $17,004.64. Importantly, the uncontroverted evidence establishes that Plaintiffs have been fully reimbursed for all losses suffered as a result of the entire embezzlement scheme by Mr. O'Brien, including this small component. As a result, the breach even if true would not warrant the extraordinary remedy of rescission as there is no evidence that any loss sustained by Plaintiffs deprived them of the benefit of their bargain or defeated the object of the agreements.

### (b)     Plaintiffs Have Nothing to Return to Defendants.

Although the Amended Complaint, filed in October 2002, boldly states that Plaintiffs "stand ready and willing to tender the business back to the Defendants", (Am. Compl., at ¶ 51), Oles LLC has admitted that its operations were shut down and the business closed three (3) months earlier in July 2002. Vicki Young depo., Exh. 1, at p. 314. This was after Plaintiffs were in sole control of the company for more than twelve (12) months, during which time the business was destroyed (and in ultimate control as its sole shareholder for twenty-two (22) months). The egg cannot be unscrambled: Plaintiffs will never be in a position to return the business they purchased from Defendants nearly four (4) years ago.[36] Therefore, there is no possible way that both parties could be restored to the status quo ante and rescission is not an available remedy. See Vrabel v. Scholler, 85 A.2d 858, 860 (Pa. 1952); Sullivan v. Allegheny Ford Truck Sales, Inc., 423 A.2d 1292 (Pa. Super. 1980).

---

[36] Oles LLC also seeks rescission of the Employment Agreements. They are similarly incapable of giving back to Robinson and Oechsle the time and effort put into the business pursuant to those Agreements over the course of seventeen (17) months and twenty-one (21) months, respectively.

**(c)    Plaintiff Waived its Right to Rescind by Failing to Promptly Notify Defendants of its Intention to Rescind the Agreements and Tender the Benefits Back to Defendants.**

A party must pursue rescission of an agreement in a timely manner, or rescission is waived and the contract is affirmed.  Fichera v. Gording, 227 A.2d 642, 643-44 (Pa. 1967); Keenheel, 579 A.2d at 1361; Sixsmith v. Martsolf, 196 A.2d 662, 663 (Pa. 1964).  The law requires that,

> when a party discovers facts which warrants rescission of his contract, it is his duty to act promptly, and, in case he elects to rescind, notify the other party without delay, or within a reasonable time.  If possible the rescission should be made while the parties can still be restored to their original positions.  Failure to rescind within a reasonable time is evidence, and may be conclusive evidence, of an election to affirm the contract.

Fichera, 227 A.2d at 643-44.

There is no dispute that all contracts at issue were executed on or about September 30, 1999.  As evidenced by the Amended Complaint, the foundation of Plaintiffs' claims is the alleged defalcations by Robinson and Oechsle occurred after the closing of the sale of RO Envelope.  Id. at ¶¶ 29-43.  It is clear from the evidence presented during discovery that Plaintiffs were fully aware of all of the allegations as alleged in the Amended Complaint as early as February 2001.

OEC's Chief Financial Officer, Mark Moderacki, was placed in charge of the investigations surrounding the alleged expense account issues and the alleged embezzlement scheme in January 2001.  Jay Young depo., Exh. 2, at pp. 224, 267.  He traveled to Oles LLC and took possession of the expense account records on January 18, 2001.  See Exhibit 20, Oles LLC's Answer to Oechsle Interrogatory No. 7; Moderacki depo., Exh. 3, at p. 207.  Moderacki admitted preparing the memorandum dated February 14, 2001 (Exhibit 30), which deals with Plaintiffs' investigation of certain disputed company expenses submitted to Oles LLC by Oechsle.  Moderacki depo., Exh. 3, at pp. 253-54.  Moderacki testified that he prepared the memorandum in late January or early February 2001 for a meeting with Oechsle.  Id. at pp. 254-55.  Thus, as of January 2001 Plaintiffs believed (albeit incorrectly) that Oechsle

was involved in the alleged expense account abuse. Moderacki depo., Exh. 3, at p. 259. This same memorandum also specifically references the alleged embezzlement scheme.[37] OEC's Vice President of Human Resources also testified to the preparation of notes that go along with Moderacki's memorandum, which demonstrate that Plaintiffs were aware (again, albeit incorrectly) in February 2001 of the alleged embezzlement scheme through the diversion of company checks.[38]

Although Plaintiffs plainly knew as early in February 2001 about the two major issues alleged in their Amended Complaint which form the basis for their claim for rescission – expense account abuses and embezzlement – it was not until May 3, 2002 that Plaintiff (by letter from counsel to Defendants' Pennsylvania counsel) demanded rescission of the Purchase Agreement and offered to tender the assets of the business back to the Defendants.[39] Two and one-half (2-1/2) years had passed since the parties executed the Purchase Agreement and over 15 months had passed between Plaintiffs' discovery of their purported claims against Defendants and Plaintiffs' tender. "In order to obtain a rescission, the party must act promptly upon discovery of the fraud to restore or tender any benefit received or the right to rescind is waived." Wolgin v. Smith, 1996 WL 355338 at *3 (E.D. Pa. 1996) (citing Sixsmith, 196 A.2d at 663 and Keenheel, 579 A.2d at 1361). Based upon the evidence presented and pursuant to the law of Pennsylvania, Plaintiff's claim for rescission is legally untimely and their delay acts as an affirmation of the contracts. Sixsmith, 196 A.2d at 663 (an action intended to effect rescission instituted 25 months after the sale was consummated is legally too late); Fichera, 227 A.2d at 643-44 (failure to rescind

---

[37] For example, the memorandum contains two numbered points which read, "6. GTD deposit of RO Envelope customer checks" and "7. RO Express deposit of RO Envelope customer checks." See Exhibit 30. At deposition, Moderacki testified that "at the time we had the expense issues and if you look at the bottom of the page we also had the check issues with GTD and RO Express to the degree that we knew in February of 2001." Moderacki depo., Exh. 3, at p. 257.

[38] See Notes (Oles B00006), attached hereto as **Exhibit 33** and incorporated herein by reference; Stacharowski depo., Exh. 4, at pp. 60-61, 72-73. Stacharowski's notes contain the following phrases:
   "Dave's established MO: (i) diverting checks to GTD; (ii) diverting new RO Express Acct; and (iii) RO Envelope diverts check to cover personal expenses."

[39] See May 3, 2002 letter, attached hereto as **Exhibit 34** and incorporated herein by reference.

within a reasonable time is evidence, and may be conclusive evidence, of an election to affirm the contract).

For all three of the reasons described above, Defendants are entitled to summary judgment on Plaintiffs', Oles LLC's claim for rescission in Count I of the Amended Complaint.

### 2.    Defendants Did Not Breach Any Agreements With Plaintiffs.

In the Amended Complaint, Plaintiffs each allege breach of contract claims.  Am. Compl. at ¶¶ 53-69.  The counts allege identical facts, but reach slightly different conclusions in order to quantify damages.[40]

As noted, by their express terms, the contracts at issue are governed by the law of Pennsylvania law.  In order to sustain a claim for breach of contract under Pennsylvania law, Plaintiffs must show four (4) elements:  (1) the existence of a contract to which the Plaintiff and Defendant are parties; (2) the essential terms of that contract; (3) a breach of duty imposed by the contract; and (4) damages to the Plaintiff as a result of the breach.  Prudential Ins. Co. of America v. Stella, 994 F. Supp. 318, 321-322 (E.D. Pa. 1998) (citing Electron Energy Corp. v. Short, 597 A.2d 175 (Pa. Super. Ct. 1991)), aff'd without opinion, 618 A. 2d 395 (Pa. 1993); Cottman Transmission Systems. v. Melody, 851 F. Supp. 660 (E.D. Pa. 1994).

The parties do not dispute the existence or authenticity of the Purchase Agreement and Employment Agreements, as well as all other documents signed at the closing of the acquisition. However, Plaintiffs have not shown, and indeed cannot prove, how any of the factual allegations that form the basis for the breach of contact claims constitute a breach of any duties to Plaintiffs imposed under any of these Agreements.

---

[40] Oles LLC alleges that "as a result of Oechsle and Robinson's material breaches of the Purchase Agreement and Employment Agreements, Oles, LLC has been deprived of the benefit of its bargain and has suffered damages in the amount of $2,100,000.00."  Am. Compl. at ¶ 60.  OEC states that "as a result of Oechsle and Robinson's material breaches of the Purchase Agreement and Employment Agreement, OEC has been deprived of the benefit of Oles LLC's bargain and has suffered damages in the amount of $1,800,000.00."  Id. at ¶ 69.

The factual basis for both of Plaintiffs' breach of contract claims is the same, and relate to the litany of alleged wrongs (as discussed in detail above).  Boiled down to their essence, and as described in the pleading, they are:  (1) the charging of personal expenses and expenses of RO Express to Plaintiffs; (2) the embezzlement of funds from Plaintiffs; (3) the diversion of customers from Plaintiffs; and (4) the allegation that Defendants "fail[ed] to work in good faith to increase the sales of Oles, LLC, fail[ed] to execute in good faith the business plan for Oles, LLC, and by working against Oles, LLC and in their own individual interest."  Am. Compl. at ¶¶ 56, 64.  As previously outlined in detail, these factual allegations are not supported by the record in this case, and there remains but a minor dispute over about $2,100.00 of Oechsle's personal expenses (and Oechsle's related counterclaim (Count II)).

Section 7 of Robinson's and Oechsle's respective Employment Agreements expressly set forth the duties assumed by each of them in connection with their employment with Oles LLC.  Those duties were:

(1)     to perform such duties as are incident and customary to their respective positions;
(2)     to devote their full business time and attention to the performance of their jobs; provided, however, that they were permitted to manage and operate RO Express;
(3)     to notify the Company of any illness or absence from work, or any intended significant change in circumstances; and
(4)     to serve in any additional positions with the Company as required by the Company.

See Exhibits 12 and 13, at Section 7.  Plaintiffs have not specifically or expressly alleged that Defendants breached any of these enumerated contractual duties.  Rather, Plaintiffs generally allege that Defendants breached their respective employment agreements by charging personal expenses and expenses of RO Express to Plaintiffs, by embezzling funds from Plaintiffs, by diverting customers from Plaintiffs, and by failing to work in good faith to increase the sales of Oles, LLC and to execute in good faith the business plan for Oles, LLC.  At best, the alleged breaches that form the basis for Plaintiffs' claim (but which are not supported by the record) may fall under the contractual duty "to perform such duties as are incident and customary to their respective positions."  Id.  In essence, however, Plaintiffs

are alleging nothing other than that Defendants breached their fiduciary duty of loyalty to Oles LLC.

Regardless of the label, the result is the same.  The factual allegations are unsupported, and Defendants

are entitled to summary judgment.

Putting aside the issue of whether Defendants breached any implied fiduciary duty or other

express duty under the Employment Agreements, the allegations nevertheless cannot form the basis for a

breach of the Purchase Agreement.  Both breach of contract counts contain the allegation that:

> under Section 6.01 of the Asset Agreement, Robinson and Oechsle are obligated
> to indemnify Oles, LLC and Oles Corporation, as an affiliate of Oles, LLC, for
> any breaches of any representation, warranty or covenant made by them and/or
> RO [Envelope] in the Asset Purchase Agreement or in any exhibit delivered to
> Oles, LLC in connection with the Asset Agreement.  The Employment
> Agreements were exhibits delivered to Oles, LLC in connection with the Asset
> Agreement.

Am. Compl. at ¶¶ 58-59.  Plaintiffs do not allege that Defendants breached any specific provisions of the

Purchase Agreement.  Rather, what Plaintiffs apparently suggest is that Defendants breached their

Employment Agreements, which breaches amount to a breach of the representations, and covenants

warranties section of the Purchase Agreement, triggering the indemnity provision of the Purchase

Agreement.  This claim fails for several reasons.

A reading of the Purchase Agreement clearly demonstrates that the "representations, warranties

and/or covenants" made by the Defendants in the Purchase Agreement (for which indemnity protection

is provided in Section 6.01) were <u>only</u> those made at the time of and as of the sale.  Article 4 of the

Asset Agreement entitled, "Closing Conditions" contains the following provision:

> (k)     <u>Representations and Warranties</u>.  All of the representations and
> warranties of Seller [Ro Envelope] and Guarantors [Robinson and Oechsle]
> contained in this Agreement shall be true and correct in all material respects
> <u>as of the Closing Date</u>.

Id. § 4.01(k), at p. 17.  The representations, warranties and covenants made in the Agreement by the

sellers are set forth in §§ 2.01 through 2.26.  Section 2.26 is titled the "Effective Date of Warranties,

Representations and Covenants."  It provides:

> Each warranty, representation, and covenant set forth in this Article 2 shall be
> deemed to be made on and as of and speak on and as of the date hereof and as
> of the Closing (except as otherwise specifically provided herein).   The
> representations and warranties contained in this Article 2 shall not be affected
> or deemed waived by reason of the fact that Purchaser and/or its
> representatives knew or should have known that any such representation or
> warranty is or might be inaccurate in any respect.

Thus, the "representations, warranties and covenants" (as that term is used in the indemnity § 6.01, upon

which Plaintiffs reply to create a breach of the Purchase Agreement out of a breach of a duty under the

Employment Agreements) are specifically and expressly limited to those matters represented <u>on</u> and <u>as</u>

<u>of</u> the date of the closing.[41]

The Purchase Agreement, in this respect, is perfectly consistent with the case law.

Representations and warranties made as part of a sales contract are statements "made by a contracting

party . . . before or at the time of making the contract, in regard to some *past or existing* fact,

circumstance, or state of fact pertinent to the contract, which is influential in bringing about the

agreement."  <u>Caudill Seed and Warehouse Co., Inc. v. Prophet 21, Inc.</u>, 126 F. Supp.2d 937, 938 (E.D.

Pa. 2001) (quoting Black's Law Dictionary 1301 (6th ed. 1990)).  The Amended Complaint contains no

allegations about pre-closing matters.  Rather, Plaintiffs clearly contend that allegedly improper conduct

---

[41] Section 6.01 of the Asset Agreement reads as follows:
> Seller and Guarantors, jointly and severally, shall indemnify, save and keep Purchaser, and its
> respective successors and assigns, stockholders, directors, officers, affiliates, representatives and
> employees . . . forever harmless against and from all liability, demands, claims actions or causes of
> action, assessments, losses, penalties, costs, damages or expenses, including reasonable attorneys and
> expert witness fees . . . sustained or incurred by any of the foregoing persons as a result of or arising
> out of or by virtue of (i) the breach of any representation, warranty or covenant made by Guarantors
> and/or Seller herein or in any certificate, exhibit or schedule delivered to Purchaser in connection
> herewith, or (ii) any debt, liability or obligation of Seller (whether known or unknown, absolute or
> contingent) not expressly assumed by Purchaser under the Assumption Agreement.

Exh. 7, at § 6.01(a), at p. 21.

occurring <u>after</u> the acquisition (and in almost all respects, well after) can somehow trigger the indemnity provisions in the Purchase Agreement relating to the representations, warranties and covenants made at the time of the sale.  Because the alleged breaches of Robinson and Oechsle's Employment Agreements occurred after the closing of the sale of RO Envelope to Oles LLC, the indemnification provision in the Purchase Agreement is not simply triggered.  <u>Id.</u>

For all of these reasons, Defendants are entitled to judgment as a matter of law on Plaintiffs' breach of contract claims based on the Employment Agreements, with the sole exception of Plaintiffs' claims against Oechsle relating to any expenses they can prove were improper and which have not already been reimbursed, and Defendants are entitled to summary judgment on the claims based upon the Purchase Agreement.[42]

### 3.    Defendants Did Not Breach any Fiduciary Duties to Oles, LLC.

Count IV of the Amended Complaint alleges that Defendants breached a fiduciary duty of loyalty owed to Oles, LLC.  Am. Compl. at ¶¶ 71-72.  Oles, LLC alleges the same multiplicity of alleged wrongdoing to support this claim, Am. Compl. at ¶¶ 73-77, and that it suffered damages in the amount of $2,100,000.00 as a result.

In Pennsylvania, the elements in a claim for breach of fiduciary duty are:

1.   that Defendant acted negligently or intentionally failed to act in good faith and solely for the benefit of the Plaintiff in all matters for which he or she was employed;

2.   that the Plaintiff suffered injuries; and

3.   that the agent's failure to act solely for the Plaintiff's benefit… was a real factor in bringing about Plaintiff's injuries.

<u>McDermott v. Party City Corp.</u>, 11 F.Supp.2d 612, 626 n. 18 (E.D. Pa. 1998).

---

[42] As noted above, the expense account issues (in particular, Plaintiffs' unilateral repayment of the expenses in 2001), is also the subject of Count II of Oechsle's Counterclaim.

Robinson and Oechsle agree that they owed a duty of loyalty to Oles, LLC during their tenure as President and Vice President, respectively.  Robinson depo., Exh. 5, at p. 17; Oechsle depo., Exh. 6, at pp. 15-16.  Based on the failure of evidence to support virtually all of its factual allegations, Oles LLC cannot prove that either Robinson or Oechsle failed to act in good faith and solely for the benefit of their employer or that it has any unrecovered losses flowing from its allegations.  In any event, as addressed in Section D.4 below, there is a complete lack of evidence in the record that any such breaches by Defendants (even if they are assumed) caused the demise of Oles LLC and damages to Oles LLC in the amount of $2,100.00.00.

(i)        Personal expenses charged by Defendants

In Count IV of the Amended Complaint, Oles, LLC first alleges that Robinson and Oechsle breached their fiduciary duties by "charging Oles, LLC and/or OEC for personal expenses."  However, as previously discussed in detail, with regard to Robinson, the evidence is non-existent.  With regard to Oechsle, while it is disputed that Oechsle intentionally charged Oles, LLC for certain personal expenses via the use of his company's credit card, there is no dispute that Plaintiffs deducted the sum of $4,826.32, the amount that Oles LLC had originally disputed, from Mr. Oechsle's October 2001 purchase price payment.  Moderacki depo., Exh. 3, at p. 282.

In addition, Plaintiffs have, since the filing of the Amended Complaint, produced a list of about $20,000.00 worth of expenses that they consider to represent expense account abuses.  That document incorporates the $4,826.32 worth of charges that Oles LLC repaid itself, and also includes, as items, automobile-related expenses and meal expenses which Oles LLC has no basis to dispute as legitimate.  As explained *supra* at IV, C, 3, the great majority of the disputed expenses are, indeed, reimbursable and there is no good faith dispute with respect to approximately $18,000.00.  Oles LLC's claim, at best,

amounts to about $2,100.00 in disputed expenses.  This is not an appropriate subject of a breach of fiduciary claim.

(ii)    Charged RO Express Expenses to Defendants

Plaintiff Oles LLC next alleges that Robinson and Oechsle breached their fiduciary duties by charging Plaintiffs for the expenses of RO Express.  Again, as previously discussed *supra* at IV, C, 1, this dispute boils down to one expense for $276.46, which Plaintiff concedes it paid itself back in October 2001.  There is no remaining dispute.

(iii)   Failure to increase sales and execute business plan

As addressed above at IV, C, 10, the record is clear and undisputed that Robinson and Oechsle worked very hard for Oles LLC after the acquisition, and Plaintiffs have failed to raise a question of fact on this point.  Plaintiffs cannot even produce a formal or written "business plan" for Oles LLC, no less any agreement by Defendants that they would cause the company to perform financially at any particular levels.  Moreover, Defendants' expert report shows that Oles LLC sales actually increased during the time that Defendants were running the company after the sale, in stark contrast to OEC's performance over similar periods.  There is no factual basis for this claim.

(iv)    Embezzled funds.

As previously discussed at IV, C, 5, there is no evidence that Robinson embezzled funds from Plaintiffs, and the evidence relating to the GTD account as it relates to Oechsle is insufficient to establish misconduct.  In any event, there is no dispute that Plaintiffs have already been reimbursed the entire amount diverted from Plaintiffs through O'Brien's embezzlement, and there is no unrecovered loss about which Oles LLC can complain.

(v)    Customers diverted to Rite Envelope

This is a claim which, as previously discussed at IV, C, 7-9, also lacks any merit.  None of the Plaintiff's witnesses could point to one customer or sale lost because of the actions of Robinson or Oechsle.  Indeed, the President of Rite Envelope plainly denied that Robinson or Oechsle diverted customers to his company.  Rather the testimony and evidence show that Kimberly Robinson, Oles LLC's top performing salesperson, resigned and took with her a significant amount of sales, as was within her right to do.  It is undisputed that she had no non-competition agreement with Oles, LLC or OEC (in fact none of the sales personnel at either Oles LLC or OEC did either) and, therefore, was under no prohibition from taking Oles LLC customers with her to her new employer.  Defendants undertook no actions to divert any customers or business away from Oles LLC or to assist Kimberly Robinson in obtaining her new position with Rite Envelope, and Plaintiffs offer no proof otherwise.  Jay Young depo., Exh. 2, at pp. 274-278; Vicki Young depo., Exh. 1, at pp. 339-41.

Oles LLC's claim for breach of fiduciary duty is simply unsupported by the record, and summary judgment is appropriate.

> **4.    Plaintiffs cannot prove "loss of expectation" damages for the alleged breaches of contract under Pennsylvania law.**

Even if the unsupported factual allegations were true, there is absolutely no evidence that such alleged actions (or inactions) by Defendants caused the demise of Oles LLC or that they resulted in the loss alleged by Plaintiffs.  At most, Plaintiffs would be entitled to whatever <u>direct</u> damages that could be proved were proximately caused by Defendants' conduct.

Under Pennsylvania law, in an action for breach of contract the Plaintiff has the burden of proving damages resulting from the breach by "clear evidence."  <u>Spang & Coe v. U.S. Steele Corp.</u>, 545 A.2d 861, 866 (Pa. 1988); <u>Gorwara v. AEL</u>, 784 F. Supp. 239 (E.D. Pa. 1992).  A party must be able to prove that the damages for breach of contract were the "*certain result* of the Defendant's conduct."

Spang, 545 A.2d at 866 (emphasis added).  Damages in the form of lost profits are recoverable under contract or tort only if "(1) there is evidence to establish them with reasonable certainty, [and] (2) there is evidence to show that they were the proximate consequence of the wrong; and in the contract actions, that they were reasonably foreseeable."  Delahanty v. First Pennsylvania Bank, 464 A.2d 1243, 1258 (Pa. Super. Ct. 1983).  The term "reasonable certainty" embraces, at a minimum, a rough calculation that is not "too speculative, vague or contingent" upon some unknown factor.  Atacs Corp. v. Trans World Communications, Inc., 155 F.3d 659, 669 (3rd Cir. 1998).  "A mere possibility that the plaintiff might have made a profit if the defendant had kept his contract will not justify damages based on the assumption that the profit would have been made."  Scobell Inc. v. Schade, 688 A.2d 715, 719 (Pa. Super. 1997).  When a plaintiff fails to proffer sufficient evidence of damages and, therefore, fails to create an issue of material fact with respect to damages, the Court may grant summary judgment in favor of the moving party on the plaintiff's claim for damages.  See, e.g., RGI, Inc. v. Unified Indus., Inc., 963 F.2d 658, 661 (4th Cir. 1992); Advanced Power Systems, Inc. v. Hi-Tech Systems, Inc., Civ. No. 90-7952, 1994 WL 116121 at *11 (E.D. Pa. March 21, 1994).

      Plaintiffs retained an expert who produced reports which quantifies their claimed damages.[43] The damage calculation is fundamentally based upon expectation damages, specifically, the "loss of the equity value" of the business resulting from the activities of Messrs. Robinson and Oechsle as alleged in the Amended Complaint.  Signorelli depo., Exh. 36, at p. at 24-25.  In connection with rendering his opinion as to damages, Plaintiffs' expert relied solely on the allegations in the Amended Complaint relating to the alleged malfeasance of Robinson and Oechsle, assumed the allegations to be true, did not

---

[43] Plaintiffs' expert, Lawrence Signorelli, produced two expert reports (one for each of Oles LLC and OEC).  Such reports are collectively attached as **Exhibit 35** and excerpts of his deposition are attached as **Exhibit 36**.

review the record with respect to the truth of the allegations, and, importantly, <u>assumed</u> that the alleged

wrongs <u>caused</u> Oles LLC to fail, as alleged in the Amended Complaint.  <u>Id</u>., at pp. 69-72.

        The amount of expectation damages was calculated specifically from a set of projections which

were prepared internally by OEC prior to the sale.  Jay Young depo., Exh. 2, at pp. 240–242; <u>see</u>

Internal projections, attached hereto as **Exhibit 37**.  These projections were prepared by OEC's former

Chief Financial Officer and contained various economic assumptions.  These include a projected 20%

increase in revenue annually for the four years following the sale and the assumption that Oles LLC

after the sale would buy 50% of the envelopes it needed for printing at a 20% profit margin and 15% of

the envelopes it needed for printing at a 30% profit margin.  Signorelli depo., Exh. 37, at pp. 114-116,

130-134.  Significantly, the revenue projections were <u>not</u> based on sales figures from prior years.  Jay

Young depo., Exh. 2, at pp. 243 – 244.  The projected revenue stands was in marked contrast to the

actual history of RO Envelope, which, as Jay Young conceded, had experienced stagnant annual revenue

growth in the years prior to the sale.  <u>Id.</u>, at pp. 252-55.  Rather, the revenue projections were based on

Plaintiffs' speculative belief that RO Envelope's product line would be expanded and that Robinson and

Oechsle would be able to market this expanded line to existing and prospective clients.  <u>See</u> Signorelli

depo., Exh. 36, at pp. 114-15.  Plaintiffs' expert testified that he never reviewed anything that

corroborated or supported Plaintiffs' belief about expanding the business to increase revenues.  <u>Id.</u>  And,

in Jay Young's words, the assumptions concerning the percentage of envelope purchases and margins

were "based on some sketchy information that we had received from the principals of RO."  Jay Young

Depo., Exh. 2, at p. 251 (emphasis supplied).  The baseline fact is that neither the Purchase Agreement

nor the Employment Agreements contained any requirement by Defendants to increase sales, to expand

RO Envelope's markets by any particular amounts, or to buy envelopes at particular numbers or

margins.  Moreover, the projections upon which Plaintiffs' expert bases his opinion were never shared

with Robinson or Oechsle.  Robinson depo., Exh. 5, at pp. 36; 41-42; Oechsle depo., Exh. 6, at pp. 14-15.

The projections upon which Plaintiffs' expert bases his opinion as to expectation damages constitute sheer speculation, and are nothing other than what Jay Young and others at OEC hoped could be accomplished at the time of the acquisition.  No one (including Signorelli) has testified that these assumptions were reasonable.  This concededly "sketchy" information cannot establish with "reasonable certainly" that the Plaintiffs incurred the expectation damages claimed in their Amended Complaint.  Because there simply is no evidence in the record to establish Plaintiffs' expectation damages with "reasonable certainty," Defendants are entitled to summary judgment on Plaintiffs' claim for expectation damages.  See Delahanty, 464 A.2d at 1258.

Even more fundamentally, there is absolutely no evidence that Defendants' alleged wrongdoing caused Plaintiffs' claimed lost expectation damages.  The factual record is simply devoid of any evidence that any of the alleged breaches by Defendants were the proximate cause of Plaintiffs' lost expectation damages.  Indeed, nowhere in the record is there any testimony or evidence to prove that allegedly improper personal charges or even losses sustained as a result of Mr. O'Brien's embezzlement scheme caused the demise of Oles LLC.  The uncontroverted evidence establishes the contrary, as the amount of the losses suffered in the embezzlement scheme (even if they had not been paid back) were not material.  See Exh. 23, at pp. 8 and 11.  The allegations that Defendants diverted customers to Rite Envelope or others are hogwash and are lacking even a scintilla of support.  Plaintiffs' expert is certainly not in a position to (and did not) render an opinion as to causation.  In fact, Mr. Signorelli, who did no independent factual investigation and assumed the truth of the allegations in the Amended Complaint, testified that he has not expressed an opinion as to whether the alleged defalcations by Messrs. Robinson and Oechsle caused the demise of the Oles LLC.  Signorelli depo., Exh. 36, at p. 88.

The record shows, through Plaintiffs' own witnesses, that the general economic downturn in the U.S. economy in general and in the paper industry in particular, as well as the September 11, 2001 tragedy, the anthrax scare, and the lack of any productive sales staff for at least 5 months following Kimberly Robinson's departure (and the fact that she took customers), caused the loss of sales at Oles, LLC and OEC.  Vicki Young depo., Exh. 1, at pp. 187-90, 231-33, 331-35.  Ms. Young, who was running the company during that time, admitted that the most serious problem Oles, LLC had was a lack of sales volume and that this led to the closing of the company (the company failed "because the sales volume didn't come up" because "we lost a certain portion of our accounts that we didn't bring the business back."  Vicki Young depo., Exh. 1, at p. 323).  The bottom line is that there is not an iota of evidence that Defendants did anything to cause the loss of even one customer or one sale of Oles LLC, and without such evidence, Plaintiffs' causation allegation fails.

Under Pennsylvania law and the standards governing Rule 56 motions, this Court should grant summary judgment in favor of Defendants on Plaintiffs' claims for expectation damages.  See Delahanty, 464 A.2d at 1258; Advanced Power Systems, Inc., 1994 WL 116121 at *9 (granting summary judgment on claim for lost profits where there was no evidence to support such a claim).

> **E.    This Court Should Grant Summary Judgment in Favor of Defendants on Counts I, II and IV of their Counterclaims**
>
> > **1.    Counterdefendants Have Failed to Pay Sums Due Under the Asset Agreement, Note and Guaranty.**

There is no dispute that the parties entered into valid and binding agreements relating to the sale of RO Envelope (*i.e.,* the Purchase Agreement, the Promissory Note, the Guaranty, and the Assumption Agreement on or about September 30, 1999).[44]  There is also no dispute that, under the terms of the Purchase Agreement and Promissory Note, Oles, LLC was to pay Defendants certain sums for the

---

[44] Plaintiffs' claims to rescind some of  these Agreements fail for the reasons set forth above.

purchase of their company, which were not contingent on any financial performance criteria of the company or the individual Defendants.  Finally, there is no dispute that OEC executed a Guaranty, which guaranteed Oles LLC's prompt payment of all sums due under the Purchase Agreement and Promissory Note.  The Chief Executive Officer of Plaintiffs admitted the genuineness of these documents and that Plaintiffs ceased making any payments due under the contracts at issue.  Jay Young depo., Exh. 2, at pp. 256 – 257.  Thus, because Plaintiffs cannot prove any of their claims (and regardless of whether the Court determines that Plaintiffs ultimately might be entitled to some amount of damages on some of their claims), it cannot be disputed that Plaintiffs owe the remainder of the purchase price for the business in the amount of $1.425 million.[45]  As a result, Defendants are entitled to summary judgment as to Counts I and IV of their Counterclaim.[46]

## 2.    Plaintiff, Oles LLC Has Failed to Pay an Assumed Liability Under the Asset Agreement.

Count II of the Counterclaim is a claim against Oles, LLC for its failure to pay an assumed liability.  The Assumption Agreement provided for the assumption of certain obligations of RO Envelope by Oles LLC, including expressly an Equipment Finance Agreement between American Express and RO Envelope for mainframe computer equipment (the "Finance Agreement").  Beginning in October 1999, following the sale, Oles LLC paid the monthly payments due under the Finance Agreement.  Oles LLC continued to make such payments only through July 2002.

---

[45] Counterclaimants are also entitled to late charges and attorneys' fees under the acquisition documents.  Counterclaimants request the right to supplement the record to establish the precise sums due upon a finding of liability by the Court.

[46] This Court may award partial summary judgment as to Plaintiffs' liability on Defendants' Counterclaim pursuant to Federal Rule 54(b), which provides:

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, or [other claim] or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of the judgment.  In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

See, e.g., National Fire Ins. Co. v. Fortune Constr. Co., Inc., 320 F.3d 1260, 1276 (11th Cir. 2003).

Prior to the sale of RO Envelope to Oles LLC, Oechsle was required to execute a personal guaranty with American Express regarding the purchase of the computer equipment on the American Express credit card. <u>See</u> Oechsle Affidavit, Exh. 25, ¶ 11. After Moderacki made the decision to cease making payments to American Express for this assumed company debt (Moderacki depo., Exh. 3, at pp. 66 – 67), American Express sought and obtained payment from Oechsle. Therefore, because there is no dispute that Oles, LLC assumed the American Express debt and failed to pay it, Defendants are entitled to judgment against Oles, LLC in the amount of the debt paid by Oechsle ($3,600.00).

## V.     <u>CONCLUSION</u>

For the foregoing reasons, Defendants and Counterclaimants, GTD Company, Inc., Harold T. Robinson and David Oechsle, respectfully request that this Court grant summary judgment or enter an order pursuant to Rule 56(d) in favor of Defendants against Plaintiffs as to all claims alleged in Plaintiffs' Amended Complaint and/or the ten particular factual allegations contained therein, as more particularly described in the body of this Memorandum, and further request the entry of summary judgment on Counts I, II and IV of their Counterclaim.

_____/s/_____
Jefferson V. Wright (Federal Bar No. 00990)
Tessa Laspia Frederick (Federal Bar No. 25374)
Brian D. Craig (Federal Bar No. 25710)
Miles & Stockbridge P.C.
10 Light Street, Suite 1200
Baltimore, Maryland 21202
(410) 727-6464

Attorneys for Defendants and Counterclaimants,
GTD Company, Inc., Harold T. Robinson
and David Oechsle

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the _____ day of August, 2003, I served the foregoing

**Memorandum in Support of Motion for Summary Judgment on Plaintiffs' Amended Complaint**

**and for Summary Judgment on Counts I, II and IV of Counterclaimants' Counterclaim or, in the**

**Alternative, an Order Pursuant to Rule 56(d)** via served first-class mail, postage prepaid, on:

>       Ward B. Coe, III, Esquire
>       Pamela M. Conover, Esquire
>       Whiteford, Taylor & Preston, L.L.P.
>       Seven Saint Paul Street
>       Baltimore, Maryland 21202
>
>       Attorneys for Plaintiffs and Counterdefendants

>       _____/s/_____
>       Jefferson V. Wright