IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

OLES ENVELOPE, LLC, <u>et al</u>.,              *

    Plaintiffs                                  *

v.                                                           *

GTD COMPANY, INC., <u>et al</u>.,          *   Civil Action No. WMN 02-2017

    Defendants                               *

   *   *   *   *   *    *    *   *   *   *   *

## OLES ENVELOPE, LLC AND OLES ENVELOPE CORPORATION'S <u>RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Oles Envelope, LLC and Oles Envelope Corporation, by undersigned counsel, file this Response to Defendants' Motion for Summary Judgment on the grounds that extensive material facts are in dispute, precluding summary judgment.

## <u>INTRODUCTION</u>

Defendants' Motion for Summary Judgment relies on facts which are not in the record, ignores facts regarding their wrongdoing which are in the record and ignores Plaintiff's basic theory of the case. It should be denied and this case should proceed to trial.

The premise of Plaintiff's case is simple: Plaintiff Oles Envelope, LLC (formerly RO Envelope, LLC) ("LLC"), a subsidiary of Oles Envelope Corporation ("Oles"), bought Defendants' envelope printing company, RO

Envelope Company, Inc. ("RO"), on October 1, 1999.  Defendants were the key employees of RO, a company which they had founded together fifteen years before.  Plaintiffs intended to operate RO as an independent subsidiary of Oles, entrusting its success to Defendants.  Instead of running LLC for the benefit of its owners, Defendants breached their trust by, among other things, stealing from the company which Plaintiffs now owned.  They left and, to no one's surprise, the company which depended on their relationships did not survive.  Overwhelming evidence in the record, which Defendants have ignored, supports this simple theory.

## STATEMENT OF FACTS

### A.    The Transaction

RO was founded in or about 1984 by Defendants Harold T. Robinson (Robinson) and David Oechsle (Oechsle).  RO was a jet shop whose business was printing envelopes.  Harold Robinson deposition, Exhibit 1 at p. 13; Jay Young deposition Exhibit 2 at p. 41.  Robinson and Oechsle ran the business as partners and were its sole owners.  Robinson was President and Oechsle Vice President.  David Oechsle deposition Exhibit 3 at pp. 5-7.  From the outset, Oechsle took care of the books and production; both partners dealt with the company's accountants, Dunn & Dunn.  Exhibit 3 at pp. 7, 8.  RO was successful and Robinson and Oechsle were primarily responsible for its success.  Exhibit 1 at pp. 16, 17; Exhibit 3 at pp. 8-9.

Oles is a manufacturer and printer of envelopes headquartered in Baltimore.  Jay Young is Oles' president and chairman.  Oles representatives and Robinson and Oechsle engaged in protracted negotiations which eventually led to RO selling its assets to LLC, a subsidiary of Oles, on September 30, 1999.  The price was $2 million, payable over five years in installments on October 1st of each year, in addition to an assumption of liabilities.  See Asset Purchase Agreement, Exhibit 4.

From Oles' standpoint, the acquisition only made sense if LLC could substantially increase its sales.  Exhibit 2 at p. 62.  Robinson and Oechsle produced a list of 400 customers, only 100 of which were active.  They represented that they could develop 300-400 customers for LLC.  Id. at pp. 64-65.  Jay Young believed that, with Oles support, LLC sales could be substantially increased.    To that end, sales projections were generated based on discussions with Robinson and Oechsle which showed substantially increased sales by LLC which would make the deal work.  Id. at pp. 33-34, 65.  The projections were shared with Robinson and Oechsle who agreed that they could be accomplished.  Id. at p. 65.  Robinson and Oechsle were responsible for developing a customer base that would provide growth and make LLC profitable.  Id. at pp.  46, 62, 67.  Shortly after the effective date of the acquisition, Robinson and Oechsle communicated to their staff that they were going to embark on a program of substantially increasing sales.  See Robinson and Oechsle memo dated 10/7/99, Exhibit 5.

Robinson and Oechsle also owned a delivery company, RO Express, which they operated out of RO's offices. Jay Young wanted them to close RO Express because it would potentially interfere with their duties to LLC. Exhibit 2 at p. 25. Robinson and Oechsle refused, referring to RO Express, prophetically, as their retirement vehicle. Exhibit 2 at p. 25; Exhibit 3 at pp. 11-12; Exhibit 1 at pp. 30, 31. At closing on the transaction, LLC agreed to use RO Express to deliver envelopes from October 1, 1999 to December 31, 2000, provided that it was at least as favorable as other carriers in terms of price and delivery times. See September 30, 1999 RO Express letter, Exhibit 6.

On October 1st, LLC began to operate as a subsidiary of Oles. Robinson was its President and Oechsle its Vice President. Robinson and Oechsle were responsible for all aspects of the LLC operation. Exhibit 2 at pp. 67, 68. Moderacki deposition, Exhibit 7 at p. 43; Stacharowski deposition, Exhibit 8 at p. 12. Essentially, their duties and responsibilities were the same as they were before closing. Exhibit 2 at p. 178.

Robinson understood that he had a fiduciary duty to act in good faith and in the best interest of LLC. Exhibit 1 at p. 17. Oechsle acknowledges that he had the obligation to do his job to the best of his ability and that he was entrusted by the owners of LLC to run the business. Exhibit 3 at p. 16. Robinson's and Oechsle's employment agreements provided that each would receive, as a bonus incentive, 10% of LLC's pretax profits on an annual basis, Robinson for two years and Oechsle for four. See Robinson Employment Agreement, Exhibit 9 at ¶6;

Oechsle Employment Agreement, Exhibit 10 at ¶ 6.  They continued to run LLC

with little interference from Oles.  They were entrusted by the owners of LLC to

accomplish the business plan of substantially increasing sales.   Exhibit 2 at pp.

67-68.  In Jay Young's view, it was considered to be a golden opportunity for all.

Id. at p. 93.

B.    **The Embezzlement**

On November 30, 1999, two months after the sale of RO, Robinson and

Oechsle opened up a new bank account at Wilmington Trust in the name of

GTD.  GTD stands for "Gone to Disney," Exhibit 3 at p. 29, and is a company

owned solely by Robinson and Oechsle.  Exhibit 1 at p. 80.  GTD has never had

any employees or business.  It has never performed any services or sent out an

invoice.  Exhibit 1 at pp. 80-81.  The purpose in opening the account was to have

an account into which Oles would make payments for the RO assets.  Exhibit 3 at

pp. 25-26.  Those payments would come on October 1st of the succeeding five

years.  Id. at p. 26.  Oechsle did not expect any other money to go into the

account.  Id.

Oechsle originally testified that he opened the account with his personal

money.  Id.  The first deposit into the account was in the amount of $3,149.55 on

November 30, 1999.  When Oechsle was confronted with that deposit, he stated

that he had "no idea where the money came from."  Id. at p. 27.  In fact, the

source of funds was two checks from Lynx Graphics payable to RO Envelope

Company in the amount deposited.  Id.  Oechsle then agreed that the Lynx

Graphics checks were used to open the GTD account.  Id. at p. 30.  Lynx,

formerly known as Circle Graphics was a customer of RO Envelope.  Id. at pp.

33-34.

Robinson knew about the embezzlement of funds from RO to GTD from

the beginning.  He signed the card opening the GTD account.  Id. at p. 20.  He

and Oechsle both knew that you need money to open a bank account.  Id. at p.

31.  Joe O'Brien, Oechsle's former brother-in-law, who worked as a bookkeeper

at RO and RO Express, deposited checks for both entities.  He also deposited

LLC checks into GTD at Oechsle's and Robinson's direction.  O'Brien deposition,

Exhibit 11 at pp. 49, 57.  O'Brien never made the determination himself that

money should go into the GTD account.  Exhibit 11 at p. 57.

Twenty-two checks payable to RO Envelope or LLC were deposited into

the GTD account owned by Robinson and Oechsle.  The total face amount of

checks was $71,317.31.  Moderacki Affidavit, Exhibit 12 at ¶ 4, 6.  Some examples

of Defendants' embezzlement methods follow:

1.     On May 30, 2000 a check from the FBK Group payable to RO

Envelope in the amount of $1,484 was deposited into the GTD

account at Wilmington Trust Bank (WTB).  The check was endorsed

by Oechsle "for deposit only GTD Corp., formerly RO Envelope

Co., Inc."  Exhibit 3 at pp. 64-65.  The check was issued as payment

for LLC job number 30-1119, which was produced on or about

March 22, 2000.  Immediately following the issuance of invoice 30-

1119 for the job, a credit note, 30-1119CN was issued for the exact amount of the invoice, thereby canceling the invoice on LLC's records.  The invoice apparently was sent to the customer, however, who then issued its check.  The check was deposited into GTD in its entirety.  Exhibit 12 at ¶5a.  Joe O'Brien testified that Oechsle knew how to delete invoices and that he saw him deleting invoices.  Exhibit 11 at pp. 125, 152.

2.      On March 31, 2000 a check from Bentley Graphics payable to RO Envelope in the amount of $948.98 was deposited into the GTD account at WTB.  The check was payment for two LLC invoices, 30-643 for $58.20 and 30-311A for $890.78.  Job number 30-311A was completed by LLC on or about January 21, 2000.  Immediately after invoice 30-311A for Bentley Graphics was produced on February 8, 2000, a credit note, 30-311ACN, was issued canceling the invoice on LLC's books.  Exhibit 12 at ¶ 5b.  The original invoice apparently was sent to the customer and a check was sent to RO in the amount of both invoices.  A check was deposited into GTD and GTD issued a check to RO for the amount of $58.20 as payment for invoice 30-643, the only invoice that was open on LLC's books.  The check was signed by Oechsle.  Id.

3.      LLC purchased season tickets to the Philadelphia Phillies baseball games.  Robinson and Oechsle discussed selling some of the tickets

to people that Robinson knew.  Exhibit 3 at p. 57.  Vincent Vallaro & Associates and a couple named the Lorentson's purchased some of the tickets.  Both were contacted by Robinson.  Id. at pp. 57-58.  All of the proceeds of the sales of the Phillies tickets were placed into the GTD account.  Oechsle filled out the deposit slip.  Id. at p. 58.  Oechsle endorsed the checks "for deposit only GTD, formerly RO Envelope Company, Inc.".  The checks were made out payable to RO Envelope.  Exhibit 12 at ¶ 5c.

4.    United States Recycling purchased scrap paper from RO and LLC.  Charlotte Robinson deposition, Exhibit 13 at p. 41-42; Exhibit 11 at pp. 46-47.  They paid for the paper with a check in the amount of $122.25 payable to RO Envelope Company.  Oechsle again endorsed the check "for deposit only GTD, formerly RO Envelope Company, Inc." and deposited it into GTD.  Exhibit 3 at pp. 55-56.  He testified that the check was for Phillies tickets.  Id. at p. 56.

Oles' personnel in Baltimore did not have access to the LLC accounting system that processed customer orders, invoices and payments.  Exhibit 7 at p. 55.  Thus, because of LLC's autonomy, these activities went undetected for well over a year.

Oechsle gave a variety of explanations for depositing LLC's checks into the account that he and Robinson owned.  He first stated, with respect to the Lynx Graphics checks, that he assumed that they belonged to RO Express,

despite the fact that the payee was LLC. Exhibit 3 at p. 29. He later testified that

he developed a scheme of depositing LLC checks into GTD where he believed

that the checks included money for RO Express, even though they were made

out to LLC. Id. at p. 35. He claimed that checks would then be written on GTD

to LLC and RO Express for their share of the money. Id. at p. 38. He stated that

Robinson "must have been there when we originally decided to do that." Id. at

p. 36. He further claimed that he relied on O'Brien to tell him whether the check

to LLC included RO Express money and how to divide it.

O'Brien testified that Oechsle made the determination which checks

would go into the GTD account. Exhibit 11 at p. 35. Both Oechsle and Robinson

gave instructions to deposit certain RO Envelope checks into GTD. Id. at pp. 49,

57. O'Brien never made the determination that money should go into the GTD

account. Id. at 57. When presented with a series of checks to LLC and deposit

slips for GTD, O'Brien testified that he did not know why those checks were

being deposited into GTD. Id. at pp. 59, 61-63.

Oechsle's excuse for depositing RO Envelope checks into GTD is false.

There is no evidence that the checks which were deposited included any funds

for RO Express. Exhibit 12 at ¶ 7. Detective Phil Owen, who investigated the

embezzlement, found that nothing in the embezzled funds was owed to RO

Express. Owen Deposition, Exhibit 14 at pp. 83-84, 86-89. In fact, with most LLC

customers where RO Express made the delivery, RO Express directly billed LLC

for the freight charges. Exhibit 3 at p. 120. Oles promptly paid those charges. Id.

at p. 121.  Even if checks to LLC included freight charges due to RO Express, the checks could have been deposited in an LLC account and remittance could have been made to RO Express, in a way which would have shown up on LLC's books.  Oechsle finally admitted that he determined to leave money in GTD to have it be a contingency fund for RO Express, the company he and Robinson owned separate from LLC but which was operated out of the same premises.  Id. at p. 45.

 In the summer of 2000, O'Brien began depositing LLC checks into the RO Express operating account, commencing a second embezzlement scheme which benefited only Robinson and Oechsle.  When he did so, he knew that Oechsle had been depositing checks for LLC into GTD.  Exhibit 11 at pp. 137, 138.  The first deposit was of the funds remaining in RO Envelope's old payroll account in the amount of $2,524.09.  A total of fourteen checks payable to LLC were deposited into the RO Express operating account between June, 2000 and January of 2001, in the amount of $30,531.63.  At times, the method of voiding an LLC invoice with the concurrent issuance of a credit note, sending the invoice to the customer and then intercepting the check when it came in was used.  The same method was used in the GTD embezzlement scheme.  Exhibit 12 at ¶ 5d, 5e.  O'Brien did not know how to issue credit notes, but Oechsle did.  Exhibit 11 at pp. 125, 152.

O'Brien also opened a bogus RO Express account and diverted RO Envelope checks into it beginning in November of 2000. The method of issuing invoices and canceling them with credit notes was again used. Exhibit 12 at ¶ 12.

On Thursday, January 18, 2001, Mark Moderacki and Vicky Young went to LLC and seized certain expense account documents. Exhibit 7 at p. 209. Moderacki had been requesting the documents for over a month but his requests had been ignored by Oechsle. Id. at pp. 200-201, 205. As Moderacki began looking for expense documents, Oechsle, Robinson and O'Brien asked what he was doing. Id. at p. 209. They seemed surprised and were obviously displeased. Id. at p. 210.

 The following weekend, O'Brien left a resignation letter for Oechsle and Robinson to find Monday morning, January 22, 2001. O'Brien told Detective Owen that he resigned because of what he was doing and what he knew Robinson and Oechsle were doing. Exhibit 14 at p. 153. After O'Brien resigned, Robinson and Oechsle claim to have first discovered the bogus RO Express account.

Robinson and Oechsle testified unequivocally that there was no reason for any LLC check to go into a RO Express account. Exhibit 3 at p. 22; Exhibit 1 at p. 150. Oechsle agreed that diverting such checks would be theft. Exhibit 3 at p. 23. Despite their clear understanding of the gravity of the situation, neither reported the "O'Brien embezzlement" from LLC to its owners until a week later. Exhibit 12 at ¶ 10; Exhibit 8 at p. 40. Oechsle testified that he thought Robinson would

report the situation to Oles. Exhibit 3 at pp. 146, 148. Robinson claimed that he

waited a week because he wanted to look at everything and give a full report.

Exhibit 8 at p. 40. Notwithstanding the fact that it was LLC's money that was

diverted into the bogus account, Robinson and Oechsle had O'Brien close out the

account and turn over the check to Robinson, who deposited the funds into the

legitimate RO Express account, thus continuing to keep the stolen funds out of

LLP's control. Exhibit 7 at p. 126; Exhibit 14 at p. 65; Exhibit 1 at p. 203.

Robinson's statement that he was directed to do so by Moderacki is false. Exhibit

12 at ¶ 10.

When Moderacki was finally notified of the "O'Brien embezzlement", he

began to investigate it. The investigation included contacting RO Envelope's

customers to see if any checks were missing. One customer, Tursak, reported a

check missing and Moderacki asked Robinson about it. Robinson responded that

it had been deposited into the GTD account and produced a copy of it. Id. at ¶

5f. While Moderacki was conducting his investigation of the diversion of checks

from LLC, neither Robinson nor Oechsle told him about their practice of

depositing LLC checks into GTD for well over a year. They told Moderacki

about the Tursak check because he was looking for it and it had just been

deposited into GTD. Exhibit 3 at pp. 268-269. According to Oechsle, the deposit

of the other checks into GTD did not seem pertinent and he did not think

Moderacki would be interested in them. Id. at pp. 269, 270. While he was

investigating the bogus account, Moderacki also told Robinson that there was an

unreconciled difference of $34,000 between the LLC accounts receivable and general ledger. Robinson assured him that he and Oechsle would make LLC whole for the difference. Exhibit 7 at pp. 137, 178.

Robinson and Oechsle even had checks for double invoices to LLC deposited into GTD. On one occasion, Oechsle had such a check and asked Robinson what to do with it. Robinson directed Oechsle to deposit it into the GTD account. Exhibit 11 at pp. 127, 128; Exhibit 14 at pp. 96-97, 164.

Oechsle testified that, when he discovered O'Brien had been embezzling, he was surprised and felt O'Brien had breached his trust. If O'Brien had not resigned, he and Robinson would have terminated him. Exhibit 3 at pp. 350- 51. Although Robinson and Oechsle understood that O'Brien's diversion of LLC checks to RO Express accounts was embezzlement and a breach of trust, they lacked the same moral clarity when it came to their diversion of checks from LLC to GTD. Thus, Robinson testified as follows:

> Q:   Do you agree that from October 1, 1999 on, any
>      diversion of any check from a customer
>      payable to RO Envelope Company or LLC into
>      an account owned by any other person or
>      entity would be theft of LLC property?
>
> A:   No, I wouldn't agree with that.
>
> Q:   You don't?
>
> A:   No.
>
> Q:   Why not?

> A:    Because I don't understand the accounting
>       system and I don't understand what the
>       ramifications of the law are in regards to
>       accounting.

Exhibit 1 at p. 62.

Oechsle blames O'Brien entirely for the embezzlement of checks into GTD.

He claims that he was relying on O'Brien to tell him whether the checks had

money in them for RO Express and for the amount to pay back to LLC.  Exhibit 3

at p. 351.  In fact, there is no evidence that any part of the embezzled checks was

owed to RO Express.  Exhibit 12 at ¶ 7; Exhibit 14 at pp. 83-84, 86-89.  Even

though he felt O'Brien had breached a trust by embezzling, he did nothing to

ensure, after O'Brien's embezzlement was discovered, that all of the LLC money

was paid back from GTD.  He claims he never discussed with Robinson that he

had relied on O'Brien with respect to the GTD account.  Exhibit 3 at p. 352.  He

never told the owners of LLC that he was diverting LLC checks into the GTD

account.  Exhibit 3 at pp. 37-38.  In fact, approximately $33,000 in funds diverted

to GTD had not been paid back to LLP.  Exhibit 7 at pp. 119-120.

Checks payable to LLC in the amount of $71,317.31 were embezzled and

deposited into the GTD account; $30,531.63 was deposited into the legitimate RO

Express account.  Document productions from the banks are incomplete.  There

are a significant number of deposits without copies of supporting checks or

where copies are illegible.  Exhibit 12 at ¶ 6.  Other documents are missing or

have been destroyed.  After the O'Brien bogus account was discovered,

documents were requested and sent to LLC from First Union.  They arrived and

were signed for by an LLC employee but since disappeared.  Exhibit 3 at p. 152;

Exhibit 14 at p. 35.  O'Brien's resignation letter, given to Robinson, disappeared.

Exhibit 8 at p. 38.  After O'Brien and Oechsle left, they returned to LLC and

downloaded or erased information from their computers.  Exhibit 14 at pp. 46,

66-67.  Oechsle was to have been allowed onto the premises only with Robinson's

permission.  Exhibit 1 at p. 322; Exhibit 8 at p.77.

Robinson, ignoring the evidence that has been accumulated, claims he had

nothing to do with the GTD embezzlement.  He admits, however, that on three

or four occasions he heard O'Brien telling Oechsle that LLC checks had freight on

them for RO Express and Oechsle making the decision to split the check.

Robinson believed that the checks were going into the GTD account.  Exhibit 1 at

pp. 102-103.  His name is on the signature card opening the account.  O'Brien

testified at deposition, and told Detective Owen that Robinson knew about the

embezzlement and directed deposits into GTD.  The sales of LLC's Phillies

tickets, proceeds from which were deposited into GTD, were directed by

Robinson.  When questioned by Moderacki about missing checks, Robinson

knew about them and admitted that they had been deposited into GTD.  He also

had money withdrawn from GTD and given to him -- $10,000 in December of 1999 and $1,500 in September of 2000. Exhibit 3 at p. 200.[1]

Oechsle made numerous withdrawals from the GTD account and had the funds placed in the RO Express operating account. See, infra p. 20-21. He also made withdrawals for his and Robinson's personal use. On June 5, 2000, he withdrew $1,000 and deposited it into his personal account a Wilmington Trust. Exhibit 3 at p. 170. He had a check written on the account to Dunn & Dunn, the accountants for RO Express, Robinson and Oechsle, in the amount of $250 for tax return preparation. Id. at pp. 189, 190. He had another check from GTD in the amount of $300 written to Dunn & Dunn on July 19, 2001 for tax returns. Id. at p. 194. He had a check written on November 1, 2000 from GTD to PP&S, his pool supply company at his home. He also had a check dated December 1, 2000 written to Equitable Insurance Company for an insurance policy that he and Robinson had. Id. at p. 200. On July 31, 2000 he had a GTD check issued in the amount of $890 to American Express for his person account. Id. at p. 203.

The total amount which is known to have been misappropriated from LLC is $175,985.71. Exhibit 12 at ¶ 11. Oechsle has repaid $16,000.00 pursuant to a restitution order from the Court of Common Pleas of Chester Co., Pennsylvania. See Order dated 10/29/02, Exhibit 15. Robinson agreed to pay

---

[1] Defendants accuse plaintiffs of recklessness for including Robinson in these allegations, stating "there is no evidence that Robinson knew where any of the diverted checks were deposited…." In light of facts in the record which defendants ignored, their accusation is reckless.

half the amount Oechsle was ordered to repay.  Some money is still unaccounted

for.  Exhibit 12 at ¶ 6, 11.

### C.    Expense Account Abuses

In September of 1999, Robinson took a family vacation to Disney World,

charging it on a company credit card.  The charge was submitted to Oles for

reimbursement after the September 30, 1999 closing.  Oles paid it and Robinson

never notified the owners who entrusted him with their subsidiary that they had

just paid for his personal vacation.  Exhibit 12 at ¶29.[2]

Moderacki was hired by Oles as CFO in November of 2000.  He shortly

thereafter became concerned about a cash account used at LLC for expenses.  The

signatories on the account were Robinson and Oechsle.  Moderacki noticed that

many checks for cash were written on the account.  He asked Oechsle what the

checks were for and was told they were for business expenses.  He then began

asking Oechsle for backup information regarding the account in early December,

2000 and was not provided any.  Frustrated, he and Vicky Young drove to LLC

on January 18, 2001 and seized expense account documents.  When they

reviewed the documents, they found widespread expense account abuses.  Id. at

¶ 27.

---

[2] Defendants claim that there is no evidence of expense account abuses by Robinson is false.
Defendants' Memorandum at p. 16.  Their references to the depositions of Steve Stacharowski
and Mark Moderacki to support their claims are inaccurate.  In fact, Robinson not only was
reimbursed for his Florida vacation, he also shared daily lunches with Oechsle which were
charged to LLC.

Moderacki reviewed the documentation for the cash checks from the special account.  Documents consisted of various receipts that were grouped together by check number and stored in an envelope with a check number written on the face of it.  Most of the cash checks had corresponding envelopes, all of which were stored in a shoebox.  Six checks had no support.  All of the envelopes were sealed and the face of the envelope included information indicating accounting expense codes, usually in Oechsle's handwriting.  None of the envelopes contained sufficient receipts to equal the total amount of the reimbursement reflected by the check to cash.  Id. at ¶ 25.

Moderacki also took records supporting the various company credit card charges.  Oechsle carried a company VISA and American Express card.  Exhibit 3 at p. 292.  He also had a personal Master card and VISA card.  Id. at p. 293.  Oechsle charged all of his automobile expenses to LLC, including tolls on the Pennsylvania Turnpike going to and from work.  Exhibit 3 at p. 289.  He charged so much gasoline to the company that it far exceeded the gasoline that would have been needed for the mileage on his company car.  Exhibit 8 at pp. 57-58.  He and Robinson ate lunch together almost everyday, claiming they were business lunches.  Exhibit 3 at p. 290.  The expenses submitted included hotdogs and ice cream cones.  Id. at p. 335.  He obtained $8,300 in reimbursement for meals.

Oechsle also charged hotel rooms in Bensalem, Pennsylvania to LLC. They were charges when he was out at night and "stayed overnight on personal business."  Id.  at p. 304.  This happened on six different occasions and he

testified that it is possible that he simply pulled the wrong credit card out of his pocket on six different occasions to pay for his personal hotel room.  Id. at p. 305.

Jay Young and Steve Stacharowski from Oles came to the LLC office in February, 2001 to discuss Oechsle's expenses with him.  Exhibit 8 at pp. 43-44.  Oechsle admitted that many of the charges were improper.  Exhibit 2 at p. 205, 224.

He admitted that almost all of the $4,200 in gasoline charges were for his company car which left about 20,000 miles of gasoline charges unaccounted for Exhibit 8 at p. 57.  Where he was confronted with duplicate receipts, he responded that stores give you two receipts – one white and one yellow – and blamed O'Brien for having him reimbursed for both.  Id. at p. 63.  He also blamed O'Brien for giving him two cash reimbursements for the same transaction.  Id. at p. 64.  Oechsle changed his story regarding the meal receipts.  They included meals on weekends, apparently with children.  Stacharowski found Oechsle's explanations not even "close to reasonable."  Id.  When Robinson was informed about Oechsle's expenses, he stated that Oechsle had abused expense accounts prior to the purchase of RO.  Jay Young Affidavit, Exhibit 16 at ¶ 6.  Because the expense account abuses were flagrant and raised

questions about Oechsle's integrity, Jay Young, Mark Moderacki and Steve Stacharowski decided that they would have to seek Oechsle's resignation.[3]

On February 23, 2001, Oechsle met with Robinson, Vicky Young and Steve Stacharowski. Exhibit 3 at p. 321. Oechsle volunteered to resign. Exhibit 8 at p. 75. Stacharowski made it clear that Oles would expect reimbursement for any improper expenses or any other financial damage that Oechsle had inflicted on LLC. Id. at pp. 72, 78-79. Oechsle agreed and volunteered that, if any other improper charges were found, they should be deducted from his next payment. Id. at p. 79.

**D.    RO Express' Financial Troubles**

RO Express experienced chronic financial difficulties of which its owners, Robinson and Oechsle were well aware. Dunn & Dunn, the accountants for Robinson and Oechsle, were also the accountants for RO Express. Dunn & Dunn did RO Express' tax returns and Oechsle or Robinson signed them. Exhibit 3 at p. 270.

RO Express' 1999 tax return reports an ordinary income loss of $16,380. Id. at pp. 271-72. Although RO Express had employees, there is no entry for salary and wages. Id. at p. 273. Loans from shareholders (Robinson and Oechsle) increased from $22,000 to $31,000 during the year. Id. at p. 274.

---

[3] Oechsle's claim that he was authorized to be reimbursed for virtually any expense he wanted to is false. He was only entitled to reimbursement for business expenses which would be deductible to LLC. Exhibit 16 at ¶ ___.

Oechsle agrees that he and Robinson discussed the loss because it had to be part of their tax returns. Id. at p. 275.

In 2000, RO Express showed an ordinary loss of $66,000. Id. at p. 276. The return has an entry for salary and wages in the amount of $131,000, an increase from the prior year which Oechsle could not explain. Id. at p. 278. Loans from shareholders increased from $31,000 to $75,000. Id. at p. 279. Oechsle would have directed Dunn & Dunn to treat money deposited into RO Express from GTD as a loan from a shareholder. Id. at p. 280.

In 2001, RO Express had a loss of $40,000. Salaries in that year were $8,000, which Oechsle again could not explain. Id. at p. 282. Loans from shareholders went up to $127,000. Id. at p. 283.

At the beginning of 2000, RO Express ceased making tax deposits. Exhibit 12 at ¶ 9. By the fall of 2000, the IRS established contact with O'Brien and demanded payment of the delinquent taxes. Id.

Oechsle was putting his own money into RO Express to fund operations in 1999. Exhibit 3 at p. 97. He believes he discussed the situation with Robinson and that Robinson was also putting money into RO Express. Id. at p. 98. Because they were partners in RO Express, Oechsle believes he would have discussed with Robinson that Robinson should be putting money in too. Id. at p. 99.

From October through December of 1999, Oechsle made the following deposits from his savings account into RO Express: $2,500, $1,000, $2,000, $2,500.

Id. at pp. 100-04.  After the GTD account was established, Oechsle found less need to deposit his own funds into RO Express.

On May 31, 2000, $1,400 was withdrawn from GTD and deposited into RO Express.  Id. at pp. 164-65.  On June 25, 2000, a GTD check in the amount of $3,557 was used to pay RO Express' Pennsylvania Income Taxes.  Id. at p. 188. On July 31, 2000, $2,000 was withdrawn from GTD and deposited into RO Express.  Id. at p. 221.

Oechsle and Robinson did not restrict themselves just to embezzling from LLC to fund RO Express' operations.  They also defrauded LLC with respect to freight charges.

RO Express would prepare a daily shipping invoice for each individual delivery they made for LLC on a particular day.  The shipping log contained information such as the LLC job number, customer name, description of goods sold and delivery charge.  These were submitted to Oles for payment.  Exhibit 12 at ¶ 14.

After discovering the expense account abuse and embezzlement schemes, Mark Moderacki began a review of the RO Express daily invoices.  That review evidenced yet another chapter in Defendants' fraudulent activities.  Id. at ¶15.

The most obvious fraud was a recurring scheme of duplicate charges for the same shipment.  A significant number of deliveries were listed twice and charged for twice.  Usually the listing would be on different days, occasionally with the customer name or envelope description changed but the job number

identical.  For example,  LLC job number 30-2938 was an order for 1,000

envelopes.  It could have been shipped by UPS for less than $10.  Instead, RO

Express charged $72 for it, both on August 16, 2000 and August 17, 2000.  Id. at ¶

16.

   The contract with RO Express provided that it would make deliveries only

if its price terms were equal to alternative carriers.  In fact, RO Express made

charges of $22 to over $100 per delivery for small items that UPS would have

charged less than $10 for.  Id. at ¶ 17.

   RO Express regularly inflated charges, such as on LLC job number 30-378.

Although the customer ordered 37,500 envelopes, RO Express charged LLC for

delivering 375,000 envelopes.  On job number 30-1928, the customer ordered

7,500 envelopes and RO Express charged for the delivery of 75,000.  In that case,

the delivery cost more than the envelopes.  Id. at ¶ 18.  On job numbers 30-47 and

30-48, the customer ordered 32,000 envelopes which were produced at the Oles

plant in Baltimore.  Oles trucks delivered the envelopes to RO, LLC's plant,

passing the customer location on the way.  RO Express delivered the envelopes

to the customer, which was 15 minutes from the LLC plant and charged $1,425 to

LLC for the delivery.  Id. at ¶ 19.  On another occasion, an entire day of deliveries

was duplicated and charged twice.  The log for the day was copied, the total was

changed by $1 and resubmitted.  Finally, RO Express charged LLC for delivery of

jobs that were cancelled or picked up at the plant by the customer.  Id. at ¶ 21.

In 2001, RO Express was replaced by normally available shippers such as UPS and common carriers. After LLC stopped using RO Express, its shipping costs decreased by over $45,000, or almost 50%. Id. at ¶ 22.

E.    **The Demise of LLC**

The entire premise of the acquisition was that Robinson and Oechsle, who founded RO and were responsible for its success, would increase LLC's success with Oles' support. Robinson and Oechsle thus were entrusted with all of the assets they sold and, as President and Vice President of LLC, were charged with running all aspects of the business. They specifically controlled their own expense accounts and the invoicing and collecting of payments from their customers, without supervision from Oles. By early 2001, it became clear to management at Oles that its trust had been misplaced. Robinson and Oechsle had both charged improper expenses to the company. Oechsle made such a habit of it that Jay Young, Mark Moderacki and Steve Stacharowski decided that he could not be trusted and had to go. The circumstances of the "O'Brien embezzlement" to the bogus account raised further issues regarding Robinson's and Oechsle's integrity. All of the embezzled funds went to benefit their company, RO Express. Robinson and Oechsle inexplicably delayed a week in notifying Oles' management about the situation. They were unable to produce O'Brien's resignation letter. Information relating to the diversion of the Tursak check payable to LLC into the GTD account came to light and Robinson knew about it. Clearly, Robinson could not be trusted either and the decision was

made to offer him early retirement, which he accepted.  Exhibit 16 at ¶ 7.  Further

investigation revealed the extent of the embezzlement from LLC to GTD, which

both Robinson and Oechsle orchestrated and from which they benefited.  The

decision to obtain Oechsle's resignation and Robinson's early retirement

obviously was justified.

Defendants' thievery placed Oles' management on the horns of a

dilemma:  they could either proceed with untrustworthy management along

with unknown and unpredictable liabilities or replace Robinson and Oechsle.

They chose the latter, which was the responsible choice.  Unfortunately, that

choice also meant losing LLC's key executives who ran the company and had the

key customer relations.  Predictably, sales started to drop almost immediately

after Oechsle left.  Robinson found himself with the burden of the President's

and Vice President's job and developed health problems.  Exhibit 1 at p. 289-96.

Sales continued to plummet after Robinson left.  Ultimately, revenue decreased

to the point that the losses were such that they could not be sustained and LLC

was closed.

## STANDARD FOR SUMMARY JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure, a motion for

summary judgment may only be granted if there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law.

Lujan v. National Wildlife Federation, 110 S. Ct. 3177, 3186 (1990).  Under the

standard set forth in the Fourth Circuit, summary judgment is proper only when

the parties agree on both the facts and the inference drawn from those facts. Morrison v. Nissan Co., Ltd., 601 F.2d 139, 141 (4th Cir. 1979). The Court must decide whether a reasonable jury could find in favor of the non-moving party, taking all factual inferences in the light most favorable to the non-movant. Helm v. Western Maryland Railway Co., 838 F.2d 729, 734 (4th Cir. 1988); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The "judge's function is not himself to weigh the evidence and determine the truth of the matter." Anderson, 477 U.S. at 249; see Miller v. Leathers, 885 F.2d 151, 154 (4th Cir. 1989), cert. denied, 111 S. Ct. 1018 (1991). A court may deny summary judgment "in a case where there is reason to believe that the better course would be to proceed to a full trial." Anderson, 477 U.S. at 255.

It is well settled that, in ruling on a motion for summary judgment , the nonmoving party's evidence is to be believed, and "all justifiable inferences are to be drawn in [that party's] favor." Id.; Continental Airlines, Inc. v. United Airlines, Inc., 277 F.3d 499, 508 (4th Cir. 2002). Summary judgment is "inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." Hunt v. Cromartie, 526 U.S. 541, 553 (1999). Courts have repeatedly held in matters factually analogous to the present case that  summary judgment is inappropriate. In re Columbia Securities Litig., 155 F.R.D. 466, (S.D.N.Y. 1994), for example, the court stated that, in the context of securities fraud claims, "we may not grant summary judgment... unless plaintiffs have failed to present facts that are capable of supporting an inference of bad

faith or an inference that defendant acted with an intent to deceive." In re Columbia Securities Litig., 155 F.R.D. 466 at 479.

Defendants seem to confuse Federal Rule of Procedure 56(d) with a motion to strike.  Fed. R. Civ. P. 56(d) governs summary judgment concerning "material...facts that appear *without substantial controversy*."  Fed. R. Civ. P. 56(d) (emphasis added).  This is merely a pre-trial adjudication that certain issues will be deemed "established for the trial of the case."  Fed. R. Civ. P. 56(d) advisory committee's note (1946).  It simply serves the purpose of streamlining litigation.  A ruling under 56(d) is made at the hearing on summary judgment if summary judgment is not granted and is not a final judgment.  Id.  A court may decline to enter a partial summary judgment pursuant to Rule 56(d) where it determines that such an action would not materially expedite the adjudication.  See, e.g, Veilleux v. National Broadcasting Co., Inc., 8 F.Supp.2d 23 (D. Me. 1998); In re Underground Storage Tank Technical Services Group, Inc., 212 B.R. 582 (Bankr. E.D. Mich 1997);  Department of Toxic Substances Control v. Interstate Non-Ferrous Corp., 99 F.Supp. 2d 1123 (E.D. Cal. 2000); Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 2737.  Moreover, courts have held that partial summary under Rule 56 (d) is disfavored as it bypasses the normal pretrial procedures. See, e.g, Kinesoft Development Corp. v. Softbank Holdings Inc., 2000 WL 1898577, *6-7 (N.D. Ill., Dec 20, 2000); Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 2737.  Defendants are seeking to use 56(d) not to eliminate Plaintiffs' claims but to eliminate allegations of fact that are

supported by evidence and that support Plaintiffs' claim of breach of fiduciary duty.

## ARGUMENT

## INTRODUCTION

The record is replete with evidence from which a reasonable jury could conclude that Oechsle and Robinson breached their fiduciary duties and contracts with LLC and that LLC suffered damages as a result. There is also substantial evidence to support the remedy of rescission. One of the cases cited by Defendants regarding damages shows the reason that summary judgment is inappropriate in a case such as this. In Delahanty v. First Pennsylvania Bank, 464 A.2d 1243, 1258 (Pa. Super. Ct. 1983), the trial court found sufficient evidence of fraud by the defendant bank and the bank appealed. The appellate court affirmed the holding, stating that:

> [t]he court decided the issue of credibility in favor of appellee, finding that the Bank officials' "pattern of convenient and selective memories of their actions . . . , smack of a cover-up." The record is replete with inconsistencies and memory lapses which substantiate the finding that the Bank officials were not worthy of belief.

Id. at 1255. The identical statement could be made about this case. It is not surprising that Oechsle and Robinson deny looting the company. However, the record is replete with inconsistencies and memory lapses which substantiate the finding that they are not worthy of belief.

**A.    EVIDENCE IN THE RECORD SUPPORTS THE CLAIM OF BREACH OF FIDUCIARY DUTY**

"Under Pennsylvania law, 'a fiduciary relationship exists where one person has reposed a special confidence in another, to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side or weakness, dependence or justifiable trust on the other.'" McDermott v. Party City Corp., 11 F.Supp.2d at 612, 626 (E.D. Pa. 1998) (quoting Commonwealth Dept. of Transp. v. E-Z Parks, Inc., 620 A.2d 712, 717 (Pa. Commw. 1993)).  An agency relationship is a fiduciary one, thus the agent is subject to a duty of loyalty to act only for the benefit of the principal.  See Basile v. H&R Block, Inc., 563 Pa. 359, 368 (Pa. 2000).  Accordingly, "in all matters affecting the subject of the agency, the agent must act with the utmost good faith in furthering and advancing the principal's interests, including a duty to disclose to the principal all relevant information."  Id.; McDermott, 11 F.Supp.2d at 627.  Further, a business association may be the basis of a fiduciary relationship when one party surrenders substantial control over some portion of its affairs to the other.  See McDermott, 11 F.Supp.2d at 626.

Here, the evidence is undisputed that Robinson and Oechsle were fiduciaries of LLC.[4]  Oles and LLC entrusted the operations of LLC to Defendants.  As agreed upon prior to the sale, Robinson and Oechsle had the same duties and responsibilities to LLC as they had to RO.  As LLC's President and Vice President, Robinson and Oechsle were responsible for all aspects of the LLC operation.  The Defendants were given the powers and duties to run LLC in

---

[4] Defendants admit the fiduciary relationship.  See Defendants' Memorandum at p. 42.

Exton, Pennsylvania, a hundred miles from Oles, with only minimal contact via telephone, email and infrequent meetings.

Defendants' Employment Agreements with LLC also created a fiduciary relationship between the parties. Pursuant to the Employment Agreements, LLC completely entrusted the operation and daily management of LLC to Robinson and Oechsle. As President and Vice President of LLC, Defendants owed the company the highest standards of responsible fiduciary conduct, see Seaboard Indus., Inc. v. Monaco, 276 A.2d 305, 310 (Pa. 1971).

Robinson's Employment Agreement provides that "[d]uring the term of this Agreement, the Executive shall serve as the President of the Company. He shall have such powers and shall perform such duties as are incident and customary to his office, and shall have such other powers and shall perform such other duties as from time to time shall be granted and assigned to him by the Board." Robinson Employment Agreement, ¶ 7.1. In addition, Robinson agreed to "devote his full business time, attention, skill, and energy to the performance of his duties under [the] Agreement." Id., ¶ 7.2.

Oechsle's Employment Agreement provides that "[d]uring the term of this Agreement, the Executive shall serve as the Vice President of the Company. He shall have such powers and shall perform such duties as are incident and customary to his office, and shall have such other powers and shall perform such other duties as from time to time shall be granted and assigned to him by the Board." Oechsle Employment Agreement, ¶ 7.1. Further, Oechsle agreed to

"devote his full business time, attention, skill, and energy to the performance of his duties under [the] Agreement, and shall comply with all reasonable requests of the Company." Id., ¶ 7.2.

The Employment Agreements impose the fiduciary standard equal to that of a corporate officer upon the Defendants. As such, the Defendants had the obligation to devote themselves to LLC affairs so as to promote the interests of LLC, and not their own. See Seaboard Indus., Inc., 276 A.2d 305, 309 (Pa. 1971); Rivoli Theatre Co., Inc. v. Allison, 152 A.2d 449, 450-51 (Pa. 1959). Defendants had the obligation to neither directly, nor indirectly, use their positions to obtain any personal profit or advantage. See id. Defendants instead enriched themselves at the expense of LLC by pocketing proceeds from checks made payable to LLC and by charging their personal meals, gas, car maintenance and hotels to LLC. See Rivoli Theatre Co., Inc., 152 A.2d at 451; McDermott, 11 F.Supp.2d at 627-28.[5]

---

[5] Despite Robinson's claim that he does not understand accounting issues and does not know if depositing checks payable to RO was illegal, it is clear under Pennsylvania law that a person is guilty of theft if he or she "unlawfully takes, or unlawfully takes control over movable property of another with the intent to deprive him thereof." 18 Pa.C.S. § 3921. See, e.g., Com v. Rosenzweig, 522 A.2d 1088, 1091 (Pa. 1987) (Employee's alleged actions that consisted of obtaining coupons from source other than employer, mailing coupons in employer's name, intercepting reimbursement checks payable to employer, and depositing checks in personal account constituted exercise of unlawful control over movable property of employer with intent to deprive employer of property and constituted theft by unlawful taking or disposition).

   Clearly, § 3927 involving theft by failure to make disposition of funds received was also violated:

   A person who obtains property upon agreement, or subject to a known legal obligation, to make specified payments or other disposition, whether from such property or its proceeds or from his own property to be reserved in equivalent amount, is guilty of theft if he intentionally deals with the property obtained as his own and

In order to recover for breach of fiduciary duty under Pennsylvania law, LLC must allege: 1) that the Defendants acted negligently or intentionally failed to act in good faith and solely for the benefit of LLC in all matters for which they were employed; 2) that LLC suffered injury; and 3) that the Defendants' failure to act with reasonable care, and solely for LLC's benefit was a real factor in bringing about LLC's injuries.  See WIH Management, Inc. v. Heine, 1999 U.S. Dist. LEXIS 14926, *4-5 (E.D. Pa. 1999); Mountbatten Surety Co., Inc. v. Brunswick Ins. Agency, 2001 U.S. Dist. LEXIS 24224, *42 (E.D. Pa. 2001).

Here, a reasonable jury could find that, through their self-dealing, Robinson and Oechsle breached their duties of loyalty and good faith.  See McDermott, 11 F.Supp.2d at 627-28.  Obviously, the repeated interception of checks made payable to LLC by Robinson and Oechsle, followed by the deposit of those checks into the GTD account constitutes a breach of loyalty and good faith.  See id.  In addition, charging personal expenses to LLC constitutes a breach of fiduciary duty.  See id. at 627.  A reasonable factfinder could certainly conclude that charging hotdogs, ice cream, family vacations and dinners, gasoline for non-business purposes, and "personal" hotel rooms for weekend nights constitute breaches of fiduciary duty.  A jury could also conclude that the

---

fails to make the required payment or disposition. The foregoing
applies notwithstanding that it may be impossible to identify
particular property as belonging to the victim at the time of the
failure of the actor to make the required payment or disposition.

18 Pa.C.S. § 3927.  Defendants were entrusted with LLC checks and improperly and secretly
disposed of them by depositing them in their own bank accounts.

overcharges, double-charges and fictitious-charges by RO Express were breaches of fiduciary duty.  These schemes, together with the failure to disclose the O'Brien embezzlement scheme until a week after it was discovered, the "loss" of O'Brien's resignation letter, the fact that O'Brien's embezzlement benefited Defendants, the fact that Robinson took the recovered funds from the RO Express bogus account, which belonged to LLC, and deposited those funds into the RO Express operating account, and permissible inferences from these facts are sufficient for a jury to conclude that there were gross breaches of fiduciary duty.  A jury could reasonably conclude that, from the outset, Defendants took advantage of the trust placed in them and stole from their employers.

**B.    AMPLE EVIDENCE IN THE RECORD SUPPORTS OLES' CLAIM OF BREACH OF CONTRACT**

**1.    Employment Agreements**

Robinson and Oechsle's breaches of their fiduciary duties were also breaches of their Employment Agreements.   In their Employment Agreements, they promised to perform the duties incident to their positions as President and Vice President, respectively.  They promised to devote their full business time, attention, skill and energy to the performance of those duties.

Instead of performing duties incident to the positions of President and Vice President, Robinson and Oechsle used their positions of trust to bilk their employer in a variety of imaginative ways.  Instead of devoting their time, skill and energy to benefiting LLC, they spent considerable time, skill and energy

diverting its assets to their own use.[6]  Thus, summary judgment in favor of

Defendants is inappropriate for Plaintiff's claim of breach of contract.

### 2.      Purchase Agreement

Robinson and Oechsle breached the Purchase Agreement by breaching

their common law and contractual fiduciary duties to LLC.  In Article 5 of the

Purchase Agreement, entitled "Pre-Closing Agreements," the Defendants

covenanted to use their "best efforts" to, among other things, preserve the

management team and work force of RO Envelope, preserve the business of RO

Envelope, preserve the goodwill of customers, clients, suppliers, creditors and

continue performance in the ordinary course of their obligations.  See Purchase

Agreement, § 5.01, 5.03. A reasonable fact finder could conclude that Defendants

embezzlement schemes, fraudulent reimbursement of personal expenses and

improper charges from RO Express were a violation of their obligations to use

their best efforts to "preserve the business of RO Envelope."

The Post-Closing Agreements section of the Purchase Agreement provides

that Robinson and Oechsle:

> jointly and severally, shall
> indemnify…[Plaintiffs]…against and from all
> liability, demands, claims, actions or causes of action,
> assessments, losses, penalties, costs, damages or
> expenses, …as a result of or arising out of or by virtue
> of (i) the breach of any representation, warranty or
> covenant made by [Robinson and Oechsle] herein or

---

[6] Defendants' argument that Plaintiffs have not pointed to a specific provision of the Employment Agreements that was breached is absurd.  Was it necessary for executive employment agreements for a President and Vice President to include a ban on stealing?

> in any certificate, <u>exhibit</u> or schedule delivered to
> [LLC] in connection herewith,…

(Emphasis supplied).  Purchase Agreement § 6.01 (a).  The Employment

Agreements are exhibits 4.01(a)(iii)A and B to the Purchase Agreement.

(Purchase Agreement, § 4.01(a)(iii)).  Defendants' breaches of fiduciary duty,

which comprise breaches of their Employment Agreements, entitle Plaintiffs to

indemnity under the Purchase Agreement.

Defendants contend that the indemnity provision only applies to

representations, warranties and covenants that the Defendants breached on or

before the closing date.  Nothing in the Purchase Agreement supports their

construction of the provision.  The clear terms are not consistent with the

limitation Defendants advance.  The indemnification obligation arises for "the

breach. . . of any covenant made. . . ."  The Employment Agreements include

various covenants which Defendants breached repeatedly.  <u>See</u> <u>supra</u> at pp. 36-

37.  Defendants also ignore the title of Article 6, "<u>POST-CLOSING</u>

<u>AGREEMENTS</u>."  Exhibit 4 at Article 6.  Consequently, Defendants' reliance on

section 2.26 of the Purchase Agreement is misplaced[7].  The indemnification

---

[7] Defendants argue that the indemnification provision of the Purchase Agreement is only triggered upon the breach of a representation, warranty or covenant made on and as of the closing date.  To that end, Defendants rely on section 2.26, "Effective Date of Warranties, Representations and Covenants," which provides that "[e]ach warranty, representation, and covenant set forth in this Article 2 shall be deemed to be made on and as of and speak on and as of the date hereof and as of the Closing (except as otherwise specifically provided herein)." However, the indemnification provision, § 6.01, and the representations, warranties and covenants that trigger it are not contained in Article 2.  Therefore, section 2.26 is wholly inapplicable.

provision of section 6.01 specifically applies to post-closing breaches of representations, warranties and covenants by the Defendants.

Defendants' interpretation of section 4.01 (k) is likewise flawed. Defendants rely on section 4.01 (k) to argue that "'the representations, warranties and/or covenants' made by the Defendants in the Purchase Agreement (for which indemnity protection is provided in Section 6.01) were only those made at the time of and as of the sale." <u>See</u> Defendants' Memorandum, p. 39. Defendants have completely misread Article 4 of the Purchase Agreement. Article 4, entitled "<u>Closing Conditions</u>" requires purchaser to close only if the conditions set forth are met. It has nothing to do with the indemnification provision.

### C. PLAINTIFF'S DAMAGE THEORY IS WELL-GROUNDED IN PENNSYLVANIA LAW

The evidence in the record of damage as a result of Robinson's and Oechsle's scheme is voluminous.[8] The affidavit of Jay Young shows that in negotiating with Robinson and Oechsle and reviewing the RO business, Oles understood that they were key executives on whom RO depended for success. Exhibit 16 at ¶ 3. Oles expected that after the acquisition of assets, Robinson and Oechsle would continue in their key executive roles and would lead LLC to greater success. <u>Id.</u> Robinson and Oechsle were entrusted to run the LLC business with support, but little interference from Oles. <u>Id.</u> In addition, Oles

---

[8] Defendants attack Plaintiffs' damage expert, Lawrence Signorelli, by claiming that Mr. Signorelli did not investigate causation but merely assumed the facts in the complaint to be true. Mr. Signorelli was not retained as a causation expert. Instead, it is for the jury to decide whether the extensive embezzlement, expense account abuse, and cover up constitute sufficient causation.

expected that it would increase sales with the help of Robinson and Oechsle and that Oles would provide part of LLC's supply requirements, such that the entities would enjoy direct sales channel benefits.  Id.

As a result of Oechsle's, Robinson's, and O'Brien's embezzlement and expense account abuses, Oles could no longer trust Oechsle or Robinson and obtained their respective resignation and retirement.  Id. at ¶ 4-6.  Oles knew that Robinson and Oechsle were key executives at RO, but when it developed serious doubts about their integrity, it had no choice but to replace them.  Exhibit 12 at ¶ 29; Exhibit 16 at ¶ 7.  Shortly after Oechsle resigned, average monthly sales at LLC started to decline.  Exhibit 12 at ¶ 30.  A precipitous drop in monthly sales started in February 2001.  Resulting losses were so great that in some instances major customers' monthly purchases were reduced to zero.  Exhibit 12 at ¶ 30.  Although new management at LLC attempted to reestablish a customer base, the base was largely dependent on Robinson's and Oechsle's contacts and relationships continued to erode.  Eventually, losses were such that LLC's operation was shut down.  Exhibit 12 at ¶ 30.

Defendants assert that even if Oles' factual allegations regarding breach of contract are correct, Oles cannot prove expectation damages under Pennsylvania law.[9]  Notably, defendants do not make the same allegation with regard to

---

[9] Defendants assert the remarkable theory that, if a President and Vice President of a company steal from it the company's damage claim is limited to the amount stolen.  That theory fundamentally ignore the basic premise of consequential damages.  As recent history has demonstrated with alarming emphasis, if executives loot their company, damages can be substantially greater than the amount they take.

damages for breach of fiduciary duty.  Nor do they allege that plaintiff cannot

prove reliance or restitution damages.  In addition, many of their references to

case law are incorrect.[10]

    "The purpose of damages in contract actions is to return the parties to the

position they would have been in but for the breach."  Birth Center v. St. Paul

Companies, Inc., 787 A.2d 376, 385 (Pa. 2001).  Defendants have cited Scobell Inc.

v. Schade, 688 A.2d 715, 719 (Pa. Super. 1997) for the proposition that a mere

possibility of profit will be insufficient to justify damages.  However, the Scobell

Court noted that because lost profits are often difficult to calculate, only

reasonable certainty is required.  Id. at 719.  "Often the reasonable certainty

required may be fulfilled by looking to a restitutionary measure of damages."  Id.

(quoting Sobers v. Shannon Optical Co., 473 A.2d 1035, 1039 (Pa. Super. 1984)).

    Thus, in Ebright v. Shutter, 386 A.2d 66, 69 (Pa. Super. 1978), the court

awarded damages for the breach of a covenant not to compete based on the

value placed upon the goodwill covenant not to compete by the parties in the

contract.  The court also noted that in contract cases in which equitable relief is

granted, but full performance is impossible, the "courts frequently grant a pro

rata abatement of the purchase price."  Id. at 68.   Proof of lost profits was not

required.  Id.  See also Sobers, 473 A.2d at 1039-40.

---

[10] Defendants cite Gorwara v. AEL, 784 F. Supp. 239 (E.D. Pa. 1992) for the unremarkable
proposition that damages must be proved by "clear evidence."  Gorwara, however, does not
address damages at all; instead, it states that under Pennsylvania law, the plaintiff must establish
the existence of an oral contract by "clear and precise evidence."  Id. at 242.  This case does not
involve the existence of an oral contract.

Applying Pennsylvania law, the Third Circuit explained alternatives

theories of recovery where lost profits are difficult to prove:

> While the traditional law of contract remedies implements the
> policy that goods and services should be consumed by the person
> who values them most highly, and hence the preference for
> expectation damages, other theories of damages provide alternative
> avenues for contract enforcement. This is especially so where an
> injured party is entitled to recover for breach of contract, but
> recovery based on traditional notions of expectation damages is
> clouded because of the uncertainty in measuring the loss in value
> to the aggrieved contracting party. . . . Thus, where a court cannot
> measure lost profits with certainty, contract law protects an injured
> party's reliance interest by seeking to achieve the position that it
> would have obtained had the contract never been made, usually
> through the recovery of expenditures actually made in performance
> or in anticipation of performance. . . . Finally, damages under a
> theory of restitution provides an appropriate form of relief in many
> contract cases. Its objective is not the enforcement of contracts
> through the protection of an injured party's expectation or reliance
> interests, but is instead rooted in common notions of equity
> through the protection of the injured's restitution interest.. . .
> Accordingly, restitution damages will <u>require</u> the party in breach to
> disgorge the benefit received by returning it to the party who
> conferred it. . . . Pennsylvania courts will look to traditional
> principles of equity, such as unjust enrichment or forfeiture, in
> considering the propriety of restitution damages. . . .

<u>ATACS Corp. v. Trans World Comuns., Inc.</u>, 155 F.3d 659, 669 (3d Cir.

1998)(internal citations omitted) (reversing for determination of appropriate

restitution damages).

In this case, as set forth above, there is ample evidence of expectation

damages.  In the alternative, the evidence is sufficient for a jury to award reliance

damages to put LLC and Oles back in the position it would have been in had the

contract not been breached.  Finally, there is ample evidence in the record to

support the award of damages under a restitution theory.  The Asset Purchase

Agreement makes clear that the purchase price included two million dollars for

goodwill.  Every bit of that goodwill was destroyed by Oechsle's and Robinson's

scheme to loot the company.

     The other cases cited by defendants do not hold to the contrary.

Defendants cite Spang & Co. v. United States Steel Corp., 545 A.2d 861, 866 (Pa.

1988) for the proposition that damages must be proved by clear evidence.  In

Spang & Co., the Pennsylvania Supreme Court affirmed the trial court's decision

to allow a new trial in a breach of contract action so that plaintiff could provide

additional evidence of damages.  While the Court did state that the plaintiff has

the burden of proving damages, it also stated:

> [T]here should be no doubt that recovery will not be precluded
> simply because there is some uncertainty as to the precise amount
> of damages incurred.  It is well established that mere uncertainty as
> to the amount of damages will not bar recovery where it is clear
> that damages were the certain result of the defendant's conduct. . .
> The basis for this rule is that the breaching party should not be
> allowed to shift the loss to the injured party when damages, even if
> uncertain in amount, were certainly the responsibility of the party
> in breach.

Id. at 866.   This is especially true in a case such as this where the breaching party

committed tortious or criminal acts.

     Defendants have also cited Delahanty v. First Pennsylvania Bank,

464 A.2d 1243, 1258 (Pa. Super. Ct. 1983) for the proposition that lost

profits must be proven with reasonable certainty and must be foreseeable.

Delahanty was a fraud, rather than breach of contract case, and the

appellate court affirmed the award of compensatory damages, although it reduced the amount by $30,000.00. In its analysis, the court stated that "mere uncertainty as to the amount of damages will not bar recovery where it is clear that the damages were the certain result of the defendant's conduct." Id. at 1257 (citations omitted).

Defendants also cite Advanced Power Systems, Inc. v. Hi-Tech Systems, Inc., Civ. No. 90-7952, 1994 WL 116121 (E.D. Pa. March 21, 1994) for the argument that the Court may grant summary judgment if a plaintiff fails to proffer sufficient evidence of damages. In Advanced Power Systems, the court actually denied summary judgment on most counts, finding sufficient evidence of damage. For example, there was sufficient evidence that plaintiff lost business as a result of defendant's actions. The Court stated that although defendant "criticizes the Coopers & Lybrand [expert] report, its challenges are more appropriate for cross-examination at trial than as a basis for summary judgment. I conclude that there is evidence that could support a jury's calculation of compensatory damages that should be awarded to [plaintiff]." Id. at *6. Defendants' arguments regarding the merits of plaintiff's expert report are likewise more appropriate for cross-examination at trial.

Finally, in RGI, Inc. v. Unified Indus., Inc., 963 F.2d 658 (4th Cir. 1992), plaintiff had claimed $500,000 in damages based on a former employee's disclosure of proprietary information to a competitor but had no evidence in the record accounting for how the damages were calculated. The only evidence in

support of the damage claim was a conclusory affidavit from the president

stating that defendant's actions put plaintiff "at a tremendous competitive

disadvantage" and stated that plaintiff's "disadvantage results directly in lost

profits," without stating any amount.  The district court ruled that the affidavit

was insufficient to raise a genuine issue of material fact.  Later, plaintiff

submitted a supplemental affidavit summarizing the amount of lost profits.  The

district court refused to consider the supplemental affidavit, because plaintiff

had no excuse for failing to present the evidence earlier.  The Fourth Circuit

ruled that it was in the court's discretion to refuse to consider the later affidavit.

Unlike RGI, plaintiff has submitted substantial evidence of the amount of its

damages.

### D.   PENNSYLVANIA LAW SUPPORTS RESCISSION AS AN ALTERNATIVE FORM OF RELIEF

Summary judgment is similarly inappropriate with respect to the

rescission claim.  Rescission is permitted when the complaining party has

suffered breaches of such material and substantial nature that they affect the very

essence of the contract and serve to defeat the object of the parties.  See Castle v.

Cohen, 676 F.Supp. 620, 627 (1987).  The flagrant and intentional breaches of

fiduciary duties committed by Robinson and Oechsle are of such a material and

substantial nature as to render the Asset Purchase Agreement and Employment

Agreements meaningless.  The entire premise of the transactions was to use the

expertise, knowledge and contacts of Robinson and Oechsle to make LLC a

successful and profitable enterprise.  Had LLC known that Robinson and

Oechsle were planning to embezzle funds and neglect their duties to effectively

manage the company, it would have never entered into negotiations for the asset

purchase.  Thus, it is abundantly clear that the very essence of the contract has

been defeated by the tortious actions of the Defendants.  Theft, embezzlement,

concealment, expense abuses and non-disclosure of the O'Brien scheme by the

President and Vice President of LLC amount to extraordinary circumstances

warranting rescission of the Asset Purchase Agreement and Employment

Agreements.

The Defendants argue that rescission in this case is inappropriate because

they cannot be restored to their original position due to the failure of LLC.

However, Defendants' argument is inconsistent with the law of Pennsylvania.

Under Pennsylvania law, the purpose of equitable rescission is to return the

parties as nearly as possible to their original positions where warranted by the

circumstances of the transaction.  See Baker v. Cambridge Chase, Inc., 725 A.2d

757, 766 (Pa. Super. Ct. 1999).  As such, a plaintiff may have a legal remedy based

upon rescission when it restores or attempts to restore the consideration.  See

New York Life Ins. Co. v. Sisson, 19 F.2d 410, 411 (W.D. Pa. 1926).  Plaintiffs

attempted to restore Defendants to their original position in May, 2002 by

offering Defendants the opportunity to rescind the transaction.  See 5/3/02

letter, Exhibit 17.  That offer was refused by Defendants.  See 5/8/02 letter,

Exhibit 18.  Therefore, the attempted surrender of LLC to Defendants permits the Plaintiffs to pursue their action for rescission.  See New York Life Ins. Co., supra.

In Morgan Publications, Inc. v. Squire Publishers, Inc., 26 S.W.3d 164 (Mo. Ct. App. 2000), the purchasers of a newspaper business brought suit against the seller to rescind the sale after it learned of discrepancies in the company's financial statements.  Similar to Pennsylvania, the purpose of rescission in Missouri is to return the parties to the status quo.  See id. at 175.  However, the Morgan Publications Court reasoned that a finding that rescission is appropriate does not require that the court restore the parties absolutely and literally to their former condition.  See id.  Rather, it is sufficient that the court effect such a restoration as is reasonably possible.  See id.

LLC attempted to tender the business back to the Defendants over one year ago, upon its discovery of the extent of Defendants' wrongdoing. Defendants refused the offer and, ultimately, LLC closed its doors.  As a matter of equity, Defendants should not be permitted to defeat Plaintiff's rescission claim by setting in motion the destruction of the company, refusing to accept rescission when it was offered and the company was operating, and contending that there is nothing to give back at a time when the full impact of their activities has run its course and the destruction of LLC is complete.

Defendants next argue that Plaintiff waived its right to rescind the agreements by failing to promptly notify Defendants of its intention to rescind and tender the benefits back to Defendants.  Plaintiff sought rescission of the

agreements in a timely manner by letter dated May 3, 2002. Because of the
fraudulent nature of Defendants' activities, Plaintiffs were not fully aware of all
of the facts giving rise to the allegations in the Amended Complaint by February
2001. In fact, February 2001 was only the beginning of the unraveling of
Defendants' wrongdoing. Accordingly, Defendants' erroneous conclusion that
Plaintiffs waited over fifteen months from the time they learned of the
wrongdoing until they sought rescission is completely inconsistent with the facts
in the record.

    The cases cited by Defendants do not support their argument that Plaintiff
failed to promptly notify Defendants of its intention to rescind. In Wolgin v.
Smith, 1996 WL 355338 (E.D. Pa. 1996), the issue was not whether the plaintiff
sought rescission in a timely manner. In Wolgin, there was no dispute that the
plaintiff did not attempt to tender what he had received under the agreement
that he was seeking to rescind. See Wolgin, 1996 WL 355338, * 1. Sixsmith v.
Martsolf, 196 A.2d 662 (Pa. 1964) does not address the issue of rescission at all
but addresses reformation. See Sixsmith, 196 A.2d at 663. In dicta, however, the
Sixsmith Court mentioned that over twenty-five months is late for rescission
purposes and that the plaintiff must act promptly upon his discovery of
wrongdoing. See id. Defendants' reliance on the dicta in Sixsmith is misplaced.
Plaintiffs here began investigating Defendants' wrongdoing fifteen months
before they claimed rescission. The fraudulent nature of Defendants' activities
prevented a full realization of them until much later. Obviously, there exists a

dispute of fact as to the time period between Plaintiff's discovery of Defendants'

embezzlement and other breaches of fiduciary duties and its tender of LLC to

Defendants.  Accordingly, summary judgment is not proper.

### E.  DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THEIR CROSS CLAIMS

Defendants seek summary judgment on Counts I and IV of their

Counterclaim based on the argument that under the terms of the Asset Purchase

Agreement and Promissory Note ("Note"), LLC is obligated to pay them the

remaining installments of the purchase price because those payments are not

contingent on any performance criteria of the company or the individual

Defendants.   Contrary to Defendants' argument, however, Plaintiffs' obligation

under the Note is subject to the indemnity provision of the Asset Purchase

Agreement.  Hence, Plaintiffs are entitled to withhold payment to the extent

necessary to indemnify them.

As set forth on pages 33-36, supra, Defendants' breaches of fiduciary duty

comprise breaches of their Employment Agreements and trigger the indemnity

provisions of the Asset Purchase Agreement.  Plaintiffs' claims for damages far

exceed the amounts due under the Note.  As a consequence, the issues of

whether they are entitled to withhold payment and whether any payments are

due at all are for the trier of fact.

 In addition to the terms of the note itself, Maryland law provides that

Defendants' attempt to enforce the note is subject to Plaintiffs' right of

recoupment.  See MD. CODE ANN., COM. LAW I § 3-305 (a) (3); Billingsley v. Kelly,

261 Md. 116, 121-22 (1971).  Here, Plaintiffs' claims under the Employment

Agreements and Asset Purchase Agreement and Defendants' claims under the

Note are all claims that arise out of the same transaction.  Thus, Plaintiffs'

liability for payments under the Note will have to await a jury's determination.

Finally, the Note states that it is made "for value received."  The evidence

in the record is clear that the purported value for the Note was the assets of RO

Envelope Company.  Because of Defendants' activities, those assets ultimately

proved to be without value.  Thus, Plaintiffs are entitled to contend that there has

been a failure of consideration as a defense to Defendants' attempt to enforce the

Note, an issue of contested facts for the jury to decide.  See Venners v. Goldberg,

133 Md. App. 428 (2000).

## CONCLUSION

Numerous factual disputes exist in the record.  Many of those disputes

revolve around the credibility of individuals who engaged in a fraudulent

scheme.  The facts and inferences to be drawn from the facts provide ample basis

for a jury to find that defendants breached their contracts and fiduciary duties.

These same facts support a defense to defendants' counterclaims.  Accordingly,

Plaintiffs respectfully request that the Court deny the motion for summary

judgment.

_____/s/_____
Ward B. Coe, III, Bar No. 00282
Pamela M. Conover, Bar No. 22453
Jennifer R. Lazenby, Bar No. 25886
Whiteford, Taylor & Preston, LLP
Seven Saint Paul Street, Suite 1400
Baltimore, Maryland  21202
(410) 347-8700

*Attorneys for Plaintiff Oles Envelope, LLC*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY, that on this 5th day of September, 2003, a copy of Oles

Envelope, LLC's Response to Plaintiff's Motion for Summary Judgment, was hand-

delivered, to:

> Jefferson V. Wright, Esquire
> Tessa Lapsia Frederick, Esquire
> Brian D. Craig, Esquire
> Miles & Stockbridge P.C.
> 10 Light Street
> Baltimore, Maryland  21202
>
> *Attorneys for Defendant, GTD Company, Inc.,*
> *Harold Robinson and David Oechsle*


_____/ s /_____
Pamela M. Conover

*1510284*