**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

OLES ENVELOPE, LLC, <u>et al.</u>,          *

      Plaintiffs,                              *

v.                                                    *          Civil Action No. WMN 02-2017

GTD COMPANY, INC., <u>et al.</u>,          *

      Defendants.                           *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**DEFENDANTS' REPLY MEMORANDUM IN FURTHER SUPPORT OF**
**THEIR MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS'**
**AMENDED COMPLAINT AND FOR SUMMARY JUDGMENT ON**
**COUNTS I, II AND IV OF COUNTERCLAIMANTS' COUNTERCLAIM OR,**
**<u>IN THE ALTERNATIVE, AN ORDER PURSUANT TO RULE 56(d)</u>**

      Defendants, GTD Company, Inc., Harold Robinson and David Oechsle (collectively, the

"Defendants"), by their undersigned counsel, submit this Reply Memorandum in Further Support of

Defendants' Motion for Summary Judgment on Plaintiff's Amended Complaint and for Summary

Judgment on Counts I, II and IV of Counterclaimants' Counterclaim or, in the alternative, for an Order

pursuant to F.R. Civ. P. 56(d).

**I.    <u>INTRODUCTION</u>**

      In their Response to Defendants' Motion for Summary Judgment (the "Response"), Plaintiffs,

Oles Envelope, LLC and Oles Envelope Corporation (collectively, the "Plaintiffs"), effectively concede

that there is no factual support for the bulk of the 10 factual allegations that form the basis for the 4

claims asserted in the Amended Complaint.  Plaintiffs devote most of their efforts attempting mightily to

describe in detail Defendants' alleged participation in Mr. O'Brien's embezzlement scheme and the

alleged expense account abuses, thereby attempting to create a dispute of fact and avoid summary

judgment.  By so doing, Plaintiffs argue that disputes of fact exist over a few thousand dollars of

expenses (a dispute of fact already recognized by Defendants in their original motion) and over Defendants' level of involvement in Mr. O'Brien's fraud. What Plaintiffs do not and cannot dispute is that all of the money they can prove was wrongfully diverted by O'Brien (or Defendants) into any accounts has long since been repaid. They are relegated instead, by their own admission, to a present claim that "approximately $20,000" of unspecified sums remain to be repaid (see Moderacki affidavit, Exh. 12 to Plaintiffs' Response, at ¶ 13). Nowhere do Plaintiffs even argue that these sums, or even the entire original sums they claim were wrongfully obtained and which were repaid, are material to the financial status of Oles LLC, and the only evidence in the record establishes the exact opposite (see Exhibit 23 in Appendix to Defendants' Motion).[1]

Recognizing that their actual damages, assuming they prevailed on their claims, would be limited to, at best, somewhere in the neighborhood of $20,000, Plaintiffs had to come up with a new theory to support their claim for damages in excess of $2 Million. Plaintiffs now argue that because of the embezzlement scheme and the expense account abuses, they had no choice but to get rid of Robinson and Oechsle, which they claim ultimately resulted in a significant decrease in sales and the ultimate closure (over 1 year later) of their business. Conspicuously absent from Plaintiff's Response (and the record in the case) is any evidence to support this legal theory. Indeed, the facts in the record (including those supplied by Plaintiffs' representatives themselves) actually support very different reasons for the closure of their business, none of which are Defendants' responsibility. At the end of the day, Plaintiffs have not and cannot show that even one customer or even one sale was lost because of the alleged involvement of Defendants in O'Brien's embezzlement scheme, the expense account abuses, or any other conduct of Defendants.

---

[1] Nearly all of the exhibits referenced herein are exhibits contained in the Appendix filed with Defendants' original motion for summary judgment, with the exception of Exhibits 38-40 which are attached hereto.

For the reasons addressed below, Defendants request the Court to enter summary judgment on each of the legal claims. Should the Court find that there is a dispute of fact with respect to one or more of Plaintiffs claims, Defendants request the Court to determine, pursuant to Rule 56(d), that 6 of the 10 factual underpinnings to Plaintiffs' claims are wholly unsupported and without controversy. Defendants further request that, in light of the complete absence of evidence with respect to Plaintiffs' underlying legal theory as to causation, the Court grant summary judgment or enter a Rule 56(d) Order finding that the Plaintiffs' claim for an award of their "expectation damages" is unsupported by any causation evidence, is wholly speculative and indeed contrary to the evidence, is not in legitimate controversy and, thus, is not recoverable. Such a ruling under Rule 56(d) would refine Plaintiffs claims to claims for the minimal losses (on the order of $20,000 or so) that they contend remain unpaid, would greatly simplify the issues for trial, and almost certainly would enhance the prospects of resolution of the dispute short of trial.

## II.    ARGUMENT

### A.    This Court Should Grant Relief Under Rule 56(d) on Six of the Ten Specific Factual Allegations in the Complaint.

In their Memorandum in Support of their Motion to Dismiss ("Defendants Motion"), Defendants argued that the evidence of record did not support the ten allegations that form the basis for all of Plaintiffs' claims. In their Response, Plaintiffs offer no absolutely no evidence to support the following factual allegations:

1.    **RO Express Expenses**. Paragraph 31 of the Amended Complaint states that "Robinson and Oechsle charged RO Express expenses to Oles LLC." See also Am. Compl., at ¶¶ 46, 54, 63, and 74. As addressed in Defendants' Memorandum, Messrs. Robinson and Oechsle deny that any RO Express expenses which were paid by Oles LLC remain unpaid. See Robinson Affidavit, Exh. 9, ¶ 3; Oechsle Affidavit, Exh. 25, ¶ 3. In their Response, Oles LLC did not provide any factual evidence to

refute Messrs. Robinson's and Oechsle's testimony.  Thus, there is no dispute of fact regarding this allegation, and this Court should grant judgment in favor of Defendants on the allegations made in paragraph 31 of the Complaint, or issue an order pursuant to Rule 56(d) that there is no controversy with respect to these allegations.

2.    **Time Spent on RO Express Business**.  Paragraph 32 of the Complaint baldly states that "Robinson and Oechsle also spent the majority of business hours operating RO Express, to the detriment of Oles LLC."  As set forth in Defendants' Memorandum, Plaintiffs expressly permitted Messrs. Robinson and Oechsle, in their Employment Agreements, "to manage and operate RO Express, Inc. . . . so long as such activities do not unreasonably interfere with [their] duties under [the] Agreement." Exhibits 12 and 13, at ¶ 7.2.  The evidence of record, which Plaintiffs have offered nothing to refute, shows that Defendants in reality spent very little time operating RO Express – only a few minutes a day and usually during their lunch hour or before their workday at Oles LLC began (the uncontroverted testimony was that Oechsle typically arrived at the office in the early morning hours).[2]  Therefore, this Court should grant summary judgment in favor of Defendants on the allegations made in paragraph 32 of the Complaint, or find pursuant to Rule 56(d) that this allegation is not in legitimate dispute.

3.    **Use of "RO Envelope" Name**.  Paragraph 34 of the Complaint alleges that "Robinson and Oechsle intentionally continued to use the 'RO' name to confuse Oles LLC's customers and banks." There has been no testimony in this case and no evidence presented by Plaintiffs to support these allegations, or to tie them to any unreimbursed loss suffered by Plaintiffs, and Plaintiffs have offered no evidence to support this allegation in their Response.  This Court should find that there is no factual basis to support the allegations made in paragraph 34 of the Amended Complaint and enter summary

---

[2] See Harold Robinson's Answers to Oles LLC's Interrogatories, Exhibit 29, at No. 6; Oechsle's Answer to Oles LLC's Interrogatory No. 4; Robinson Affidavit, Exh. 9, ¶ 4; Oechsle Affidavit, Exh. 25, ¶ 4.

judgment accordingly, or order pursuant to Rule 56(d) that these allegations are not in legitimate dispute.

4. **Diversion of Customers to Rite Envelope**. Paragraph 39 states "that after July 2001, Robinson and Oechsle embarked upon a scheme to entice customers away from Oles LLC to a major competitor, Rite Envelope." This allegation was key to the Amended Complaint because it was the alleged factual basis for causation (together with the related allegations concerning Kimberly Robinson's employment with Rite Envelope, addressed next below) that tied directly to the reason Plaintiffs give for the company's failure: a large decrease in sales volume. There is no evidence (either in deposition testimony or in any documentation that has been produced in this case) that either Robinson or Oechsle diverted any customers away from Oles LLC to Rite Envelope. In their Response, Plaintiffs never even address this allegation, much less provide any evidence to support it. Thus, this Court should grant judgment in favor of Defendants on the allegations made in paragraph 39 of the Complaint, or order that this issue is not in dispute pursuant to Rule 56(d).

5. **Kimberly Robinson's Employment With Rite Envelope**. Paragraph 42 states "that upon information and belief, Robinson assisted his daughter in obtaining employment with Rite Envelope." Plaintiffs once again have generated <u>no</u> evidence to support this allegation, and do not even mention this allegation in their Response. Accordingly, this Court should determine that there is no dispute of fact with respect to this claim of wrongdoing, and enter summary judgment accordingly.

6. **Enticement of Customers to Rite Envelope**. Paragraph 43 states "that upon information and belief, Robinson assisted his daughter in enticing Oles LLC customers to do business with Rite Envelope." The undisputed evidence of record, however, reveals that Mr. Robinson never referred business to Rite, never engaged in any kind of customer relation activity with Rite, and that Kimberly Robinson never engaged Mr. Robinson on her behalf to convince customers to do business with Rite. Newman depo., Exh. 32, at p. 49. Again, Plaintiffs never even addressed this allegation in

5

their response.  Thus, the Court should grant judgment in favor of Defendants or enter a Rule 56(d)

order on the allegations made in paragraph 43 of the Amended Complaint.

Based on the Plaintiffs' failure to point to any evidence to support the above factual allegations,

it is clear that Federal Rule of Civil Procedure 56(d) is the ideal vehicle to at least narrow the issues for

trial.  Rule 56(d) provides that the Court:

> by examining the pleadings and the evidence before it and by interrogating counsel, shall
> if practicable ascertain what material facts exist without substantial controversy and what
> material facts are actually and in good faith controverted.  It shall thereupon make an
> order specifying the facts that appear without substantial controversy, including the
> extent to which the amount of damages or other relief is not in controversy, and directing
> such further proceedings in the action as are just.  Upon the trial of the action the facts so
> specified shall be deemed established, and the trial shall be conducted accordingly.

The purpose of Rule 56(d) is to enable "the Court to withdraw some issues from the case and to specify

those facts that really cannot be controverted."  Cohen v. Bd. of Trustees, 867 F.2d 1455, 1463 (3rd Cir.

1989) (quoting 10A Wright, Miller and Kane, Federal Practice and Procedure § 2737, at pp. 457-58

(1983)).

### B.    The Alleged Embezzlement and Expense Account Abuse resulted in little or no direct damages to Plaintiffs.

#### 1.    The alleged embezzlement scheme.

Recognizing that there is no evidence to support most of the factual allegations that support their

claims, Plaintiffs attempt to create a dispute of fact regarding Messrs. Robinson and Oechsle's

involvement in an alleged embezzlement scheme perpetrated by Joseph O'Brien, the bookkeeper for RO

Envelope and RO Express.  As set forth in detail in Defendants' Motion, Mr. O'Brien was involved in

an embezzlement scheme, which was achieved through four (4) separate means:

> (i)    the opening of an unauthorized account at First Union Bank in the name of RO
> Express (through O'Brien falsely pretending to be an officer of RO Express), and
> the subsequent deposit of checks made payable to RO Envelope into that account
> and the use of those diverted funds for purposes related to RO Express and for
> O'Brien's personal purposes.  O'Brien depo., Exh. 14, at pp. 178-185;

    (ii)      the diversion of checks made payable to RO Envelope into the RO Express operating account (a legitimate account).  Id., at pp. 205-222;

    (iii)     the deposit of checks payable to RO Envelope into an account in the name of GTD, Inc., which was the successor by name change to RO Envelope Co., Inc. (the operating company of the Defendants before the acquisition).  Id., at pp. 160-178.  The GTD, Inc. account was intended in part to be (and in fact was) the account into which Oles LLC paid the deferred purchase price payments that were made; and

    (iv)     the theft of money from both RO Envelope and RO Express by cashing checks made payable to "Cash" drawn on these accounts and using the resulting funds for purposes other than petty cash, and by drawing checks on the bogus account to pay personal debts of O'Brien's.  Id., at pp. 188-192, 221.

As addressed in Defendants' Motion, Mr. O'Brien acted completely alone with respect to the thefts which occurred as described in items (i), (ii) and (iv) above.

       Plaintiffs have offered no competent evidence to refute the Defendants' contention that they were not involved in any way in, and did not benefit from, O'Brien's scheme with respect to the bogus and legitimate RO Express accounts.[3]  Plaintiffs hint that there was some involvement by Robinson and Oechsle in O'Brien's embezzlement through the bogus RO Express account and the legitimate RO Express account.  For instance, Plaintiffs imply that Robinson and Oechsle must have been involved because they allegedly waited a week to report the embezzlement to Plaintiffs after it was discovered.  Robinson and Oechsle, however, have explained the reasons for the delay (which in fact was far less than a week) and they ultimately did report the embezzlement scheme.  Plaintiffs attempt to cast further doubt by pointing out that O'Brien's resignation letter was thrown away, but there is no factual dispute that O'Brien resigned by leaving a letter of resignation at RO's offices (O'Brien admits it, and both Robinson and Oechsle read it and testified to it).  See Oechsle depo., Exh. 6, at p. 136-37; Robinson

---

[3] Plaintiffs contend that in the summer of 2000, "O'Brien began depositing LLC checks into the RO Express operating account, commencing a second embezzlement scheme which benefited only Robinson and Oechsle."  Plaintiffs' Response at 10.  Once again, Plaintiffs' statement is not supported by the record.  O'Brien has testified that he wrote checks from that account for cash and took the cash for personal reasons.  O'Brien depo., Exhibit 14, at p. 221.

depo., Exh. 5, at pp. 155-58.  Finally, Plaintiffs point to copies of records relating to the bogus account

at First Union – which Robinson and Oechsle had asked for – and which were delivered to one of RO's

employees and then lost.  Plaintiffs have no proof whatsoever that the loss of the documents was

intentional on anyone's part or was caused by any action of either Robinson or Oechsle.  Nor have

Plaintiffs established any harm, as additional copies of these bank records were obtained immediately

from the bank.  The fact is, and the record clearly establishes, that the Defendants were as much duped

in Mr. O'Brien's schemes as were the Plaintiffs, and that, in fact, Mr. O'Brien acted to hide his activities

from Defendants.[4]  See O'Brien depo., Exh. 14, at pp. 178-185, 205-222, 190-192, and 221; Robinson

Affidavit, Exh. 9, at ¶ 7; Oechsle Affidavit, Exh. 25, at ¶ 5.  Defendants have offered no evidence to

refute this.

Plaintiffs also argue that Defendants were involved in the scheme with respect to the deposits

into the GTD account based on the fact that Mr. Oechsle authorized O'Brien to deposit checks payable

to Oles, LLC into the GTD account.  As far as Mr. Robinson is concerned, he vehemently denies any

involvement in the deposit of checks payable to Oles LLC into the GTD account, and the portions of the

record relied upon by Plaintiffs do not support the allegation that Mr. Robinson was involved in any

scheme with respect to the GTD account.

First, Plaintiffs allege that Robinson must have known about O'Brien's embezzlement scheme

relating to the GTD account because he "signed the card opening the account."  Plaintiffs' Response at

6.  There is no dispute that Robinson knew of the account, but that fact of course does not establish that

he knew of any diversions of checks into the account.  Next, Plaintiffs misleadingly cite to Mr.

---

[4] Mr. O'Brien opened the bogus account at First Union on his own, falsely purporting to be an officer of RO Express, and had the account statements delivered to an address where Robinson and Oechsle would not see them.  O'Brien depo., Exh. 14, at 179-80.  The account opening forms establish these facts, and O'Brien has admitted to them.  Id.  Moreover, O'Brien failed to pay payroll taxes for RO Express and, when the IRS investigated, O'Brien met with the IRS agent alone, pretending to be an officer of RO Express, and entered into an agreement to pay overdue payroll taxes, all without any notice to Defendants. Id., at 199-206.  The first notice to Defendants of the fact that payroll taxes had not been paid or that an IRS agent had contacted RO Express was when O'Brien resigned and Robinson and Oechsle found copies of two checks payable to the IRS drawn on the bogus First Union account.

O'Brien's deposition testimony and Mr. Oechsle's deposition testimony to support the claim that Robinson was involved. The testimony of O'Brien occurred over the objection of counsel following an improper compound question.[5] In any event, his testimony on this point is anything but clear given his later statement. See Plaintiffs' Exhibit 3 at p. 57. The testimony from Oechsle, quoted by Plaintiffs at page 9 of their Response, was taken out of context and ignores Oechsle's statement in which he stated on the same page that he did not recall whether he discussed with Robinson depositing Oles LLC checks into the GTD account. Id. Finally, Plaintiffs insinuate that Robinson improperly benefited from the alleged embezzlement scheme relating to the GTD account because he received a check for $10,000 from the account in December 1999. This allegation is reckless, as the $10,000 was Robinson's portion of a payment made into that account on December 29, 1999 by Oles to pay Defendants for certain tax liability, which constituted a portion of the purchase price in connection with the Purchase Agreement. See Excerpts from Robinson deposition, attached hereto as Exhibit 39, at pp. 336-340; see also Purchase Agreement, Exh. 7, at Section 1.04.[6] The $10,000 check from the GTD account to Robinson simply represented his portion of the taxes that Oles itself funded in accordance with its obligations under the Purchase Agreement. Id. at 337, 340.

The evidence of record supports Defendants' contention that O'Brien and Oechsle were the only parties involved in the deposit of Oles LLC checks into the GTD account. As addressed fully in Plaintiffs Motion, Mr. Oechsle had a legitimate reason for this and relied on Mr. O'Brien to inform him of the supposed "splits" of the checks between RO Envelope and RO Express, and Plaintiffs have

---

[5] At page 49 of Mr. O'Brien's deposition, the following colloquy took place:

    Q.        Would it have been deposited for the same reason that the other checks were deposited?
    A.        Yes.
    Q.        Pursuant to Mr. Oechsle's and Mr. Robinson's instructions?
               MR. WRIGHT:  Objection.
               THE WITNESS:  Yes.
See Excerpts from O'Brien deposition, attached hereto as Exhibit 38.

[6] Mr. Robinson testified that John Hutson, the former CFO of Oles Envelope, instructed him to close out an old RO Envelope account containing approximately $2,500 and to deposit those funds into the GTD account. Mr. Hutson then advised Mr. Robinson that he would wire $17,413.70 into the GTD account to arrive at the total amount of the estimated tax liability of $19,953 due to Robinson and Oechsle pursuant to the Purchase Agreement, which he did on December 29, 1999. Id. at 337.

pointed to no real evidence to refute Defendants' position with respect to deposits into the GTD account. Thus, Defendants contend that there is no real dispute of fact on this issue.

Nevertheless, even if the Court ultimately determines that there is a dispute of fact as to the GTD account, Plaintiffs can establish no unreimbursed harm associated with the GTD account or, for that matter, any of O'Brien's embezzlement schemes. As addressed in Defendants' Motion, there were twenty-three (23) checks payable to RO Envelope which were deposited into the GTD account (in the aggregate face amount of $71,310.01), and of this sum, $54,305.37 was paid over immediately to RO Envelope, through checks drawn back to RO Envelope and sent to Oles in Baltimore for deposit, based on the "split" that O'Brien calculated. Oechsle Affidavit, Exh. 25, at ¶ 5. Thus, a net amount of $17,004.64 remained in the GTD account for anything more than a momentary period of time. Importantly, it is undisputed that Plaintiffs <u>have</u> <u>been</u> <u>fully</u> <u>paid</u> <u>back</u> <u>for</u> <u>their</u> <u>loss</u> in the embezzlement schemes of O'Brien, whether related to deposits into the bogus account, the legitimate RO Express account, or the GTD account. Thus, they have no direct damages resulting from the embezzlement scheme. Moreover, Plaintiffs have not proffered any evidence to suggest that the closure of their business was the result of the embezzlement scheme. Indeed, Plaintiffs <u>concede</u> and the factual record is clear that the business was closed because of a large decrease in sales volume in late 2001 and the first six months of 2002.

**2.      Alleged expense account abuse.**

Similarly, in an effort to create a dispute of fact on the issue of alleged expense account abuse, Plaintiffs offer evidence through, *inter alia*, Moderacki's affidavit of various examples of improper expenses by both Robinson and Oechsle. While there may be a dispute of fact as to whether or not some or all of the expenses charged by Robinson and Oechsle were improper (as Defendants stated in their original Motion), the bottom line is that Plaintiffs repaid themselves at the time of Mr. Oechsle's resignation for <u>all</u> of those expenses they believed at the time were incorrectly submitted (but which

Oechsle correctly disputed in many cases).  Plaintiffs have offered no evidence to rebut, and do not

contest, Defendants' contention that all or nearly all of the disputed expenses have been paid back to

Plaintiffs.  Plaintiffs similarly have offered no evidence, and do not argue, that the expense account

activity, which according to Plaintiffs themselves totals no more than $20,000.00, caused the demise of

Oles LLC and the loss of millions in "lost expectation" damages.  The Court should grant summary

judgment or Rule 56(d) relief on this claim, limiting Plaintiffs to, at most, recovery for the <u>actual</u>

expenses which Plaintiffs can contest and prove were not proper for reimbursement (and which

Plaintiffs have not already been paid).

> **C.    Plaintiffs lack any evidence whatsoever that any alleged wrongdoing by Robinson and Oechsle caused the demise of Oles LLC.**

Plaintiffs seem to concede that the any direct loss resulting from O'Brien's embezzlement

scheme or any improper expense reimbursements did not cause the demise of Oles LLC.  Instead,

Plaintiffs take the position in their Response that they had no choice but to get rid of Robinson and

Oechsle as a result of the alleged embezzlement scheme and perceived expense account abuses, and that

because Robinson and Oechsle were no longer with the company Oles LLC's sales decreased

significantly and the operations at the company ultimately (about a year later) had to be shut down.  This

purely speculative causation theory is simply not supported by and, indeed, is belied by the record.

First, with respect to Robinson, Plaintiffs contend that they offered him early retirement, which

he accepted.  Plaintiffs now suggest that the reason early retirement was offered was because they could

no longer trust Robinson, although Plaintiffs admittedly (according to Jay Young, <u>see</u> Young affidavit,

Exhibit 16 to Plaintiffs' Response, at ¶ 7) at the time never stated this to Robinson (the reason offered

was Mr. Robinson's health).  Nor did Plaintiffs terminate Mr. Robinson upon discovery of O'Brien's

embezzlements (in January 2001) or Mr. Oechsle's expense account abuse (in February 2001); to the

contrary, Plaintiffs continued to have Mr. Robinson serve as President of Oles LLC for several months.

Having offered early retirement, Plaintiffs conveniently now argue the theory that it is this early retirement that caused the financial ruination of the company and, thereby, attempt to avoid the payment of the full purchase price for the company.  It is critical to note, however, that Robinson retired effective June 30, 2001, just <u>three</u> <u>months</u> earlier than he was supposed to retire.  Plaintiffs have offered no evidence to suggest or establish that the absence of Robinson in that three month period led to the demise of Oles LLC.

Plaintiffs next argue that shortly after Oechsle left, monthly sales began to drop and its customer base began to erode.  This allegation not only is unsupported by the record, it is contradicted by the record.  First, sales did not begin to drop shortly after Oechsle left.  Indeed, Oles LLC had two of its best months in sales in March and May of 2001, after Oechsle's departure.  <u>See</u> Oliner Report, Exhibit 23 (Tab 1 thereto).  The consistent drop in sales volume did not begin until September 2001 when Kimberly Robinson left Oles LLC's employ and (as all parties agree) took several of her largest customers with her to her new employer.  <u>Id.</u>; <u>see</u> <u>also</u> footnote 8.

More importantly, there is no evidence in the record, and Plaintiffs have not pointed to any evidence in their Response, that any loss of customers or decrease in sales resulted from Oechsle or Robinson leaving the company earlier than originally planned.  Significantly, Plaintiffs ignore (and do not offer evidence to rebut) the evidence presented by Defendants in their Motion regarding the cause of the decrease in sales at Oles LLC following the departure of Robinson and Oechsle.  As addressed in Defendants' Memorandum, Kimberly Robinson (Robbie Robinson's daughter) resigned from Oles LLC in early September 2001.  Kimberly Robinson had been a salesperson with Oles LLC for 16 years, and was the leading salesperson at Oles, in charge of several of the company's largest customer relationships.  <u>See</u> Deposition of Kimberly Robinson, Exhibit 19, at p. 4; Robinson Affidavit, Exh. 9, at

¶ 11.  After she resigned, she took with her a number of customers, as was within her right to do.[7] Although Mr. Moderacki in his affidavit references QVC as an example of a customer whose monthly purchases were reduced to zero shortly after the departure of Mr. Robinson, in actuality this is an example of one of the many customers Kimberly Robinson took with her upon her departure in September 2001.[8]  There is no evidence (and Moderacki offers none) that Mr. Robinson had anything to do with QVCs (or any other customer's) departure, and the evidence supports just the opposite.  See Deposition of Harold Newman, Exhibit 32, at pp. 37, 48-49; Robinson Affidavit, Exh. 9, ¶ 10; Oechsle Affidavit, Exh. 25, ¶ 9.

Following Kimberly Robinson's departure in September 2001, only one salesperson was left in the operation, Al Applebaum (another salesperson had previously been fired by Oles LLC over Mr. Robinson's objection in March 2001 and not replaced).  Vicki Young depo. Exh. 1, at pp. 188-90, 231-33.  Mr. Applebaum was fired in January 2002 by Vicki Young for lack of productivity, which she testified had been a problem since the Fall of 2001.  Id.. pp. 331-32.  Oles LLC, by Vicki Young's own admission, did not have a single productive salesperson on site for at least five months after Kimberly Robinson's departure in September 2001.[9]  Ms. Young, who was running the company during that time, admitted that the most serious problem Oles, LLC had was a lack of sales volume and that this led to the closure of the company (the company failed "because the sales volume didn't come up" because "we lost a certain portion of our accounts that we didn't bring the business back."  Vicki Young depo., Exh. 1, at p. 323).

---

[7] It is undisputed that she had no non-competition agreement with Oles, LLC or OEC (in fact none of the sales personnel at either Oles LLC or OEC did either) and, therefore, was under no prohibition from taking Oles LLC customers with her to her new employer.
[8] According to Kim Robinson, she was able to take several customers with her after she was hired by Rite Envelope, including QVC, ClientLogic, DVL, Southwest Graphics, and Wilmington Savings Fund Society.  See Excerpts from Kimberly Robinson deposition, attached hereto as Exhibit 40, at p. 67-68.
[9] Another salesperson was hired in October 2001 and fired about a week later, Vicki Young depo., at pp. 190 (for reasons Ms. Young could not remember), and John Weghorst was hired in mid-November, but his subsequent sales performance (according to Vicki Young) was disappointing as well. Id. at 335.

In addition to the lack of any productive sales force, the record shows, through Plaintiffs' own witnesses, that the general economic downturn in the U.S. economy in general and in the paper industry in particular, as well as the September 11, 2001 tragedy, and the anthrax scare, further contributed to the loss of sales at Oles, LLC and OEC.  Vicki Young depo., Exh. 1, at pp. 187-90, 231-33, 331-35.  While Plaintiffs may indeed be correct in alleging that their decision to close Oles LLC was the result of a significant decrease in sales, the evidentiary record does not contain an iota of evidence that the fact that Defendants were no longer with the company caused the loss of one customer or one sale of Oles LLC.  Without such evidence, Plaintiffs' causation theory fails.

Defendants also ignore (and do not offer evidence to rebut) that the loss of sales and the demise of Oles LLC was caused, at least in part, by poor management at Oles LLC following the departure of Robinson and Oechsle.  Even prior to the departure of Robinson, Plaintiffs made the decision to place Vicki Robinson, Harold Robinson's daughter, in the position of Vice President and General Manager of Oles LLC, effective April 1, 2001.  Ms. Young had never run a jet shop or printing business before, had never been a general manager of any company, and had no management experience with regard to running a print production shop.  Jay Young depo., Exh. 2, at pp. 297-298, 300.  During the time that Ms. Young ran Oles LLC, sales decreased very significantly.  Vicki Young depo., at pp. 186-187.[10]

In their Response, Plaintiffs do no more than try to take advantage of the timing of Robinson's and Oechsle's departures (in February and  June 2001) to argue that the drop in sales (starting in September 2001) and the demise of the company must have been the result of Robinson and Oechsle no longer running the company.  However, Plaintiffs have not proffered *any* evidence to support this

---

[10] Mr. Young admitted that Ms. Young was responsible for increasing the sales of Oles LLC and that, during her tenure at Oles LLC, sales in fact did not increase.  Jay Young depo., Exh. 2, at p. 301.  OEC's chief financial officer testified that, by 2002, Oles LLC's "profits had eroded because sales had eroded [and] [s]ales had decreased so greatly" and that "there was a fairly precipitous drop . . . [in sales in] the late summer, early fall of 2001."  Moderacki depo., Exh. 3, at p. 375.  In fact, Oles LLC's sales suffered a huge drop from September 2001 through the time the business was closed, representing a 56.2% decrease from the prior year when Robinson and Oechsle were still running the business.  Supplemental Expert Report of Stephen W. Oliner, Exhibit 23 at p. 4.

causation theory. Plaintiffs completely ignore the evidence of record, including substantial testimony from their own officers and employees, which indicates that the drop in sales and ultimate closure of the business was the result of other factors, none of which involved Messrs. Robinson and Oechsle. Plaintiffs' theory ignores the evidence of record, constitutes rank speculation, and does not provide an adequate foundation for any award of damages, including specifically, the claimed loss of expectation damages.

      **D.**     **Defendants Are Entitled To Summary Judgment on all of Plaintiffs claims, or a Rule 56(d) Order limiting the scope of damages.**

         **1.**     **Breach of Fiduciary Duties.**

It is undisputed that Defendants owed fiduciary duties to Oles LLC after that company was purchased by Plaintiffs. Plaintiffs argue that Robinson and Oechsle breached these duties by authorizing the deposit of Oles LLC checks into the GTD account and by charging expenses Plaintiffs deem to be inappropriate. While Defendants (and particularly Oechsle, since Robinson was not involved with the deposits) have fully explained their actions in this regard and believe that the evidence shows that Defendants did not breach any fiduciary duties, even if Plaintiffs have created a dispute of fact on these issues, there is no dispute of fact that Plaintiffs have been reimbursed fully for all funds that they claimed in 2001 were improperly deposited into accounts other than the Oles LLC account.[11] With respect to expenses, Plaintiffs do not dispute that they have been reimbursed for nearly all expenses they claim were improper. Thus, should the Court deny Defendants' motion for summary judgment on this claim, the Court should issue a Rule 56(d) order limiting the amount of damages to any direct or actual losses sustained from the alleged expense account abuses and alleged improper diversion of funds, which Plaintiffs can show have not been reimbursed.

---

[11] As noted above, they now appear to assert that there may be an additional $20,000 unaccounted for, but they have not been able to specify or substantiate that claim.

**2.    There is no evidence to support Plaintiffs' claims for breach of the Purchase Agreement.**

Plaintiffs contend that Robinson and Oechsle breached the Purchase Agreement in two ways. First, Plaintiffs say that Robinson and Oechsle breached Sections 5.01 and 5.03 by failing to use their best efforts to "preserve the management team and work force of RO Envelope, preserve the business of RO Envelope, preserve the goodwill of customers, clients, suppliers, creditors, and continue performance in the ordinary course of their obligations."[12] Defendants Response at 34. These provisions Plaintiffs claim were breached are contained in "Article 5 Pre-closing Agreements" and relate to Defendants' duties for the period between the execution of the agreement and the closing date. It is undisputed that all of the allegations of wrongdoing that form the basis for Plaintiffs' claims occurred after the closing date. Thus, Sections 5.01 and 5.03 are inapplicable.

Plaintiffs also contend that they are entitled to indemnification for damages resulting from the "breach of any representation, warranty or covenant made by [Defendants] herein or in any . . . exhibit . . . in connection herewith." Plaintiffs contend that Robinson and Oechsle breached fiduciary duties set forth in their respective employment agreements, which were attached as exhibits to the Purchase Agreement. As addressed in Defendants' Motion, the Purchase Agreement clearly provides that the "representations, warranties and/or covenants" made by the Defendants in the Purchase Agreement, for which indemnity protection is provided in Section 6.01, were <u>only</u> those made at the time of and as of the sale. The representations, warranties and covenants made in the Agreement by the sellers are set forth in §§ 2.01 through 2.26. Section 2.26 is titled the "Effective Date of Warranties, Representations and Covenants." It provides:

> Each warranty, representation, and covenant set forth in this Article 2 shall be deemed to be made on and as of and speak on and as of the date hereof and as of the Closing (except as otherwise specifically provided herein). The representations and warranties contained

---

[12] This claim is contained nowhere in Plaintiffs' Amended Complaint.

> in this Article 2 shall not be affected or deemed waived by reason of the fact that Purchaser and/or its representatives knew or should have known that any such representation or warranty is or might be inaccurate in any respect.

Thus, the "representations, warranties and covenants" (as that term is used in § 6.01, upon which Plaintiffs rely to argue a breach of the Purchase Agreement as a result of a breach of a duty under the Employment Agreements) are specifically and expressly limited to those matters represented on and as of the date of the closing.[13]

Plaintiffs argue that Section 2.26 applies only to those representations made in Article 2 of the Purchase Agreement, and does not apply to the representations made in the Employment Agreements. Plaintiffs' reading of the Purchase Agreement would result in an absurd result and is inconsistent with Pennsylvania law. Defendants agreed to indemnify Plaintiffs for damages resulting from any breach of any "representation, warranty or covenant" made by Defendants in the Purchase Agreement and any exhibits thereto, including the Employment Agreements. The Purchase Agreement expressly states that each representation is made as of the closing date. It would be inconsistent if such a limitation did not apply to a "representation, warranty or covenant" made in an exhibit to the Purchase Agreement. Defendants certainly did not intend to indemnify Plaintiffs for damages that might result from some unanticipated or unforeseeable breach of their employment agreements two or three years after the sale. Moreover, Plaintiffs' reading of the Purchase Agreement does not comport with the case law. Generally, representations and warranties made as part of a sales contract are statements "made by a contracting party . . . before or at the time of making the contract, in regard to some *past or existing* fact,

---

[13] Section 6.01 of the Purchase Agreement reads as follows:

> Seller and Guarantors, jointly and severally, shall indemnify, save and keep Purchaser, and its respective successors and assigns, stockholders, directors, officers, affiliates, representatives and employees . . . forever harmless against and from all liability, demands, claims actions or causes of action, assessments, losses, penalties, costs, damages or expenses, including reasonable attorneys and expert witness fees . . . sustained or incurred by any of the foregoing persons as a result of or arising out of or by virtue of (i) the breach of any representation, warranty or covenant made by Guarantors and/or Seller herein or in any certificate, exhibit or schedule delivered to Purchaser in connection herewith, or (ii) any debt, liability or obligation of Seller (whether known or unknown, absolute or contingent) not expressly assumed by Purchaser under the Assumption Agreement.

Exh. 7, at § 6.01(a), at p. 21.

circumstance, or state of fact pertinent to the contract, which is influential in bringing about the agreement." Caudill Seed and Warehouse Co., Inc. v. Prophet 21, Inc., 126 F. Supp.2d 937, 938 (E.D. Pa. 2001) (quoting Black's Law Dictionary 1301 (6th ed. 1990)).

In cannot be disputed that neither the Amended Complaint nor Plaintiffs' Response contains any allegations about pre-closing matters.  Rather, Plaintiffs clearly contend that allegedly improper conduct occurring after the acquisition (and in almost all respects, well after) can somehow trigger the indemnity provisions in the Purchase Agreement relating to the representations, warranties and covenants made as of the closing date.  Because the alleged breaches of Robinson and Oechsle's Employment Agreements occurred after the closing of the sale of RO Envelope to Oles LLC, the indemnification provision in the Purchase Agreement simply is not triggered.  Id.

3.      The evidence of record does not support Plaintiffs' claim for damages.

Plaintiffs contend that the alleged embezzlement scheme and expense account abuse by Robinson and Oechsle forced Plaintiffs to get rid of Robinson and Oechsle, and that their early departures caused the drop in sales and Plaintiffs' ultimate decision to close Oles LLC.  Plaintiffs seek damages in excess of $2.1 Million, representing what they claim to be the loss of value of what Plaintiffs "expected" to obtain from the acquisition, based upon pre-closing beliefs and expectations of what might be achieved with the business.

First, as noted above, even if the unsupported factual allegations were true, as addressed *supra* at 11-14, Plaintiffs still have not put forth any evidence that such alleged actions (or inactions) by Defendants caused the demise of Oles LLC or that they resulted in the loss alleged by Plaintiffs.  At most, Plaintiffs would be entitled to whatever direct or actual damages that could be proved were proximately caused by Defendants' conduct.

Second, contrary to Plaintiffs' contention in their Response, there is not ample evidence of expectation damages or reliance damages.  As addressed in Defendants' Motion, the amount of

expectation damages was calculated specifically from a set of projections which were prepared

internally by OEC prior to the sale.[14]  Jay Young depo., Exh. 2, at pp. 240–242; see Internal projections,

Exhibit 37.  These projections were prepared by OEC's former Chief Financial Officer and contained

various economic assumptions.  Significantly, the revenue projections were not based on sales figures

from prior years, see  Jay Young depo., Exh. 2, at pp. 243 – 244, and stand in marked contrast to the

actual history of RO Envelope, which, as Jay Young conceded, had experienced stagnant annual revenue

growth in the years prior to the sale.  Id., at pp. 252-55.  As Jay Young stated during his deposition, the

assumptions concerning the percentage of envelope purchases (by Oles LLC from Oles Envelope) and

margins were "based on some sketchy information that we had received from the principals of RO."  Jay

Young depo., Exh. 2, at p. 251 (emphasis supplied).

     The fact is, the projections upon which Plaintiffs' expert bases his opinion as to expectation

damages constitute sheer speculation, and are nothing other than what Jay Young and others at OEC

hoped could be accomplished at the time of the acquisition.[15]  No one (including Plaintiffs' expert

witness, Mr. Signorelli) has testified that these assumptions were reasonable.  This concededly

"sketchy" information cannot establish with "reasonable certainty" that the Plaintiffs incurred the

expectation damages claimed in their Amended Complaint.  See Delahanty v. First Pennsylvania Bank,

464 A.2d 1243, 1258 (Pa. Super. Ct. 1983); Atacs Corp. v. Trans World Communications, Inc., 155 F.3d

659, 669 (3rd Cir. 1998) (noting that the term "reasonable certainty" embraces, at a minimum, a rough

calculation that is not "too speculative, vague or contingent" upon some unknown factor).  Accordingly,

Defendants are entitled to summary judgment on Plaintiffs' claim to loss of expectation damages.  See

---

[14] In their Response, Plaintiffs contend that the projections were shared with Robinson and Oechsle, who agreed the projections could be accomplished.  In support of this contention, Plaintiffs cite to page 65 of Jay Young's deposition. However, nowhere on page 65 does Mr. Young state make this statement, and Mr. Robinson and Mr. Oechsle have flatly denied this allegation.  Robinson Affidavit, Exh. 9, at ¶ 13; Oechsle Affidavit, Exh. 25, ¶ 8.
[15] The Purchase Agreement and its attachments contain no provisions requiring Oles LLC, or Robinson or Oechsle, to generate revenues, profits or any other performance indicator to any particular level, or even establishing any guidelines or benchmarks.  Thus, neither assumptions nor financial results reflected in Oles' preclosing projections made their way into the Purchase Agreement in any form.

Delahanty, 464 A.2d at 1258; Advanced Power Systems, Inc. v. Hi-Tech Systems, Inc., Civ. No. 90-7952, 1994 WL 116121 at *11 (E.D. Pa. March 21, 1994) (granting summary judgment on claim for lost profits where there was no evidence to support such a claim).

Plaintiffs also argue that Defendants have misstated the law regarding expectation damages. For instance, they point out that one decision cited by Defendants, Sprang & Co. v. U.S. Steel Corp., 545 A.2d 861, 866 (Pa. 1988), held that "recovery will not be precluded merely because there is some uncertainty as to the precise amount of damage caused." As addressed above, and in contrast to the situation presented in Sprang, the only evidence to support Plaintiffs' damages are the projections prepared by Plaintiffs, which are based solely on speculation. More importantly, however, the Court in Sprang also stated that "mere uncertainty [as to the amount of damages] will not bar recovery where it is clear that damages were *the certain result of the defendants conduct*." Id. In this case, as addressed above, the evidence establishes that the drop in sales and ultimate closure of the business was the result of a variety of factors, none of which were the "certain result" of any conduct on the part of Defendants.

### 4.    Oles LLC's Claim for Rescission of the Agreements Must Fail.

Plaintiffs argue that rescission is appropriate in this case. As set forth in Defendants Motion, rescission is described as,

> the unmaking of a contract, and is not merely a termination of the rights and obligations of the parties towards each other, but is an abrogation of all rights and responsibilities of the parties towards each other from the inception of the contract. The purpose of an equitable rescission is to return the parties as nearly as possible to their original positions with regard to the subject matter of the contract. ***One who wishes to rescind a contract must restore or tender a return of the property or security, which was the subject matter of the contract***.

Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc., 94 F. Supp.2d 589, 595-96 (E.D. Pa. 1999) (emphasis supplied) (quoting Keenheel v. Securities Comm'n, 579 A.2d 1358, 1361 (Pa. Commw. Ct. 1990)). Importantly, "unlike a breach of contract seeking money damages, rescission comes in to play

*only when a party is attacking the validity of the agreement, that is, challenging whether there was ever a meeting of the minds.*  Rescission is a remedy in equity to void a contract *ab initio* and to return the parties to their positions prior to the execution of the writing or to do so to the extent possible."  <u>Coram Healthcare Corp.</u>, 94 F. Supp. 2d at 596 (emphasis added).  Rescission is "appropriate only under *extraordinary circumstances* when the complaining party has suffered a *breach of such a fundamental and material nature* that it *affects the very essence of the contract* and serves to defeat the object of the parties."  <u>Castle v. Cohen</u>, 676 F. Supp. 620, 627 (E.D. Pa. 1987) (emphasis supplied).

    Plaintiffs contend that the "flagrant and intentional breaches of fiduciary duty committed by Robinson and Oechsle are of such a material and substantial nature as to render the Asset Purchase Agreement and Employment Agreements meaningless."  Plaintiffs Response at 42.  However, Plaintiffs do not attack the validity of the agreement or challenge whether there was ever a meeting of the minds as to the agreements.  Rather, the grounds for rescission are based solely on what they allege is post-closing conduct as described above.  While Plaintiffs contend that they would not have entered into the Purchase Agreement had they known that Defendants were going to embezzle funds and mismanage the company, even assuming Plaintiffs were correct that Defendants were involved in improper behavior (which they were not) such post-contract breaches that have nothing to do with the formation of the agreement cannot form the basis for a claim for rescission.  <u>Coram Healthcare Corp.</u>, 94 F. Supp. 2d at 596.

    The evidence of record also does not support Plaintiffs' claim for rescission because the alleged breaches, even if true, are not "so fundamental and material" that they affect the very essence of the contract.  Defendants contend that the essence of the contract was defeated by Defendants' "[t]heft, embezzlement, concealment, expense abuses, and non-disclosure of O'Brien's scheme."  Response at 43.  Even if these allegations were true, which they are not, they do not warrant the extraordinary remedy of rescission.  Although Plaintiffs attempt to gloss over this fact, it is undisputed that Plaintiffs

have been reimbursed for nearly all of the disputed expenses.  Even assuming that Oechsle breached

some agreement with Plaintiffs by improperly charging expenses to Plaintiffs (or, for that matter, even

the entire $20,000.00 of expenses they have identified), such alleged breach, as a matter of law, is not so

fundamental and material that it warrants the extraordinary remedy of rescission of the acquisition and

all its related agreements.  As argued in Defendants' Motion, the contention that an acquisition of a

business should be rescinded because of alleged expense account improprieties identified close to a year

and a half following the closing borders on the absurd.

Similarly, the claim that Defendants breached the agreements when they allegedly embezzled

funds from Plaintiffs is insufficient to warrant the extraordinary remedy of rescission.  At best, there is a

dispute of fact as to whether Defendants participated in one component of Mr. O'Brien's multifaceted

scheme when Oechsle in good faith authorized the deposit of certain checks payable to RO Envelope

into the GTD account.  Even if one were to assume that Oechsle's actions were accompanied by

wrongful intent, the net amount improperly diverted from Plaintiffs as a result of that component of Mr.

O'Brien's embezzlement scheme is $17,004.64.  Again, the uncontroverted evidence establishes that

Plaintiffs have been <u>fully</u> <u>reimbursed</u> for all losses suffered as a result of the entire embezzlement

scheme by Mr. O'Brien, including this small component.  As a result, the breach, even if true, would not

warrant the extraordinary remedy of rescission as there is no evidence that any loss sustained by

Plaintiffs deprived them of the benefit of their bargain or defeated the object of the agreements.

Importantly, Plaintiffs also have nothing to return to Defendants.  Although the Amended

Complaint, filed in October 2002, states that Plaintiffs "stand ready and willing to tender the business

back to the Defendants" (Am. Compl., at ¶ 51), Oles LLC has admitted that its operations were shut

down and the business closed three (3) months earlier in July 2002.  Vicki Young depo., Exh. 1, at p.

314.  As the Court noted in <u>Morgan Publishers Inc. v. Squire Publishers, Inc.</u>, 26 S.W.3d 164 (Mo. Ct.

App. 2000), a case cited by Plaintiffs, it would be impossible to put Defendants in substantially the same

condition as they were in prior to the sale of the company since there is no longer any going concern to return to Defendants.

Plaintiffs argue that they are entitled to the equitable remedy of rescission because they offered to return the company in May 2002, prior to its closure, and that Defendants should not be able to benefit from the fact that they did not accept Plaintiffs' offer.  Plaintiffs' argument in this regard is without merit.  It had been nearly three years  since the parties entered into the Purchase Agreement and Oles LLC was not the same or substantially the same company in May 2002, as evidenced by the fact that Plaintiffs were then planning to close the business just two months after the offer.  Plaintiffs seem to suggest that, since they offered to return the company in May 2002, they are automatically entitled to the extraordinary remedy of rescission.  For the reasons discussed above and in Defendants' Motion, that simply is not the case and Plaintiffs' claim for rescission is not consistent with the law.

Finally, as addressed in Defendants Motion, a party must pursue rescission of an agreement in a timely manner, or rescission is waived and the contract is affirmed.  Fichera v. Gording, 227 A.2d 642, 643-44 (Pa. 1967); Keenheel, 579 A.2d at 1361; Sixsmith v. Martsolf, 196 A.2d 662, 663 (Pa. 1964). There is no dispute that all contracts at issue were executed on or about September 30, 1999, and the evidence of record shows that Plaintiffs were fully aware of all of the allegations as alleged in the Amended Complaint in February 2001.  Defendants argue that the February 2001 marked "only the beginning of the unraveling of Defendants wrongdoing" and that Defendants were incorrect in stating that Plaintiffs waited over 15 months before seeking rescission.  Response at 45.  However, they point to no evidence to support their claim that the grounds for rescission were revealed much later than February 2001.  Moreover, the internal inconsistencies in Plaintiffs' position is apparent.  They claim that it was their discovery of the embezzlement scheme and expense account issues that led them to ask for Mr. Oechsle's resignation in February 2001 and offer in about May 2001 Mr. Robinson slightly early retirement (by 3 months).  They cannot simultaneously claim that they did not know about these very

23

same alleged facts until a year or more after they say they acted on them.  The only conclusion that can be reached based on the evidence is that Plaintiffs sought rescission only after they realized that the operation would have to be closed (as addressed above, for reasons having nothing to do with Robinson or Oechsle).

>    **E.    This Court Should Grant Summary Judgment in Favor of Defendants on Counts I, II and IV of their Counterclaims**

As addressed in Defendants' Motion, there is no dispute that the parties entered into valid and binding agreements relating to the sale of RO Envelope (*i.e.,* the Purchase Agreement, the Promissory Note, the Guaranty, and the Assumption Agreement on or about September 30, 1999).[16]  There is also no dispute that, under the terms of the Purchase Agreement and Promissory Note, Oles, LLC was to pay Defendants certain sums for the purchase of their company, which were not contingent on any financial performance of the company or the individual Defendants.  Finally, there is no dispute that OEC executed a Guaranty, which guaranteed Oles LLC's prompt payment of all sums due under the Purchase Agreement and Promissory Note.  The Chief Executive Officer of Plaintiffs admitted the genuineness of these documents and that Plaintiffs ceased making any payments due under the contracts at issue.  Jay Young depo., Exh. 2, at pp. 256 – 257.

Defendants believe that they are entitled to summary judgment.  However, even if the Court should decide that there is a dispute of fact with respect to one or more of Plaintiffs' claims, there is no evidence to support Plaintiffs' claim for damages.  Thus, regardless of whether the Court determines that Plaintiffs ultimately might be entitled to some small amount of direct or actual damages on some of their claims, it cannot be disputed that Plaintiffs owe the remainder of the purchase price for the business in the amount of $1.425 million.  As a result, Defendants are entitled to summary judgment as to Counts I

---

[16] Plaintiffs' claims to rescind these Agreements fail for the reasons set forth above.

and IV of their Counterclaim, subject to any setoff that might be appropriate should Plaintiffs prevail in proving liability and actual damages on any of their claims.

Similarly, with respect to Count II of their counterclaim (failure to pay an assumed liability), there is no dispute that Oles, LLC assumed the American Express debt and failed to pay it.  As a result, Defendants are entitled to judgment against Oles, LLC in the amount of the debt paid by Mr. Oechsle ($3,600.00).

## III.   CONCLUSION

For the foregoing reasons, and for the reasons set forth in Defendants' Memorandum in Support of its Motion for Summary Judgment, Defendants and Counterclaimants, GTD Company, Inc., Harold T. Robinson and David Oechsle, respectfully request that this Court grant summary judgment or enter an order pursuant to Rule 56(d) in favor of Defendants against Plaintiffs as to all claims alleged in Plaintiffs' Amended Complaint and/or the six particular factual allegations contained therein, as more particularly described in the body of this Memorandum, and further request the entry of summary judgment on Counts I, II and IV of their Counterclaim.  In the alternative, Defendants request that the Court grant summary judgment or enter a Rule 56(d) Order finding that the Plaintiffs' claim for an award of their "expectation damages" is unsupported by any causation evidence and is not recoverable.


Dated:  October 1, 2003

                                       _____/s/_____
                                       Jefferson V. Wright (Federal Bar No. 00990)
                                       Tessa Laspia Frederick (Federal Bar No. 25374)
                                       Brian D. Craig (Federal Bar No. 25710)
                                       Miles & Stockbridge P.C.
                                       10 Light Street, Suite 1200
                                       Baltimore, Maryland 21202
                                       (410) 727-6464

                                       Attorneys for Defendants and Counterclaimants,
                                       GTD Company, Inc., Harold T. Robinson
                                       and David Oechsle