# CONDENSED TRANSCRIPT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

OLES ENVELOPE,
LLC, et al.

            V                NO. WMN  02-2017

GTD COMPANY,
INC., et al.

Oral deposition of JOSEPH M. O'BRIEN, taken at the law offices of Barley, Snyder, Senft & Cohen, LLC, 1000 Westlakes Drive, One Westlakes Drive, Mack-Cali Board Room, Berwyn, PA, on Tuesday, May 6, 2003, beginning at approximately 10:00 a.m., before Maureen E. Broderick, a Registered Professional Reporter, and Notary Public, pursuant to notice.

**EXHIBIT**

**39**

## James DeCrescenzo Reporting, LLC
Pennsylvania's Leader in Information and Technology Management

215.564.3905
phone

1700 Sansom Street, 5th Floor,
Philadelphia, PA 19103
www.jdreporting.com

215.751.0581
fax

ORAL DEPOSITION OF JOSEPH O'BRIEN, 05-09-03

46

1    THE WITNESS: Yes.
2 BY MR. COE:
3    Q. Kim Robinson was the
4 salesperson for RO Envelope, right?
5    A. Yes.
6    Q. Was she also a salesperson
7 for RO Express?
8    A. No.
9    Q. I'll show you what's been
10 marked as Exhibit 29 at
11 Mr. Robinson's deposition, which is
12 an April 28, 2000 statement for the
13 GTD account with attached documents.
14 On the second page, can you identify
15 the handwriting on the deposit slip?
16    A. It's Dave's.
17    Q. Who is United States
18 Recycling?
19    A. United States Recycling,
20 Incorporated? That was a company
21 that picked up bad envelopes, a
22 recycling company.
23    Q. Paper recycling?
24    A. Yes.

47

1    Q. They picked up scrap paper
2 from RO Envelope Company; is that
3 right?
4    A. Yes.
5    Q. Did they pay RO Envelope
6 Company for that scrap paper?
7    A. I guess so. I don't know.
8    Q. Who was Vincent Varallo
9 Associates?
10    A. I don't know.
11    Q. Who were Robert and
12 Catherine Lawrence?
13    A. I don't know.
14    Q. Do you have any idea why
15 these checks were deposited into the
16 GTD account?
17    A. No.
18    Q. If you look at the last
19 page, can you tell me who the
20 handwriting is on the back of the
21 checks?
22    A. Dave's.
23    Q. Did RO Envelope Company
24 purchase season tickets to the

48

1 Phillies?
2    A. Since LLC took over?
3    Q. Ever?
4    A. Well, yeah. Yes.
5    Q. During what years did RO
6 Envelope purchase tickets, season
7 tickets for the Phillies?
8    A. I don't remember.
9    Q. Did you have anything to do
10 with the acquisition of the tickets
11 for the Phillies?
12    A. No. No.
13    Q. Did RO Envelope Company
14 purchase a whole season's worth of
15 tickets?
16    A. I wasn't involved in that.
17    Q. So you don't know?
18    A. I don't -- I don't know.
19    Q. Showing you what's been
20 marked as Exhibit 30 at
21 Mr. Robinson's deposition. This is
22 an April 28, 2000 GTD statement with
23 attached documents.
24    Mr. O'Brien, was Precision

49

1 a customer of RO Envelope Company?
2    A. Yes.
3    Q. Do you know whose
4 handwriting is on the deposit slip on
5 the second page of this exhibit?
6    A. Mine.
7    Q. Do you recall filling out
8 this deposit slip for the Precision
9 check to go into GTD?
10    A. No, not really.
11    Q. Would it have been
12 deposited for the same reason that
13 the other checks were deposited?
14    A. Yes.
15    Q. Pursuant to Mr. Oechsle and
16 Mr. Robinson's instructions?
17    MR. WRIGHT: Objection.
18    THE WITNESS: Yes.
19 BY MR. COE:
20    Q. Next showing you what was
21 marked as Exhibit 18 at
22 Mr. Robinson's deposition, which is a
23 May 31, 2000 GTD statement and
24 attached documents. This is a check

James DeCrescenzo Reporting
Pennsylvania's Leader in Technology and Information Management
215.564.3905    1700 Sansom Street, 5th Floor Philadelphia, PA 19103    FAX 215.751.0581
www.JDReporting.com

239

1                         VOLUME II

2           IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MARYLAND
3

4    OLES ENVELOPE LLC

5              Plaintiff

6      vs.                                #WMN 02-2017

7    GTD COMPANY

8              Defendant

9    _____/

10             The deposition of HAROLD ROBINSON was

11   continued on Wednesday, April 30, 2003, commencing at

12   10:10 a.m., at the Law Offices of Whiteford, Taylor &

13   Preston, 7 St. Paul Street, Baltimore, Maryland,

14   21201, before Paula J. Eliopoulos, Notary Public.

15   APPEARANCES:

16             WARD B. COE, ESQUIRE
                  On behalf of Plaintiff
17
               JEFFERSON WRIGHT, ESQUIRE
18                On behalf of Defendant

19   ALSO PRESENT:

20             VICKI YOUNG and MARK MODERACKI

21   REPORTED BY:   PAULA J. ELIOPOULOS

EXHIBIT
39

336

1    A    No.

2    Q    Did you ask for one?

3    A    No, not that I know of. I know he had to

4    open up the account. I know we had to put money in

5    it. So, you know, I guess I would have to assume that

6    it was money left in the account that we left in there

7    when we opened the account.

8         MR. COE: Let's take a couple minute

9    break.

10        (Pause in the proceedings.)

11   Q    Mr. Robinson, I'm going to show you

12   Exhibits 25 and 26 which were from the first day.

13        MR. COE: Do you have copies of those,

14   Jeff?

15        MR. WRIGHT: I do, yes.

16        THE WITNESS: Okay.

17   Q    I'll represent to you that this is --

18   these are statements for the GTD account --

19   A    Okay.

20   Q    -- as of October -- strike that -- as of

21   December 31st, 1999.

337

1    A    Uh huh.

2    Q    And you see that there is a wire transfer

3    into the account of $17,413.70 --

4    A    Yes.

5    Q    -- on December 29th?

6    A    Yes.

7    Q    And is it your understanding that that was

8    the tax payment that you and Mr. Oeschle were entitled

9    to?

10   A    Yes.

11   Q    And was that a tax payment that was to be

12   split between the two of you?

13   A    Yes.

14   Q    And what were those taxes for?

15   A    That was part of the agreement of sale

16   that Oles Envelope would pay the asset taxes.

17   Q    Right.

18   A    Whatever the asset taxes on the equipment

19   of the -- acquisition of the equipment.

20   Q    And we earlier identified, first on

21   Exhibit 26, that there was a deposit of a Links

338

1    Graphic check that is the deposit of December 10th.

2         Do you see that? In the amount of $1,565?

3    A    Okay.

4    Q    And on --

5    A    Excuse me one second. Are these the same?

6    Q    No. They're different. 25 and 26 are

7    different except the first page is the same, okay?

8    A    Oh, okay.

9    Q    And if you look at 25, again, there's a

10   deposit of two Links Graphic checks --

11   A    Uh huh.

12   Q    -- in the amount of $3,149.55 --

13   A    Right.

14   Q    -- on December 1st.

15   A    Okay.

16   Q    Do you see that?

17   A    Yes.

18   Q    And I'll represent to you that on

19   December 29th, there was a deposit of $3,426.59.

20   A    Uh huh.

21   Q    And that was from the closeout of the old

339

1    RO Envelope Company account.

2    A    Okay.

3         MR. WRIGHT: I'm sorry. The

4    representation was that on December 29th, there was a

5    deposit of --

6         MR. COE: $3,426.59.

7         THE WITNESS: Uh huh.

8         MR. COE: As a closeout of the old

9    RO Envelope Company account.

10        THE WITNESS: Okay.

11        MR. WRIGHT: As reflected on the first

12   page of each of these Exhibits.

13        MR. COE: Yes.

14   Q    Do you have any information about that

15   deposit?

16   A    Which one?

17   Q    On December 29th, 1999 in the amount of

18   three thousand --

19   A    The closeout of the old account?

20   Q    Yes.

21   A    I believe I told you yesterday -- or I'm

340

1  sorry, not yesterday -- Friday --
2  Q   Uh huh.
3  A   -- I thought it was $2,500, but I wasn't
4  sure. But that closeout was directed by John Hutson
5  to be placed in GTD. My understanding of it, okay. I
6  didn't see any of these transactions.
7  Q   And that was an understanding that you got
8  from Mr. Oeschle?
9  A   Correct.
10 Q   Some time after it occurred?
11 A   Right. That that was -- that John Hutson
12 had directed that to go into the account and that he
13 would wire the difference up in taxes, and then the
14 two $10,000 checks that followed were for the taxes.
15 Q   Did that explanation make sense to you?
16 A   In what way?
17 Q   Did it make sense to you that you should
18 deposit the old RO Envelope Company account balance
19 into the GTD account?
20 A   Well, John Hutson, who was the chief
21 financial officer of Oles Envelope, said to do it that

341

1  way. Who was I to argue with it?
2  Q   I wasn't asking you to argue with it. I
3  was asking if it made sense.
4  A   Why would I even try to make sense out of
5  it? It wasn't my decision.
6  MR. WRIGHT: Why don't you not ask
7  questions back? Just respond to his questions. It
8  makes for a messy transcript. Just answer the
9  question.
10 THE WITNESS: Okay.
11 MR. WRIGHT: The question is, just so we
12 can be clear about it, did it make sense to you?
13 MR. COE: Right.
14 MR. WRIGHT: Would you answer that
15 question.
16 THE WITNESS: I don't know.
17 Q   In any event, you didn't question the
18 explanation?
19 A   I didn't think about it, and I didn't
20 question it, right.
21 Q   I'm also showing you again Exhibit 14 from

342

1  the first day of your deposition.
2  A   Okay.
3  Q   And I think -- well, you indicated before
4  that you believe that Mr. Oeschle either gave you or
5  Mrs. Robinson this and that Mrs. Robinson probably
6  deposited it; is that correct?
7  MR. WRIGHT: This being?
8  A   You're talking about the $10,000 check
9  there?
10 Q   Yes.
11 MR. WRIGHT: This being the second page of
12 the Exhibit, I think; right, Ward?
13 MR. COE: Yes.
14 MR. WRIGHT: I want you to look at the
15 right page here.
16 THE WITNESS: I can't tell by these
17 documents.
18 Q   Okay.
19 A   It looks -- I can't tell by the documents.
20 But the check was deposited into our account,
21 irregardless.

343

1  Q   Did you ask Mr. Oeschle why you were
2  getting $10,000?
3  A   I'm sure I did.
4  Q   Do you recall?
5  A   It had to do with the taxes.
6  Q   Do you actually recall a conversation with
7  Mr. Oeschle about that subject?
8  A   Yes.
9  Q   What did Mr. Oeschle say?
10 A   It's for the taxes.
11 MR. COE: Could I have this marked as the
12 next Exhibit, please.
13 (Robinson Deposition Exhibit Number 45 was
14 marked for purposes of identification.)
15 Q   Mr. Robinson, could you identify
16 Exhibit 45, tell me what it is?
17 A   No.
18 Q   Did you have an executive corporate card
19 that you made charges on prior to October 1st, 1999?
20 A   Yes.
21 Q   And do you see that on the third page of

# CONDENSED TRANSCRIPT

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
### (Northern Division)

OLES ENVELOPE,
LLC, et al.

V                                                NO. WMN 02-2017

GTD COMPANY,
INC., et al.


Oral deposition of KIMBERLY ROBINSON, taken at the law offices of Barley, Snyder, Senft & Cohen, LLC, 1000 Westlakes Drive, One Westlakes Drive, Mack-Cali Board Room, Berwyn, Pennsylvania, on Tuesday, May 20, 2003, beginning at approximately 10:45 a.m., before Maureen E. Broderick, a Registered Professional Reporter, and Notary Public, pursuant to notice.

**EXHIBIT**

**40**

## James DeCrescenzo Reporting, LLC
Pennsylvania's Leader in Information and Technology Management

215.564.3905
phone

1700 Sansom Street, 5th Floor,
Philadelphia, PA 19103
www.jdreporting.com

215.751.0581
fax

ORAL DEPOSITION OF KIMBERLY ROBINSON, 05-20-03

62

1 my inside person, who knew nothing
2 about my customers. Then she left.
3      So then Linda was going to
4 do it again, and that never
5 happened. `Stuff like that. We're
6 going to do this, you know, hang in
7 there, and just -- you know, promises
8 of things that never came, like
9 better deliveries, better turnaround
10 time for getting quotes back.
11    Q. Who was in charge of
12 getting quotes back?
13    A. That's a good question. It
14 became so crazy at the end, I don't
15 even know. We were supposed to use
16 this new quoting system that was so
17 hard. You know, I don't even know if
18 the Exton location ever even used
19 that quoting system because it was so
20 difficult.
21      I mean, I know Vicky used
22 our original one, Linda was using our
23 original quote system, just to get
24 the quote done.

63

1    Q. When did the new quoting
2 system start?
3    A. Gosh, maybe -- I don't
4 know. Because I didn't really do a
5 lot of quotes. And I never got into
6 using the new system. I know my dad
7 and Dave did. So they would be
8 better suited to tell you when that
9 started.
10    Q. Were Mr. Robinson and
11 Mr. Oechsle the people who were
12 primarily responsible for getting
13 quotes out --
14    A. Yes.
15    Q. -- when they were there?
16    A. Yes.
17    Q. Did that become
18 disorganized after both of them left?
19    A. Yes.
20    Q. When you resigned, did you
21 talk to anybody at Oles about why you
22 were resigning?
23    A. No.
24    Q. I know that you wrote a

64

1 letter resigning, correct?
2    A. Yes.
3    Q. To this day, or at any
4 time, did you talk to anyone at Oles
5 about why you were resigning?
6    A. No.
7      MR. COE: Can we just take
8 a couple minute break?
9      (Brief recess.)
10 BY MR. COE:
11    Q. When did you first get in
12 contact with Rite about being
13 employed there?
14    A. End of August.
15    Q. How did you get in contact
16 with them?
17      Just to clarify, August of
18 2001?
19    A. Yes, August of 2001.
20 Called him.
21    Q. Called Mr. Newman?
22    A. Yes.
23    Q. How did you know to call
24 Mr. Newman?

65

1    A. Rite Envelope was one of
2 our biggest competitors. So I chose
3 to call him as well as another one of
4 our competitors.
5    Q. Did you know Mr. Newman?
6    A. Yes.
7    Q. How did you know him?
8    A. Through the business, known
9 him for years. He used to work right
10 down the street from our Exton shop.
11    Q. What did you tell
12 Mr. Newman?
13    A. I didn't really tell him
14 anything. I just asked if he was
15 interested in hiring any more
16 salespeople.
17    Q. What was his response?
18    A. He said sure. He said yes.
19    Q. Do you recall anything else
20 about the conversation?
21    A. No.
22    Q. Did you subsequently have
23 an interview with him?
24    A. Yes.



**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905          1700 Sansom Street, 5th Floor          FAX 215.751.0581
                      Philadelphia, PA 19103
                      www.JDReporting.com

ORAL DEPOSITION OF KIMBERLY ROBINSON, 05-20-03

66

1    Q.  Tell me what took place at
2  the interview.
3    A.  I told him that I was
4  interested in changing my employment
5  and I told him approximately what my
6  sales were.  And he told me he would
7  make me an offer and then I could
8  decide from that.  And I asked a lot
9  about Rite Envelope as well.
10    Q.  What did you tell him your
11  sales were?
12    A.  I told him they were
13  between $80 and $100,000 a month.
14    Q.  Do you recall anything else
15  about the interview with Mr. Newman?
16    A.  No.
17    Q.  What happened next?
18    A.  That day?
19    Q.  No.  With respect to
20  getting a job at Rite.
21    A.  He made me an offer.  It
22  was in a sealed envelope and I took
23  it from him, took it home and I read
24  it and I was, I mean, still making a

67

1  decision, so, you know, it was really
2  up in the air.  I hadn't really made
3  a decision to work there or the other
4  place I had looked.
5    Q.  What was the other place?
6    A.  NEI.
7    Q.  Did you also get an offer
8  from them?
9    A.  No.  It never actually got
10  as far as, you know, that.
11    Q.  In your conversations with
12  Mr. Newman, did you have any
13  discussions about which RO customers
14  you thought you could bring to Rite?
15    A.  Yes.
16    Q.  Which ones did you say you
17  thought you could bring?
18    A.  I thought that I could
19  bring ClientLogic, I thought that I
20  could bring QVC, Precision, DVL,
21  Alcom, Independence Blue Cross,
22  Independence School Management,
23  Southwest Graphics, Enoch,
24  E-N-O-C-H.  And some I was able to

68

1  and some I wasn't.
2    Q.  Which ones were you able to
3  bring?
4    A.  ClientLogic, QVC --
5  initially?
6    Q.  Yes.
7      MS. FREDERICK:  What was
8  the question?
9  BY MR. COE:
10    Q.  Which clients were you able
11  to bring, to take with you to?
12    A.  Yes.  ClientLogic, QVC,
13  DVL, Southwest Graphics, WSFS.
14    Q.  What is WSFS?
15    A.  Wilmington Savings Fund
16  Society.
17    Q.  Were they a long-term
18  customer of RO's?
19    A.  Yes.
20    Q.  Were there others you were
21  able to bring with you to Rite?
22      The ones you mentioned that
23  you discussed were Precision?
24    A.  Yes.

69

1    Q.  Were you able to bring them
2  to Rite?
3    A.  Yes.  Not immediately.
4  Same with Independence Blue Cross, I
5  didn't start getting business from
6  them until June of 2002.
7    Q.  How about Alcom?
8    A.  Alcom, that was kind of --
9  yeah, same, I thought I could bring
10  some business with them.  I had just
11  made contact with them at Oles
12  Envelope.  So dribs and drabs.
13    Q.  You did bring some business
14  from Alcom to Rite?
15    A.  Yes.
16    Q.  How about Enoch?
17    A.  Enoch, no.  Never was able
18  to bring him along.  Same with
19  Independence School Management.  Some
20  people get spooked when you switch
21  companies.  And so she went out and
22  got quotes and was successful with
23  another local company.  So I lost
24  that one as well, as Southwest

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905          1700 Sansom Street, 5th Floor          FAX 215.751.0581
                          Philadelphia, PA 19103
                          www.JDReporting.com