IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| OLES ENVELOPE, LLC, et al., | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. WMN 02-2017 |
| GTD COMPANY, INC., et al., | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT WITNESS, LAWRENCE W. SIGNORELLI**

Defendants and Counterclaimants, GTD Company, Inc., Harold T. Robinson and David Oechsle (collectively, the "Defendants"), by their undersigned counsel, hereby submit this Memorandum in Support of their Motion in Limine to Exclude Testimony of Plaintiffs' Expert Witness, Lawrence W. Signorelli.

**INTRODUCTION**

Plaintiffs intend to call as an expert witness at trial Lawrence W. Signorelli, who will offer his opinion as to the amount of damages to which Plaintiffs are entitled in the event that they prevail on their remaining claims. Specifically, Mr. Signorelli will offer his opinion as to the loss of value of Oles Envelope LLC ("Oles LLC") and Oles Corporation ("OEC") following the sale of RO Envelope to Plaintiffs as a result of the alleged wrongful actions by Defendants. However, as evidenced by his two reports and his deposition testimony, Mr. Signorelli's opinion as to the lost equity value of the two companies is based on completely speculative projections prepared by Plaintiffs (which he neither testified nor can opine are reasonable) and never shared with Defendants prior to the sale. Mr.

Signorelli relied entirely on and assumed the truth of all of the factual allegations set forth in the Complaint, many of which allegations the Court has already determined have no factual basis. Finally, Mr. Signorelli performed no independent investigation to confirm those facts. As set forth below, Mr. Signorelli's opinion is neither reliable nor relevant, and therefore must be excluded under Rule 702.

## BACKGROUND

Mr. Signorelli prepared two expert reports that purport to quantify Plaintiffs' claimed so-called "lost expectation" damages.[1] In his October 11, 2002 report addressing Oles LLC, Mr. Signorelli purports to calculate the "loss of equity value [of Oles LLC] resulting from the activities of its two former principals, Messrs. Oechsle and Robinson, and the ultimate closure of RO." Exhibit A, at p.1. This report "specifically identified and separated the elements of value expected to accrue to Oles LLC as a result of the acquisition." Id. Mr. Signorelli opined that the equity value of RO Envelope at the time of the acquisition was $2.1 Million, all of which was lost when the company closed in July 2002. Id. at p. 2. According to Mr. Signorelli's report, "the primary driver of Oles LLC's decision to acquire RO was the opportunity to significantly increase RO's revenues and earnings" by expanding RO Envelope's product line and allowing Messrs. Robinson and Oechsle to market expanded products and services to existing and prospective customers. Id.

In his June 6, 2003 report, which dealt with damages to OEC, the parent company, Mr. Signorelli opined that his "analyses and calculations indicate that Oles Corp. lost approximately $1.5 million of investor value that it expected to accrue from the Oles LLC acquisition of RO." Exhibit B, at p. 1. Mr.

---

[1] Mr. Signorelli produced two expert reports (one for each of Oles LLC and OEC). The report dated October 1, 2002 is attached hereto as **Exhibit A**, and the report dated June 6, 2003 is attached hereto as **Exhibit B** and these exhibits are incorporated herein by reference.

2

Signorelli opined that OEC "incurred total damages in excess of $2.3 million," including expenses of at least $890,000 incurred as a result of the acquisition.  Id.

The total amount of expectation damages that, according to Mr. Signorelli, Plaintiffs suffered was calculated specifically from a set of projections which were prepared internally by OEC prior to the sale.[2]  See internal projections dated April 29, 1999, attached hereto as Exhibit D, and internal projections (with revenue for prior years) dated September 23, 1999, attached hereto as Exhibit E.  The assumptions underlying the projections include, among other things, a projected 20% increase in revenue annually for the four years following the sale, and the assumption that Oles LLC after the sale would buy 50% of the envelopes it needed for printing at a 20% profit margin and a further 15% of the envelopes it needed for printing at a 30% profit margin.[3]

The assumptions used in the projections were based, in significant part, on several of OEC's business rationales for purchasing RO Envelope.  First, OEC perceived that it needed another location for its manufacturing operations, and RO Envelope's Exton, Pennsylvania location appeared ideal to answer this need, in significant part because of the location of many of OEC's customers in Pennsylvania.  See Affidavit of Dennis R. Stewart, former President of OEC, a copy of which is attached hereto as Exhibit G, at ¶ 4.  Second, OEC anticipated the likelihood that it would move its jet shop equipment from Baltimore to Exton, Pennsylvania and that the entire jet shop operation would be consolidated at the RO Envelope facility.  Id.  In addition, OEC perceived the opportunity to sell more envelopes then it had been selling to RO Envelope.  Id.  RO Envelope purchased envelopes from both OEC and some of its competitors prior to the acquisition, which were then used by RO in its printing

---

[2] See Relevant portions of the Deposition of Jay Young, attached hereto as **Exhibit C**, at pp. 240–242;
[3] See Relevant portions of the Deposition of Lawrence Signorelli, attached hereto as **Exhibit F** at pp. 114-116, 130-134.

3

operation and ultimately supplied to its customers. Id. OEC perceived the likelihood that OEC would supply a much larger portion of RO Envelope's needs once it became a subsidiary of OEC. Id.

As it turned out, several of these business rationales, upon which the assumptions in the projections were based, did not come to pass subsequent to the acquisition. Id. at ¶ 7. For instance, OEC did not move its manufacturing equipment to Exton in order to develop another manufacturing facility. Id. In addition, the consolidation of neither the management nor the operations of the jet shop in or under RO Envelope occurred. Id. While a business plan to achieve this consolidation (which would have resulted in the entire jet shop operation being run out of the RO facility in Exton, Pennsylvania) was prepared and finalized, it ultimately was rejected immediately prior to the plan implementation by Jay Young. Id. Finally, a continuous problem was that OEC simply could not supply the envelope needs of RO Envelope within the quick timeframes often required by its customers and/or on the price terms which were competitive with other envelope manufacturers, such as New York Envelope and Old Colony Envelope. Id. RO Envelope and its principals simply had no control over these issues. OEC did try to supply envelopes from Oles de Puerto Rico, however, RO experienced consistent quality issues with the product. Id.

Although Mr. Signorelli completely relied on the above-referenced projections and assumptions in reaching his conclusions regarding the alleged lost equity value of Oles LLC, and indeed testified that the projections were "fundamental" to his damages calculation, he also testified that he never reviewed anything that corroborated or supported Plaintiffs' belief about expanding the business to increase revenues. See Signorelli depo., Exh. F, at pp. 36, 114-15. In addition, he relied solely on the allegations in the Complaint relating to the alleged malfeasance of Robinson and Oechsle, assumed all of the allegations to be true, did not review the record with respect to the truth of the allegations, and,

importantly, assumed that the alleged wrongs wholly caused Oles LLC to fail, as alleged in the Complaint. Id., at pp. 69-72. Mr. Signorelli testified that he conducted no factual investigation to confirm the allegations in the Complaint. Id. at p. 71. Mr. Signorelli also testified during his deposition that he has not expressed an opinion as to whether the alleged defalcations by Messrs. Robinson and Oechsle caused the demise of the Oles LLC. Id. at p. 88.

As addressed below, because Mr. Signorelli's opinions are completely speculative and based on assumptions that find no support in the record, his opinions should be excluded.

## ARGUMENT

**I.     Mr. Signorelli's testimony is inadmissible under Federal Rule of Evidence 702.**

The admissibility of expert witness testimony is governed by Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

The trial courts must act as a gatekeepers to ensure that any and all expert testimony is both relevant and reliable. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 588, 113 S. Ct. 2786 (1993); Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167 (1999) (holding that Daubert analysis applies to all experts, not just scientists); Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (2001). Non-scientific expert testimony must be evaluated to ensure that the expert is basing his opinion on "the same level of intellectual vigor that characterizes the practice in the relevant field." Kumho Tire, 526 U.S. at 152. An essential part of the Court's gatekeeping function is to ensure that the

expert testimony is more than mere speculation. See Daubert, 509 U.S. at 590; see also Giddings v. Bristol-Myers Squibb Co., 192 F. Supp.2d 421 (D. Md. 2002). Courts "must recognize that due to the difficulty of evaluating their testimony, expert witnesses have the potential to 'be both powerful and quite misleading.'" Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999) (quoting Daubert, 509 U.S. at 592-93).

**A.   Mr. Signorelli's testimony is not reliable.**

It is fundamental that a reliable expert opinion must be based on scientific, technical or other specialized knowledge, and not on belief or speculation. Cooper, 259 F.3d at 200. An expert's opinion should be excluded if it is based on assumptions that are speculative and not supported by the record. Tyger Constr. Co. v. Pensacola Constr. Co., 29 F.3d 137, 142 (4th Cir. 1994); Eastern Auto Distributors, Inc. v. Peugeot Motors of America, 795 F.2d 329, 337 (4th Cir. 1986); Blake v. Bell's Trucking, Inc., 168 F. Supp.2d 532 (D. Md. 2001). It is the Court's responsibility to ensure that an expert opinion has an adequate basis in fact. Id. at 533.

Courts routinely exclude expert testimony that is based on assumptions that are speculative. In Eastern Auto, for example, a distributor of automobiles, Eastern Auto, sued Peugeot and its importer alleging that Peugeot's importer improperly allocated vehicles among Eastern Auto and Peugeot's own distributor in the United States during periods of shortages, effectively favoring its own distributor. Eastern Auto, 795 F.2d at 331-32. Eastern Auto contended that the importer failed to supply enough vehicles, which led to Eastern Auto's inability to establish additional retail dealers. Eastern Auto retained an expert to testify regarding Eastern Auto's damages resulting from its inability to establish additional retail dealers. The expert proposed to quantify Eastern Auto's loss by estimating the number of new dealers that Eastern Auto would have established and the additional sales that those dealers

6

would have generated.  Id. at 337.  Eastern Auto's expert relied on two assumptions.  First, the expert assumed that Eastern Auto's failure to open additional dealers was due to the vehicle shortage.  This assumption, however, was not supported by any evidence.  Id.  The expert also assumed that Eastern Auto's market share from earlier years would have been exactly the same in later years.  However, the expert failed to take into account such factors as the increased demand for Peugeot vehicles and the introduction of new models.

In affirming the lower court's decision to exclude the expert opinion, the Fourth Circuit stated that "[s]crutiny of expert testimony is especially proper where it consists of 'an array of figures conveying a delusive impression of exactness in an area where a jury's common senses is less available than usual to protect it.'"  Id. at 338 (quoting Herman Schwabe, Inc. v. United Shoe Machinery Corp., 297 F.2d 906, 912 (2nd Cir. 1962)).  The Court held that "in light of the unsupported and speculative assumptions" underlying the expert's opinion, the lower court did not abuse its discretion in excluding the testimony.  Id.; see also American Road Equip. Co. v. Extrusions, Inc., 29 F.3d 341, 344-45 (8th Cir. 1994) (reversing lower court decision in which damages expert "assumed that the 1989 sales projections were reasonable for 1990" even though expert had no first-hand knowledge of American Road's business and simply relied upon the 1989 business plan.  Court noted that critical component of damages claim was "built on thin air.")

In this case, Mr. Signorelli produced reports that purport to quantify Plaintiffs' claimed loss of expectation damages.  The amount of loss of expectation damages was calculated specifically from a set of projections which were prepared internally by OEC prior to the sale.  See Jay Young depo., Exh. C, at pp. 240–242; see Internal projections, Exhibits D and E.  The Projections represented a best guess or prediction, at the time they were created, of how RO Envelope would perform financially subsequent to

the acquisition. See Stewart Affidavit, Exh. G at ¶ 5. They include a bold projection that revenues would increase 20% annually for the four years following the sale, and the assumption that Oles LLC after the sale would buy 50% of the envelopes it needed for printing at a 20% profit margin and 15% of the envelopes it needed for printing at a 30% profit margin. Signorelli depo., Exh. F, at pp. 114-116, 130-134. The revenue projections were based on Plaintiffs' speculative belief that RO Envelope's product line would be expanded, and that Robinson and Oechsle would be able to market this expanded line to existing and prospective clients. Id. at pp. 114-15. They were also based on several business rationales for purchasing the business that ultimately did not come to pass. Stewart Affidavit, Exh. G, at ¶ 7. It is undisputed, however, that there was no requirement in either the purchase agreement or the employment agreements of Messrs. Robinson and Oechsle to expand the business by any specified amount, or to buy their envelope purchasing requirements in any particular amount from OEC.

Moreover, the revenue projections were not based on sales figures from prior years. Jay Young depo., Exh. C, at pp. 243-244. Indeed, the projected revenue stands in marked contrast to the actual history of RO Envelope, which, as Jay Young conceded, had experienced essentially stagnant annual revenue growth in the years prior to the sale. Id., at pp. 252-55. For instance, in 1996 RO Envelope's annual revenue was $4.50 million, in 1997 it was $4.53 million and in 1998 it dropped to $4.34 million. See Exhibit E.

As for the assumptions relating to the percentage of envelopes Oles LLC would buy from OEC and the profit margins OEC expected as a result of such sale, these assumptions also were never shared with Defendants and were not part of the Purchase Agreement.[4] Indeed, Vicki Young, who ran Oles LLC from April 2001 until it was shut down in July 2002 and is the daughter of Jay Young, testified that

---

[4] Relevant portions of the Deposition of Harold T. Robinson, attached hereto as **Exhibit H**, at pp. 36, 41-42; Relevant portions of the deposition of David Oechsle, attached hereto as **Exhibit I**, at pp. 14-15.

8

she was not even aware of the purchase requirements that form the basis for the projections used by Mr. Signorelli.[5]  Nevertheless, Defendants did try to purchase as much of RO Envelope's requirements for envelopes as possible from OEC, subject to OEC's ability to supply the envelopes within the timeframes required for RO to satisfy its customers and at prices which were at least competitive with those offered by OEC's competitors.  Stewart Affidavit, Exh. G, at ¶ 8.  According to Ms. Young, however, OEC did not fill some of Oles LLC's orders because they lacked the items in stock, their prices were not competitive, or they considered some orders to be too small.  Vicki Young depo., Exh. J, at 80-82; see also Stewart Affidavit, Exh. G, at ¶ 9.  Thus, the purchase and margin assumptions were not only not a requirement (in the Agreement), but also not something that Oles LLC could even control since it needed to respond to the timing and pricing demands of its customers and OEC might not be (and in fact was not), in many particular instances, able to meet those needs.  Id. at ¶¶ 6 and 7.

   Notwithstanding his complete reliance on these projections and assumptions in rendering his expert opinion in this case regarding the alleged lost equity value of Oles LLC, Mr. Signorelli testified that he never reviewed anything that corroborated or supported Plaintiffs' belief about expanding the business to increase revenues.  See Signorelli depo., Exh. F, at 36, 114-15.  There also is no evidence that such projections were reasonable, and Mr. Signorelli certainly did not test for their reasonableness or accuracy, but instead assumed it.  Id. at 69-72.  Moreover, the assumptions concerning the percentage of envelope purchases and margins were, in Jay Young's words, "based on some sketchy information that we had received from the principals of RO."  Jay Young Depo., Exh. C, at p. 251 (emphasis supplied).  Mr. Signorelli also did not confirm or research the reasons why RO Envelope did not purchase from OEC the amount of envelopes that OEC assumed would be purchased and were included

---

[5] See Relevant portions of the deposition of Vicki Young, attached hereto as **Exhibit J**, at 151-52.

in the projections. Signorelli depo., Exh. F at 134-38.  As noted, neither the Purchase Agreement nor the Employment Agreements contained any requirement by Defendants to increase sales, to expand RO Envelope's markets by any particular amounts, or to buy envelopes at particular numbers or margins, and, thus, the assumptions are not tied to <u>any</u> contractual undertakings of the parties.  <u>See</u> Stewart Affidavit, Exh. G, at ¶ 6.

The projections upon which Plaintiffs' expert bases his opinion as to expectation damages constitute sheer speculation, and are nothing other than what Jay Young and others at OEC hoped could be accomplished at the time of the acquisition.  They simply were based on OEC's best estimate as to how RO Envelope would perform in the future, after the acquisition, based on information available at the time.  Stewart Affidavit, Exh. G, at ¶ 9.  No one, including Mr. Signorelli, has testified that these assumptions were reasonable.  Moreover, the projections lack an adequate basis in fact as they are completely inconsistent with the three-year revenue history of RO Envelope prior to the sale.  Indeed, by way of example of the unpredictability of the projections, OEC was also predicting growth in its revenues for fiscal years ending 2000 and 2001.  <u>Id.</u> at ¶ 9.  Not only were OEC's growth projections not achieved, sales actually declined during that period.  <u>Id.</u>

This concededly "sketchy" information simply is too speculative to rely upon, and the fact that Mr. Signorelli failed to conduct any tests or independent investigation to verify whether the projections regarding increased revenue and the assumptions regarding OEC's sales were reasonable renders the opinion unreliable.  Accordingly, his opinion must be excluded under Rule 702.  <u>See</u> <u>Daubert</u>, 509 U.S. at 590; <u>see also</u> <u>Giddings</u>, 192 F. Supp.2d at 425.

### B.    Mr. Signorelli's opinions are not relevant.

Even assuming the Court finds that Mr. Signorelli's opinion is reliable under Rule 702, it should nevertheless be excluded as it is irrelevant.  The relevance inquiry required under Daubert assures that the expert's proposed testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue."  Daubert, 509 U.S. at 591.  The consideration of relevance requires the district court to determine whether the testimony "fits" the instant case because not all reliable expert testimony is relevant.  Id.

In connection with rendering his opinion as to damages in this case, Plaintiffs' expert relied solely on the allegations in the Complaint relating to the alleged malfeasance of Robinson and Oechsle, assumed all of the allegations to be true, did not review the record with respect to the truth of the allegations, and, importantly, assumed that the alleged wrongs caused Oles LLC to fail, as alleged in the Complaint.  Signorelli depo., Exh. F, at pp. 69-72.  Although he relied on all of the factual allegations in the Complaint in rendering his opinion as to damages, Mr. Signorelli testified that he conducted no factual investigation in order to test or confirm the allegations.  Id. at 71.  Mr. Signorelli also testified that he does not have an opinion as to whether the alleged defalcations by Messrs. Robinson and Oechsle caused the demise of the Oles LLC.  Id., at p. 88.

The fact is, and as the Court stated in its Memorandum Opinion, many of the allegations in the Complaint that form the basis for Plaintiffs' claims, and upon which Mr. Signorelli relied, are completely unsupported by the factual record in this case.  For instance, the record is devoid of any evidence that:  (1) Defendants diverted customers to Rite Envelope or others, or caused Kim Robinson to leave and take her business with her; (2) Messrs. Robinson and Oechsle spent time on RO Express to the detriment of Oles LLC; or (3) Defendants improperly charged RO Express expenses to Oles.  Nor is

11

there any testimony or evidence in the record to prove that allegedly improper personal charges or even losses sustained as a result of Mr. O'Brien's embezzlement scheme caused the demise of Oles LLC.[6] The record shows, through Plaintiffs' own witnesses, that the general economic downturn in the U.S. economy in general and in the paper industry in particular, as well as the September 11, 2001 tragedy, the anthrax scare, and the lack of any productive sales staff for at least 5 months following Kimberly Robinson's departure and the fact that she took many of her customers with her, caused the loss of sales at Oles, LLC and OEC. Vicki Young depo., Exh. J, at pp. 187-90, 231-33, 331-35. Ms. Young, who was running the company during that time, admitted that the most serious problem Oles, LLC had was a lack of sales volume and that this led to the closing of the company. Id. at p. 323 (the company failed "because the sales volume didn't come up" because "we lost a certain portion of our accounts that we didn't bring the business back.").

    Mr. Signorelli does not deal with any of this evidence (which all comes from OEC's officers themselves) because he was asked to ignore it. The plain and simple truth is that Mr. Signorelli formed opinions based on the truth of 10 separate factual allegations of wrongdoing and direct causation contained in the Complaint, while the record establishes that most of those factual allegations are specious and unsupported by evidence and that the performance of Oles LLC was the function of (viewing the record very favorably for the Plaintiffs) many factors for which Defendants bear not responsibility. Without any evidence that Defendants engaged in the activities that Mr. Signorelli assumed occurred or caused the loss of equity value of Oles and OEC, which calculation is set forth in Mr. Signorelli's expert report, Plaintiffs cannot recover expectation damages even if they were to

---

[6] The uncontroverted evidence establishes the contrary, as the amount of the losses suffered in the embezzlement scheme (even if they had not been paid back) was not material, from a financial perspective.

otherwise prevail on their remaining claims. Thus, Mr. Signorelli's opinions on the loss in equity value of the two companies is irrelevant and must be excluded under Rules of Evidence 402 and 702.

## **CONCLUSION**

For the foregoing reasons, Defendants, GTD Company, Inc., Harold T. Robinson and David Oechsle, respectfully request that the Court grant their Motion in Limine to Exclude the Testimony of Lawrence Signorelli.

Dated: March 17, 2004                                  /s/
                                                              Jefferson V. Wright (Federal Bar No. 00990)
Tessa Laspia Frederick (Federal Bar No. 25374)
Brian D. Craig (Federal Bar No. 25710)
Miles & Stockbridge P.C.
10 Light Street, Suite 1200
Baltimore, Maryland 21202
(410) 727-6464

Attorneys for Defendants and Counterclaimants,
GTD Company, Inc., Harold T. Robinson and David Oechsle