```
 1                    VOLUME II

 2        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MARYLAND
 3
    OLES ENVELOPE LLC          *    WMN-02-2017
 4            Plaintiff
                               *
 5      vs.                         Northern Division
                               *
 6  GTD COMPANY, INC., et al.
              Defendants       *    June 6, 2003
 7
              *      *      *      *      *
 8            Deposition of JAY YOUNG, a witness of

 9  lawful age, taken on behalf of the Defendant In the

10  above-entitled cause, pending in the District Court of

11  the United States for the District of Maryland, before

12  Dawn L. Venker, a Notary Public in and for Baltimore

13  County, Maryland, at 10 Light Street, 8th Floor,

14  Baltimore, Maryland 21202, on the 6th day of June,

15  2003.

16            *      *      *      *      *

17  APPEARANCES:

18            WARD B. COE, III, Esquire
                 For the Plaintiff
19
              TESSA LASPIA FREDERICK, Esquire
20               For the Defendants

21  Reported By:   Dawn L. Venker
```


EXHIBIT C

GORE BROTHERS Reporting & Video Co., Inc.      Towson Reporting Company
410-837-3027                                   410-828-4148

239

1  JAY YOUNG,
2  called as a witness and having been duly sworn,
3  testified as follows:
4  EXAMINATION BY MS. FREDERICK:
5  Q  Mr. Young, welcome back. Just to remind
6  you, I'm Tess Frederick, and we are continuing your
7  deposition which we started on December 19th, and rules
8  are the same. There is no rules. If you need to get
9  up and take a break, just let me know. Take your time,
10  it's not a race. I'm sure you want to get out of here
11  as much as I do. So we'll just work together. I will
12  try to limit my questions today as much as possible.
13  You know I've got a list of things I want to talk to
14  you about today which will take a little bit of time,
15  but I'll try to make it as quick as I can.
16  Again, if you answer a question, I'm going
17  to assume that you understood my question and that you
18  answered it. If I do one of my favorite compound
19  questions I like to do all the time, you can stop me.
20  Anything I'm saying isn't making sense, just interrupt
21  me. In my condition, that happens quite often lately.

240

1  With that said, do you have any -- are you ready to go,
2  or are you on any medication that will make you not
3  possible to be deposed today or not understand my
4  questions?
5  A  I'm fine. Thank you.
6  Q  Okay. Good. One of the things we didn't
7  talk about last time when you were here is a document
8  that I'm going to show you today.
9  MS. FREDERICK: We are going to mark that
10  as 17.
11  (J. Young Deposition Exhibit Number 17 was
12  marked by the reporter.)
13  Q  Okay. Mr. Young, I'm going to show you
14  what has been marked as your Deposition Exhibit Number
15  17. Have you seen this document before?
16  A  I believe I have.
17  Q  When have you seen this document?
18  A  I guess back at the time it was prepared.
19  Q  I understand that this is probably an Excel
20  spreadsheet, and there is dates at the top. Would it
21  be fair to say that the first page we have looks like

241

1  it was printed out on 4-29 of '99. Would it be fair to
2  say that you would have looked at this document at that
3  time?
4  A  Yes.
5  Q  And the rest of the documents all have
6  different dates, and I understand that. I'm not trying
7  to incorporate one date into each document. Do you
8  know who prepared this document?
9  A  I believe it was Mr. John Hutson.
10  Q  Was he the former CFO of the company?
11  A  That's correct.
12  Q  Why did he prepare this document?
13  A  So that we could have discussions about the
14  purchase.
15  Q  Was this an internal document? In other
16  words, was this something that was generated within the
17  company to discuss whether or not you wanted to
18  purchase RO Envelope?
19  A  Initially, yes.
20  Q  And did you have meetings to discuss this
21  document, or documents like it?

242

1  A  Yes.
2  Q  Who was involved in these meetings?
3  A  I believe it was Mr. Stewart, Mr. Hutson,
4  and myself. I'm not sure. There my have been others.
5  I really can't recall.
6  Q  What -- based on the assumptions that are
7  made, and the pro forma numbers that are part of this
8  document, can you tell me what the discussions were?
9  What was decided about the purchase or potential
10  purchase of RO Envelope?
11  A  Well, the discussions centered around the
12  obvious economic viability of pursuing this, and as you
13  can see, we had certain assumptions that we thought had
14  to occur. We had projections here of how sales might
15  grow. What our pro forma would look like after we made
16  the purchase. This was required both for our own
17  benefit and certainly for the benefit of our financial
18  institution.
19  Q  And at that time who was that?
20  A  That was First Union.
21  Q  Would First Union have seen something like

**243**

1  this as well?
2  A   I don't believe so.
3  Q   So Mr. Hutson took this out about four
4  years then, the pro forma; is that right? He has --
5  yeah?
6  A   That's correct.
7  Q   Years one through four? Okay.
8      The assumptions that are on the first page,
9  which is also designated as Oles K00006, do you know
10 who came up with those twelve assumptions?
11 A   Not specifically. I think it was a team
12 effort.
13 Q   A team effort?
14 A   Uh-huh.
15 Q   Do you know whether any one of these
16 assumptions, or any of these assumptions were something
17 that you specifically said, okay, we need to turn AR
18 eight times or forty-five days? Is there anything in
19 here that you specifically would have put in here or
20 you remember saying, yes, I think we need this
21 assumption?

**244**

1  A   I can't pin down that.
2  Q   Do you know whether you relied on
3  Mr. Hutson to come up with these assumptions, or
4  whether it was actually a group --
5  A   No. It was actually a group effort.
6  Q   The assumption number three says, "Will
7  need to secure a line of credit for 750,000 to
8  $1,000,000." Do you see that?
9  A   Uh-huh.
10 Q   Did you actually do that? Did you secure a
11 line of credit?
12 A   No we did not.
13 Q   Why didn't you do that?
14 A   Well, the way the deal worked out, we
15 didn't see a need to do that.
16 Q   Just can you explain that to me?
17 A   Well, I mean the way we were eventually
18 able to finance the deal didn't require us to take out
19 a line of credit to that extent.
20 Q   I understand that the decision was made --
21 from previous depositions, I understand that the

**245**

1  decision was made to pay for the purchase of RO
2  Envelope out of operations; is that right?
3  A   That's correct.
4  Q   Instead of getting a line of credit to just
5  pay it off or pay --
6  A   The decision was made that way because
7  there wasn't a need.
8  Q   You have in assumption number ten says
9  officer compensation for Robby -- I'm assuming you mean
10 Robby Robinson -- will end after year two. Do you see
11 that?
12 A   Yes.
13 Q   Did you have an understanding then that
14 Mr. Robinson would only work at the company for about
15 two years after the sale?
16 A   That was our assumption, yes.
17 Q   Was that something that you were simply --
18 literally assuming or something that Mr. Robinson had
19 conveyed to you that was all he wanted to do? In other
20 words, he only wanted to work two years?
21 A   I believe at that time it was our

**246**

1  assumption.
2  Q   It was your assumption?
3  A   Right.
4  Q   Do you know specifically about assumption
5  11, the warehouse will not be rented? Do you know what
6  that means?
7  A   They had a warehouse in addition to the
8  about 58,000 square feet that they operated the
9  printing operation, and which was in the same
10 industrial park. And it was our opinion that that
11 warehouse would not be needed.
12 Q   So it was extra space?
13 A   It was extra space.
14 Q   And so when it says warehouse will not be
15 rented, does that mean you are assuming that you would
16 be able to get out of, I guess, the lease on that space
17 because you wouldn't need it, and therefore those
18 dollars wouldn't be -- you wouldn't need to have a
19 budget for those dollars?
20 A   That's correct.
21 Q   The last assumption, assumption Number 12,

3 (Pages 243 to 246)

251

1  know how you came up with the numbers, the fifty
2  percent, that you would manufacture fifty percent of
3  the standard envelopes and fifteen of maybe these
4  custom or preprinted sheets? How you came up with
5  those numbers, the assumptions?
6      A   It was based on some sketchy information
7  that we had received from the principals of RO.
8      Q   What do you mean sketchy?
9      A   Well, they couldn't, never really tell us
10 precisely what they bought. They didn't have those
11 records available, so they guessed. You know, we know
12 we process X amount of envelopes and we think, you
13 know, Y amount of this type.
14     Q   Well, they are a pretty small shop, right?
15     A   That's correct.
16     Q   If you could turn to the third to the last
17 page. It says at the bottom -- keep going. Third page
18 from the bottom. Oles K00003?
19         MR. COE: Is it 3 or 9.
20         MS. FREDERICK: That's 3. I put them in
21 the order that they should have been.

252

1      A   Six, seven, eight, nine --
2      Q   And then it's -- it goes --
3      A   -- ten, eleven.
4      Q   After 11 is 3.
5      A   After 11 is nothing.
6          MR. COE: Ours are different.
7      Q   May I see that for a second? Okay, that
8  would make sense then wouldn't it. I'll show you mine.
9  They were produced by your attorneys. Some additional
10 sheets that -- your Exhibit 17 is Oles K00006 through
11 11. They were documents obviously produced prior to
12 that number, and they are Oles K3, 4 and 5. I'm going
13 to show you those. They also appear to be -- well, I'm
14 going to ask you, what are those? Are those additional
15 pro formas and documents that your company would have
16 prepared prior to the purchase?
17     A   That's correct.
18     Q   And would Mr. Hutson have actually prepared
19 that document?
20     A   That's right.
21     Q   I want to ask you about the sales numbers

253

1  on the Oles K0003. It appears that Mr. Hutson -- it
2  appears that Mr. Hutson is using actual numbers here
3  for '94, '95, '96 and '97, and then he's got a couple
4  of numbers here for December, May and August of --
5  looks like '98 and '99. This is the best copy I have
6  unfortunately.
7          Would you agree that sales -- we are
8  talking about sales, we are not talking about
9  profits -- were generally going up during that period
10 of time for RO Envelope?
11     A   Well, if you look at the actual numbers --
12     Q   The history?
13     A   At the history. They went up from '94 to
14 '95 and from '95 to '96 and basically were flattened
15 from '96 to '97. Went down in '98.
16     Q   You only have partial year for '99?
17     A   We only have eight months out of --
18     Q   You would have looked at those to determine
19 how the business was doing over a period of time?
20     A   That's correct.
21     Q   And do you recall or remember what --

254

1  whether these numbers had any impression on you, what
2  you thought about them? Whether you thought they were
3  good?
4      A   I didn't think they were good.
5      Q   Okay. Well, you were considering
6  purchasing the business. I would assume the sales
7  numbers would be important.
8      A   They are. Of course.
9      Q   So why was the decision then made, based on
10 these numbers that we are looking at, to purchase the
11 company if, like you said, you felt the sales numbers
12 were not good?
13     A   We felt the sales were adequate. It
14 provided I guess a satisfactory level of living for the
15 principals. And we thought at this level, with the
16 combination of Oles being a converter and their
17 presence in the Exton, Philadelphia area, which we also
18 had a presence, would make a much more permeable
19 combination to enable us to grow and attain some of the
20 projections that we had put forth.
21     Q   Do you think it was unusual for the owners

255

1  of this business, the RO business, to -- it appears
2  that they are basically breaking even on a yearly
3  basis. Is that what you thought?
4     A    I'm not sure I understand what you --
5     Q    I mean you said the sales numbers were --
6  for the owners were comfortable. In other words, they
7  weren't -- as you can see, their numbers weren't huge.
8  They might have -- not have increased by a lot, they
9  might have gone up and down a little bit, but they
10 seemed to be relatively steady. You are a businessman.
11 Why did you think that they were comfortable, the
12 owners were comfortable with these numbers?
13    A    Well, from what we could -- we could look
14 at with the expenses that they were charging to the
15 business, and in conversations with them, they seemed
16 comfortable, and seemed pleased with what they were
17 doing.
18       MS. FREDERICK: I'm just going to mark
19 those last three pages as 18. If you would mark those
20 last pages.
21       (J. Young Deposition Exhibit Number 18 was

256

1  marked by the reporter.)
2     Q    Last time I marked as a deposition exhibit
3  number -- as an exhibit to your deposition Number 4.
4  I'm just going to show it to you again. We are not
5  going to mark it again. And this is the promissory
6  note that was executed in this case. Can you just look
7  at that for a second, Mr. Young.
8       MR. COE: You want him to read the whole
9  document, or just take a look at it?
10      MS. FREDERICK: I want him to look at it.
11 It is only a two-page -- three pages, counting the
12 signature.
13    Q    I think we agreed last time that your
14 signature appeared on page three; is that right?
15    A    That's correct.
16    Q    I want to find out -- I think we know, but
17 I want to find out for the record what the status of
18 this note is. I understand that currently Oles is not
19 making payments under this note; is that right?
20    A    That's correct.
21    Q    And when I say Oles, it would be the entity

257

1  that is RO Envelope, LLC. RO Envelope, LLC is not
2  making payments under this note; is that right?
3     A    That's correct.
4     Q    You understood that Oles Envelope
5  Corporation had signed a guarantee as well to guarantee
6  payment of the monies due under the note; is that
7  right?
8     A    That's correct.
9     Q    Is Oles currently paying any of the
10 obligations pursuant to the agreement?
11    A    It is not.
12    Q    Do you know when payments were stopped? In
13 other words, when RO Envelope, LLC or Oles stopped
14 making payments under the promissory note?
15    A    I believe there was a payment due October
16 1, 2002 --
17    Q    Okay.
18    A    -- that was not made.
19    Q    You did make the payment for 2001?
20    A    I believe so.
21       MS. FREDERICK: Mark this as 19.

258

1       (J. Young Deposition Exhibit Number 19 was
2  marked by the reporter.)
3     Q    Mr. Young, I'm showing you what has just
4  been marked as Young Deposition Number 19. It is also
5  designated as Oles J00362 and 363. Can you take a
6  second to look at that document?
7     A    Okay.
8     Q    Have you seen this document before?
9     A    Yes.
10    Q    When have you seen this document?
11    A    It says May 5, 1999.
12    Q    Okay.
13    A    I assume it was around that time.
14    Q    I'll just represent to you that that
15 handwritten notation regarding the date was on the
16 document when we received it. Do you know whose
17 handwriting it is?
18    A    I think it is mine.
19    Q    So it would be fair to say that you
20 probably saw it around that date?
21    A    I think that is fair to say.