```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
2

  OLES ENVELOPE, LLC, et al.,
3           Plaintiffs
  v.
4 GTD COMPANY, INC., et al.
            Defendants
5
                                    CIVIL ACTION NO:
       vs.
6                                   WMN 02-2017

  GTD COMPANY, INC., et al.
7 Defendants
  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
8 GTD COMPANY, INC.,
  HAROLD ROBINSON, and
9 DAVID OECHSLE
            Counter Plaintiffs
10 v.
   OLES ENVELOPE, LLC,
11 and
   OLES ENVELOPE CORPORATION,
12          Counterclaim Defendants
   _____/
13         The deposition of LAWRENCE WILLIAM

14 SIGNORELLI was held on Monday, July 7, 2003, commencing

15 at 9:40 a.m. at the Law Offices of Miles & Stockbridge,

16 10 Light Street, 13th Floor, Baltimore, Maryland,

17 21202, before R. Dwayne Harrison, Notary Public.

18

19

20
                                          EXHIBIT
21 REPORTED BY:  R. Dwayne Harrison           F
```

**34**

1  Q  Rather than have you just jump to
2  something, I'm going to take a look at this at a break
3  and I'll come back with more specific questions if I
4  have any. It might be easier for both of us.
5  A  Okay.
6  Q  Other than your conversations with
7  Mr. Moderacki and Mr. Coe and putting aside the
8  administrative communication that you might have had on
9  non-substantive matters, did you receive any
10 information from any other source with reference to
11 this engagement?
12 A  There was Mr. Young's deposition. I didn't
13 read the whole deposition. Because of a question that
14 came up, the answer was included in his deposition. So
15 I saw the pages. I forget what pages they were. Two
16 pages answered my question.
17 Q  What was that question?
18 A  Relative to had the other side agreed to
19 the -- had the RO principals seen and agreed to the
20 forecasts that were prepared immediately prior to the
21 transaction.

**35**

1  Q  And his response to that was?
2  A  Yes.
3  Q  So did you assume the truth of that as a
4  part of your report?
5  A  Yes.
6  Q  What difference does that answer make to
7  your opinion?
8  A  It was the expected answer. I've been
9  party to a tremendous amount of merger and acquisition
10 transactions while I was a consultant and also as an
11 employee and owner of a company and I've never been
12 party to the company where both sides didn't agree on a
13 forecast at the time of the transaction.
14 Q  Okay. What importance does that answer
15 have, though, to your opinion other than the fact that
16 it was expected by you?
17 A  My opinion is based on the -- a lot of the
18 valuation is based on that forecast. A lot of the
19 damages are ultimately derived from that forecast.
20 Q  What is the importance of that forecast
21 being shared with the RO principals for purposes of

**36**

1  your opinion?
2  A  The importance is the RO principals agreed
3  that this is what the combined companies or the new
4  company acquired by Oles Corporation was expected to do
5  in the next three years, three to four years.
6  Q  And if you were convinced as a factual
7  matter that, in fact, the forecast were not shared
8  and/or that there was no agreement between Mr. Young or
9  Oles and the RO principals on the forecast, what impact
10 would that have on your opinion?
11     MR. COE: Objection. Go ahead and answer.
12 A  If I could be convinced it could affect the
13 valuation. It is the underlying cashflow to the damage
14 calculation.
15 Q  It's fundamental to your calculation, is it
16 not? That is, the forecast?
17     MR. COE: Objection. Go ahead.
18 A  Yes.
19 Q  Let me ask you to be a little more specific
20 in response to the question I asked I think two
21 questions ago. Since it is fundamental to your

**37**

1  calculation, if it were the case that the cashflow --
2  rather, the forecast was not shared and/or that there
3  was not an agreement on that forecast, what impact
4  would it have on your opinion?
5     MR. COE: Object to form. Go ahead and
6  answer.
7  A  If it was showing that, I would need more
8  information to quantify the impact.
9  Q  How would you go about doing that if you're
10 able to explain that at this point?
11 A  I would need to see something -- I would
12 really need to see something different that contradicts
13 that forecast, a hard copy. I would want to see
14 something else that they arrived at. Again, through my
15 experience, it goes back to my first deal in 1982.
16 I've always seen -- there has always been some type of
17 forecast that has been the basis for a transaction for
18 an acquisition that has been agreed upon by both sides
19 or the acquirer would not do the deal.
20 Q  You are aware that the RO principals
21 steadfastly deny that the forecast that you referred to

66

1  well as on a regional level broken down into multiple
2  regions?
3    A    Correct.
4    Q    What does it show on a national level with
5  respect to the year 2000 over the year 1999?
6    A    I looked at dollar sales. 4.4 percent
7  increase.
8    Q    How about 2001 over 2000?
9    A    .6 percent decrease.
10   Q    What does Exhibit 7 show?
11   A    The same information but the years were May
12 and it went 2001 versus 2000 and May -- the year ended
13 May 2002 versus 2001.
14   Q    And what were the percentages on the
15 national level?
16   A    Years 2001 versus 2000 was a 3.9 percent
17 increase. 2002 was a 5.8 percent decrease.
18   Q    Is this information that you consider
19 useful?
20   A    Yes, you want to look at the health of the
21 industry.

67

1    Q    And you looked at the Envelope
2  Manufacturers Association or information published by
3  EMA because they're the leading association for this
4  industry?
5    A    As far as my knowledge, yes.
6    Q    Is this information considered by you to be
7  authoritative?
8    A    Yes.
9    Q    All right. Back to your report and, in
10 particular, the third page of your October 2002 report.
11 Are there any other documents that you reviewed?
12   A    No.
13   Q    So let me just note while we're on this so
14 we can -- your second report contains the same listing
15 except that you've added one item, I believe, at the
16 end which is Oles Corp's prepared schedules of cash
17 outlays and related interest costs?
18   A    Correct.
19   Q    So if we included everything on that list
20 and we add the EMA information, that would be -- and we
21 add the couple of page excerpt from Mr. Young's

68

1  deposition, that would be everything that you reviewed
2  in connection with your retention?
3    A    Correct.
4    Q    You didn't review any other deposition
5  testimony of any other person in this case?
6    A    Not before I prepared these.
7    Q    Subsequently?
8    A    Yes, I was given your expert's report.
9    Q    Okay.
10   A    June 26, I believe.
11   Q    How about -- I was asking you about
12 deposition testimony.
13   A    I'm sorry, I misunderstand.
14   Q    That's all right. Any other deposition
15 testimony reviewed by you other than the page or two or
16 three from Mr. Young's deposition?
17   A    No.
18   Q    And no other documents?
19   A    Correct.
20   Q    Now, you mentioned in your first paragraph
21 of your October 2002 report that you calculated the

69

1  loss of equity value resulting from the activities of
2  RO's two former principals, Messrs. Oechsle and
3  Robinson and the ultimate closure of RO.
4       Do you see that?
5    A    Yes.
6    Q    I just want to confirm my understanding,
7  that is, that you're not expressing an opinion on the
8  causation of what you opine to be the damages but,
9  rather, you are quantifying your opinion as limited to
10 quantifying the damages? Is that a fair summary?
11   A    I'm not sure I understand the term
12 "causation."
13   Q    Okay. Your sentence reads that you've
14 calculated the loss of equity value resulting from the
15 activities of the two former principals. Based on the
16 information that you reviewed or maybe, more
17 appropriately, not reviewed, I'm under the impression
18 that you are not stating an opinion that the damages
19 that you opined on as a factual matter resulted from
20 the activities of the two former principals; is that
21 correct?


Case 1:02-cv-02017-WMN  Document 62-8  Filed 03/17/2004  Page 4 of 8
Lawrence William Signorelli  7/7/03

Page 70

1  MR. COE: Object to form.
2  A  My understanding is, yes, that due to the
3  failures or due to the activities of Mr. Oechsle and
4  Mr. Robinson, that the company -- that Oles LLC never
5  realized the expected value at that time.
6  Q  Well, what factual investigation or review
7  have you made of the activities of the two former
8  principals identified here?
9  A  I'm basing this based on the Complaint,
10 that the Complaint is accurate as to what they did and
11 the fact that they did not meet their fuduciary
12 responsibilities and they destroyed the good will that
13 was ultimately the value of the business.
14 Q  So you're assuming those facts to be true?
15 A  Correct.
16 Q  That's what I was getting to in my
17 question. Maybe my question wasn't artful and if it
18 wasn't, I apologize for that. But you essentially have
19 been asked to assume, I take it, then, that the
20 allegations set forth in the Complaint about the
21 activities of Mr. Oechsle and Mr. Robinson are correct?

Page 71

1  A  Correct.
2  Q  You have done or conducted no independent
3  factual review of those allegations to express an
4  opinion that their activities were, in fact, improper
5  in some way, correct?
6  A  I didn't do any factual investigation,
7  correct.
8  Q  So if it turns out, as a factual matter,
9  that some or all of the things that are alleged to have
10 been done by these two individuals or either of them in
11 the Complaint are not, in fact, correct, and did not,
12 in fact, occur, what impact would that scenario have on
13 your opinion?
14    MR. COE: Object to form.
15 A  I mean, if it can be demonstrated that --
16 my understanding is, basically, that the checks were
17 being deposited into a different account -- that the --
18 I'll call it the expense account abuse and the ultimate
19 unraveling of the company at the time of that
20 basically, after the expense account abuse by
21 Mr. Oechsle was discovered, didn't happen, there is

Page 72

1  still this loss of valuation. But right now I'm saying
2  if that didn't happen, the company still lost this
3  value. My understanding, everything I've assumed, this
4  is the value that was lost.
5  Q  You've assumed that this value was lost
6  because of their activities?
7  A  Correct.
8  Q  That's the assumption?
9  A  Correct.
10 Q  That there is a relationship between the
11 alleged activities and the loss of equity value and
12 other damages that you quantify here?
13 A  If they did those activities, this is the
14 loss.
15 Q  And if they didn't do those activities,
16 what effect does that have on your opinion?
17 A  I guess my opinion is on this loss. If
18 they didn't do it, then opinion wouldn't be.
19 Q  Applicable?
20 A  Applicable.
21 Q  Just so we have it on the record, what is

Page 73

1  your understanding of what is alleged to be the
2  improper activities of the two former principals of RO?
3  A  My understanding of the activities began
4  pretty much right after -- they established a new
5  company, GTD, I believe it is. They opened up an
6  account to which they were signatures. My
7  understanding is originally that was done basically to
8  accept the installment purchase price payments, if you
9  will. However, relatively soon thereafter they began
10 depositing checks that were RO Envelope/Oles LLC checks
11 into that account. This went on for some time, pretty
12 much from 1999, my understanding, through early 2001.
13 That was discovered sometime then.
14    Also, at the time, 2001, it was discovered
15 that Mr. Oechsle was significantly padding his expense
16 account and, in fact, resigned because of that and when
17 he basically resigned that's when the company really
18 deteriorated quite rapidly, down to a complete loss of
19 value.
20 Q  After he resigned?
21 A  That's when the deterioration began, yes,


19 (Pages 70 to 73)

GORE BROTHERS Reporting & Video Co., Inc.  
410-837-3027

Towson Reporting Company  
410-828-4148

Page 86

1  Mr. Young?
2  A  No.
3  Q  What is your understanding in that regard?
4  A  My understanding is he retired in June of
5  2001.
6  Q  Do you have any understanding that that
7  retirement took place without the consent and agreement
8  of Mr. Young or Oles?
9  A  No.
10 Q  You understand the converse that, in fact,
11 it took place with his consent?
12 A  I'm hearing that said now.
13 Q  I'm asking if you know anything about that.
14 A  I know that he retired in June 2001. I
15 know that the check cashing irregularities -- the scope
16 or scale of the check cashing irregularities were
17 discovered subsequent to his retirement.
18 Q  Is it your understanding that he was asked
19 to retire by Mr. Young?
20 A  Again, no. I don't have an -- I know he
21 retired.

Page 87

1  Q  Do you know what the dollar amount involved
2  in the check irregularities was?
3  A  Generally, I know it was a couple of
4  hundred thousand dollars. Ballpark, that area.
5  Q  Mr. Moderacki told you that?
6  A  Somebody told me that. Again, I was
7  looking at the lost value, not the amount of the
8  dollars.
9  Q  Have you ever reviewed any of the checks or
10 any of the deposit slips or any of the documentation
11 having to do with that whole episode?
12 A  No.
13 Q  Do you know how much money was involved in
14 the expense account issues related to Mr. Oechsle?
15 A  No.
16 Q  No idea in terms of order of magnitude,
17 whether it was $15 or $100,000?
18 A  My assumption, if he's being let go for it,
19 resigning because of it, it's going to be more --
20 closer to $100,000, not the $15.
21 Q  But no one told you what the amount was?

Page 88

1  A  No, and, to me, the fact that he's doing it
2  is enough to create the damage.
3  Q  Have you performed any type of -- I'll call
4  it a sensitivity analysis, although I may not be using
5  the term exactly correctly from a technical standpoint,
6  but have you done any sensitivity analysis of whether
7  the check -- the problems with the checking or bank
8  accounts or the problems with the -- the alleged
9  problems with the expense account reimbursements
10 actually caused, directly, the financial demise of the
11 company?
12 A  No.
13 Q  So you are not expressing an opinion that
14 there is a direct relationship between the losses
15 sustained as a result of the checking account issues or
16 the losses sustained as a result of the expense account
17 issues that led to the demise of the company or the
18 closure of the company?
19 A  Correct.
20 Q  Why is it that you believe that the value
21 of Oles's expectation as manifests from the forecast is

Page 89

1  the relevant measure of damages?
2  A  Oles -- basically, that's what Oles bought.
3  Oles bought RO. They valued RO. They paid $2 million
4  dollars for RO. It just so happens if you look at the
5  valuation of Oles Envelope, LLC -- the valuation that
6  Oles Envelope LLC paid RO was $2 million dollars. They
7  paid that $2 million dollars. They didn't get that $2
8  million dollars in value back. The company is no
9  longer in business. Valuation, what you paid today, is
10 your estimation of your expected benefit in the future.
11 They lost that.
12 Q  So that's your assessment of what they
13 lost?
14 A  Yes.
15 Q  And you've mentioned it based on what their
16 expectation was?
17 A  When you buy a company, that's what you pay
18 for your company. You're going to pay some level of
19 your expectation. You're not going to pay all of your
20 expectation but you're going to pay a dollar value and
21 what we've calculated is a reasonable estimation of

Page 114

1  Q  Let me press you. Are you able to give me
2  any sources that you believe are authoritative as you
3  are sitting here today right now?
4  A  I can't do it off the top of my head right
5  now.
6     MR. WRIGHT: Why don't we take a break?
7     (There was a break in the proceedings.)
8  Q  Let's get back to the October 2002 report
9  and I want to ask you just a few questions on your
10 section of the second page dealing with opportunities
11 to increase revenue.
12 A  I'm ready.
13 Q  You mentioned a primary driver in Oles's
14 decision to acquire RO was the opportunity to
15 significantly increase RO's revenues and earnings.
16 Mr. Moderacki was the source of that information?
17 A  Yes.
18 Q  Then you go on to explain that the revenue
19 enhancement benefits were to be derived from expanding
20 RO's product line to include sales of envelopes as well
21 as existing printing services and allowing RO's senior

Page 115

1  executives to market these expanded products and
2  services to existing and identified prospective
3  customers. Do you see that?
4  A  Yes.
5  Q  Again, the source of that information was
6  who?
7  A  Mr. Moderacki.
8  Q  Did you see anything in particular that
9  corroborated or supported that those two particular
10 things would be the source of the increased revenues?
11 A  No.
12 Q  So that revenue was simply based on the
13 verbal discussions that you had with Mr. Moderacki?
14 A  Correct.
15 Q  And then you mentioned the forecast, the
16 September 23, 1999 forecast here in your report. We've
17 talked about that before and you mentioned that it
18 included an annual revenue growth rate of 20 percent,
19 correct?
20 A  Correct.
21 Q  And that was over a period of four years?

Page 116

1  A  Annual, at least 20 percent annually.
2  Q  And then you mentioned the customer list
3  that you referred to earlier here?
4  A  Yes.
5  Q  By the way, did the agreement with
6  reference to the customer or the contact list that you
7  highlighted earlier, did the agreement contain any
8  particular reference or requirement that Mr. Oechsle or
9  Mr. Robinson would do anything with reference to those
10 contacts on that list?
11 A  The agreement did not mention what
12 Mr. Oechsle and Mr. Robinson would do with that list.
13 The agreement did identify that list as one of the
14 acquired assets.
15 Q  So the list was attached to the agreement
16 in order to delineate it as an acquired asset; is that
17 right?
18 A  I would have to check why it was attached
19 if that was the case. The list is apparently -- again,
20 I read it quickly. It's attached to the Bill of Sale.
21 I haven't read all the language. I do know from

Page 117

1  reading the purchase agreement the customer list is
2  specifically mentioned as one of the assets. Do you
3  want me to read through this to see if it's related?
4  Q  No. If you don't know the answer based on
5  your prior review, I'll accept that in the interest of
6  time, not having you read the Bill of Sale in
7  particular. I think we can agree, based on your prior
8  review, that the list of customers or prospects is not
9  attached in order to create any specific performance
10 obligation on the part of Mr. Robinson and Mr. Oechsle
11 with respect to those customers and prospects; is that
12 right?
13 A  That's fair. It's listed as a purchased
14 asset.
15 Q  Fair enough.
16    Now, you used a higher discount rate of
17 thirty percent with respect to the opportunity to
18 increase revenue and I assume that's because of the
19 your perception that there was increased risk of not
20 achieving that revenue increase in this category?
21 A  Correct.

130

1  A  No, without additional work -- significant
2 additional work.
3  Q  You mean going and looking at the forecast?
4  A  Right.
5  Q  And measuring that against the actual
6 performance?
7  A  Yes.
8  Q  But short of that in terms of coming up
9 with a ballpark percentage, you are not able to do that
10 as you sit here?
11  A  No, but I'm proud to say from my five or
12 six years in corporate America, we hit our forecast
13 every year.
14  Q  But the point is that regardless of your
15 personal experience, the point is that many American
16 businesses, even in the non-public arena do not. Would
17 you agree with that?
18  A  Some do, some don't. I can agree with
19 that.
20  Q  The direct sales channel benefits flow
21 from -- and correct me if I'm wrong -- flow from the

131

1 expectation on the part of Oles Corporation that
2 65 percent of RO's envelope requirements would be
3 purchased from Oles Envelope Corporation after the
4 acquisition; is that right?
5  A  Correct.
6  Q  And then you go on to explain that 50
7 percent of this material requirement would be at a
8 20 percent margin and 15 percent of this material
9 requirement would be at a 30 percent margin, correct?
10  A  Correct.
11  Q  And all of those facts or expectations, I
12 should say, are based on the forecasts, the September
13 '99 forecasts?
14  A  Yes, and discussions with Mark.
15  Q  Okay. What discussions with Mark?
16  A  Mark, in reference to those same numbers
17 that are in the forecast. So, yes, that was their
18 expectation.
19  Q  Their being Oles?
20  A  Oles' expectation.
21  Q  Did Mr. Moderacki describe whose

132

1 expectation, exactly, it was?
2  A  We talked with the Oles management team.
3  Q  The Oles management team?
4  A  The Oles management team.
5  Q  He wasn't a member of the management team
6 at the time. The reason I ask is in 1999 he wasn't a
7 member of the management team, right?
8  A  Yes.
9  Q  So did he purport to describe to you whose
10 mindset he was attempting to describe?
11  A  No.
12  Q  Have you seen any evidence in your review
13 of all the documentation that the principals of RO
14 agreed with the 65 percent number or the margin
15 percentage?
16  A  Everything I have was provided by Oles.
17 So, no.
18  Q  I take it it's your understanding that the
19 65 percent number was not achieved, correct?
20  A  I don't want to say that I know the
21 65 percent was achieved. I know that the numbers were

133

1 not achieved.
2  Q  Have you conducted any factual inquiry into
3 why the percentage of RO's purchases of envelopes did
4 not equal or exceed the 65 percent expectation of Oles?
5  A  I did not. In fact, I thought -- again,
6 like I said, I looked at the total number. So I
7 looked -- I did give credit for what was done and the
8 percentages, talking with Mr. Moderacki were still
9 reasonable for this analysis, my understanding.
10  Q  What do you mean by that?
11  A  Fifty percent at and the --
12  Q  You're talking about the margins?
13  A  Yes.
14  Q  Let's focus for a moment on the 65 percent.
15  A  Okay.
16  Q  RO did not buy 65 percent of its purchases
17 from Oles, in fact; is that right?
18  A  I'll have to say I did not know that.
19  Q  Okay. Well, do you have an opinion or do
20 you have an understanding as to what percentage of its
21 envelope requirements it did buy from Oles?

134

1  A  What I did is the two valuations were based
2  on the assumptions at the time and then I gave credit
3  for what was actually done. So, I reduced my value
4  from what was actually achieved. What I'm saying is
5  this was based on what we were going to do at the time.
6  Then I gave credit for what we actually did.
7  Q  And you didn't attempt to look at the
8  reasons why RO didn't buy a higher percentage of its
9  envelope requirements from Oles?
10  A  I did not.
11  Q  And you would agree with me the reason for
12  that could vary widely, right?
13  A  Yes. The assumption here is because of the
14  decline in the company and the actions of the
15  principals.
16  Q  That's the assumption?
17  A  That's the assumption.
18  Q  Okay. What is that assumption based on?
19  A  The premise of this valuation.
20  Q  I mean, you've assumed that a certain
21  percentage of envelope purchase requirements was not

135

1  met by RO and you are saying, as I understand it,
2  that -- you're assuming that that didn't occur because
3  of the activities of the principals; is that right?
4      MR. COE: Object to form. You can answer.
5  A  Actually, what we're saying is this is what
6  was expected and then when you would come in and give
7  the ultimate valuation, I'm coming down to the bottom
8  line. I gave credit for what happened but the loss of
9  value is what we had at the time we entered into -- the
10  transaction closed.
11  Q  Well, if you were to learn that the reason
12  that 65 percent of the requirements were not purchased
13  was, in large part if not completely, because Oles was
14  not able to supply the requisite numbers of envelopes,
15  would that impact your opinion of Oles?
16  A  I guess if I found that to be the fact
17  versus the action of the owners, yes.
18  Q  Well, I guess --
19  A  Or it could, I should say. It could
20  affect.
21  Q  Well, I guess what I'm trying to understand

136

1  is the precise point you're making. You're referring
2  to the actions of the owners. What is it about an
3  expense account or what was it about the issues that
4  arose relating to the GTD account and Mr. O'Brien's
5  conduct that would prevent RO from buying 65 percent of
6  its requirement from Oles? What's the tie there?
7  A  Well, this is our expectation of value, the
8  two numbers. If you go to Exhibit 8, the first two
9  numbers. It was based on, again, the forecast, my
10  assumption and everything I've been shown, led to
11  believe has been abreast by everybody. That's the
12  loss. That's the value of the assets at the time of
13  the transaction.
14      What I did then was give credit for what
15  was, in fact, sold and that was the credit. But then
16  the deterioration of the company from this assumption
17  is because of the actions, the breach of their
18  fiduciary responsibility, the fact that we didn't
19  benefit -- get the benefit of the owners'
20  relationships, customer list, et cetera.
21  Q  All right. Just so we're clear on this

137

1  before we move on then, if you were to learn that the
2  reason why more envelopes were not purchased from Oles
3  by RO was that they were unable to supply the envelopes
4  or they were unable to supply them in a timely manner
5  so that RO could meet its customers' expectations or
6  they could not supply them at the price -- at the best
7  price compared with Oles as competitors who also
8  supplied such envelopes or that there were quality
9  control problems with envelopes supplied by Oles, in
10  particular from its Puerto Rico plant, if you were to
11  learn that those things were facts, it would impact
12  your opinion, would it not?
13  A  It could.
14  Q  Well, wouldn't it impact your opinion? The
15  way you've set up your opinion is you said they have an
16  expectation to achieve this level of sales based on the
17  65 percent figure. If, in point of fact, the reason
18  that all or a portion of those sales were achieved at
19  that level is because of problems that Oles had, it
20  would impact your opinion, would it not?
21  A  I think so, yes.