IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| OLES ENVELOPE, LLC, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. WMN 02-2017 |
| GTD COMPANY, INC., *et al.*, | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### AFFIDAVIT OF DENNIS R. STEWART

1.  My name is Dennis R. Stewart, and my business address is 501 W. 23rd Street, Baltimore, Maryland 21211. I am currently employed as Owner/Secretary-Treasurer of Uptown Press, Inc. I am over eighteen (18) years of age, under no mental disabilities and am competent to be a witness.

2.  I was the President of Oles Envelope Corporation ("OEC") from approximately May 1998 through May 2000. Except for a brief stint away from OEC in 1997 and early 1998, I was also employed by OEC for over 9 years in various managerial and executive positions.

3.  As President of OEC, in 1998, I began to have discussions with the principals of RO Envelope, Inc. ("RO"), Harold T. Robinson and David Oechsle, about the possibility of OEC purchasing RO. In my capacity as President, I was heavily involved in the discussions and negotiations leading up to the acquisition and the ultimate consummation of the acquisition, which was closed on or about September 30, 1999.

4.  There were several business rationales, from OEC's perspective, for the purchase of RO. Those rationales included, among others, the following:



EXHIBIT 6

(a) OEC perceived that it needed another location for its manufacturing operations, and RO's Exton, Pennsylvania location appeared ideal to answer this need, in significant part because of the location of many of OEC's customers in Pennsylvania.

(b) OEC was interested in acquiring the experience which RO had in running a jet shop printing operation and capitalizing on that experience. While OEC had a jet shop in its Baltimore location, it was in my opinion, not efficient, and OEC anticipated the likelihood that the two jet shop operations would be managed by RO or that the jet shop equipment would be moved from Baltimore to Exton and the entire jet shop operation would be consolidated at the RO facility.

(c) OEC perceived the opportunity to sell more envelopes then it had been selling to RO. RO acquired envelopes from both OEC and some of its competitors prior to the purchase which would then be used by RO in its printing operation and ultimately supplied to its customers. We perceived the likelihood that OEC would supply a much larger portion of RO's envelope needs once it became a subsidiary of OEC. In fact, it was my personal objective to, at some time, supply RO with 100% of their envelope requirements.

(d) OEC perceived that the RO sales force would be able to increase sales by selling existing and new customers flexo envelope product in addition to jet product.

5. I have been supplied with two sets of projections, which were prepared by OEC in the weeks and/or months leading up to the acquisition. These documents are attached to Defendants' Motion in Limine to Exclude Testimony of Plaintiffs' Expert, Lawrence Signorelli as Exhibits D and E, and I will refer to them as "the Projections" in this Affidavit. Prior to the purchase, the OEC executive team prepared several versions of projections relating to the possible acquisition, for our internal use and deliberations. The Projections represented the best guess or prediction, at the time they were created, of how RO would perform financially

subsequent to the acquisition, based in significant part upon the business rationales for the acquisition which were inherent in the Projections. I did not supply the Projections to the Messrs. Robinson and Oechsle at RO prior to the closing on the acquisition, and I do not have any knowledge that any other members of the OEC executive team did either. Discussions did occur with Messrs. Robinson and Oechsle regarding the significant growth potential of OEC acquiring RO, but I did not discuss specific projections with them prior to the purchase.

6. The Projections contained various assumptions, including among others, the assumption that RO's revenue would grow at a 20% annual growth rate for the four years following the acquisition and that this growth would occur based on an expanded jet business and increased flexo sales utilizing OEC capabilities. OEC did expect margins to improve, however, I do not remember the exact number. None of these assumptions which are reflected in the Projections, or any of the other assumptions which are reflected in the Projections, became a part of or are reflected in the Purchase Agreement governing the transaction. Moreover, I am not aware that the parties otherwise agreed in any formal sense prior to closing that the assumptions would necessarily be achieved or that the financial results reflected in the Projections would be met. Instead, the Purchase Agreement contained a fixed purchase price of $2 million which was not contingent in any way upon any particular financial performance (whether measured by revenue, operating income, net income or profits, or otherwise) by RO, or the principals of RO, after the purchase. The purchase price was fixed, and its payment was deferred over a period of a number of years.

7. Several of the business rationales, upon which the assumptions in the Projections were based in significant part, did not come to pass subsequent to the acquisition. Specifically, I note the following:

(a) OEC did not move manufacturing equipment (for instance, a folding machine) to RO's facility so that OEC could develop a third manufacturing facility (it already, in addition to the Baltimore location, had a second manufacturing facility in Puerto Rico).

(b) The consolidation of either the management or the operations of the jet shop in or under RO did not occur. A business plan to achieve this consolidation (which would have resulted in the entire jet shop operation being run out of the RO facility in Exton, Pennsylvania) was prepared and finalized, but was rejected immediately prior to the plan implementation by Jay Young. Mr. Young rejected the consolidation plan against my recommendation, and to the best of my recollection, the recommendation of others in the executive team at OEC.

(c) Oles was not able to deliver the envelope needs or requirements of RO on the terms RO needed to satisfy its customers or at the rates and margins set forth in the Projections. A continuous problem was that OEC simply could not supply the envelope needs of RO within the quick timeframes often required by RO's customers and/or on the price terms which were competitive with other envelope manufacturers, such as New York Envelope and Old Colony Envelope. RO, and its principals, simply had no control over these issues. OEC did try to supply envelopes from Oles de Puerto Rico, however, RO experienced consistent quality issues with the product.

8. After the purchase, I established a working arrangement with the principals of RO with regard to RO's purchase of envelopes from OEC. That arrangement called for RO to purchase as much of its requirements for envelopes as possible from OEC, subject to OEC's ability to supply the envelopes within the timeframes required for RO to satisfy its customers and at prices which were at least competitive with those offered by OEC's competitors. It was my observation that the principals of RO fully complied with this operating protocol, as RO made

multiple requests for quotes from OEC on a daily basis and placed orders with OEC subject to availability and competitive pricing. While I was disappointed with OEC's ability to supply all or much of RO's needs, I was fully satisfied with the efforts made by RO's principals to purchase as much of its requirements from OEC as possible. Jay Young, the Chairman of OEC, and I had occasion to discuss the operating protocol referred to above, which occasionally was referred to as a "last look" (meaning that OEC would be given a chance to take a last look at a competitive quote made by one of OEC's competitors before the order was placed with that competitor). Mr. Young expressed his disagreement with the "last look" approach because it sometimes resulted in orders being placed by RO with OEC's competitors, but I was unwilling to require RO to buy product from OEC under terms which either were not competitive or would result in RO not being able to meet the envelope requirements of its customers within the timeframes needed. For as long as I was President of OEC, I did not force RO to purchase envelopes from OEC which did not achieve the primary objectives of growing the business and satisfying the customer. It should be noted that even though Jay Young disagreed, he allowed me to make the decisions I believed appropriate until I resigned in May of 2000.

9. The Projections attached to this Affidavit were based upon OEC management's best estimate as to how RO would perform in the future, after an acquisition, based on the information we had available at the time. The projections, for instance, do not reflect the fact that OEC, subsequent to the acquisition, would not implement some of the major business rationales which underlay the whole reason for the acquisition in the first place and which were fundamentally part of the Projections. We also did not know that OEC would have as much difficulty as it did meeting RO's customer's needs for availability and pricing. We were also unaware of other potential factors which would impact financial performance, of both RO and OEC, including both the economy in general and the paper and printing industries in particular,

5

which OEC did not recognize, as of the summer and early fall of 1999, were heading into recession. Further example of the unpredictability of projections, including projections prepared by OEC, generally, is evident from OEC's financial performance. During the same time that the Projections attached to this Affidavit were being prepared, OEC was predicting growth in its revenues for the fiscal years ending 2000 and 2001. Subsequently, not only were the growth goals not achieved, sales declined.

THE UNDERSIGNED STATES, UNDER PENALTIES OF PERJURY, THAT THE FOREGOING CONTENTS OF THIS AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF HIS KNOWLEDGE.

Date: 3-16-04

Dennis R. Stewart