```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
 2
    OLES ENVELOPE LLC         *    WMN-02-2017 L-00-3675
 3           Plaintiff
                              *
 4  vs.                            Northern Division
                              *
 5  GTD COMPANY, INC., et al.
             Defendants       *    April 25, 2003
 6
                *     *     *     *     *
 7

 8           Deposition of HAROLD T. ROBINSON, a witness

 9  of lawful age, taken on behalf of the Plaintiff in the

10  above-entitled cause, pending in the District Court of

11  the United States for the District of Maryland, before

12  Dawn L. Venker, a Notary Public in and for Baltimore

13  County, Maryland, at 7 Saint Paul Street, 15th Floor,

14  Baltimore, Maryland 21201, on the 25th day of April,

15  2003.

16              *     *     *     *     *

17

18

19

20                                    EXHIBIT
                                         H
21  REPORTED BY:  Dawn L. Venker
```

Page 34

1  people up to run the machinery?" I said, "No, I have
2  two employees that used to run envelope equipment --
3  folding equipment." Namely, Ed Coogler and Joanne.
4  And he said, "Okay, would they be able to come down to
5  Baltimore for a refresher course?" The answer to that
6  was yes, and I had talked to him about that. And then
7  their duties at RO Envelope would not totally switch to
8  the envelope folding machine, but they would be dual
9  air type thing. Where they could run the envelope
10 folding machine and they could also run jets if we
11 didn't have any work for the folding machines at the
12 time. But I think the ultimate goal, at least the
13 impression that I got from Jay, was that he wanted to
14 open up a conversion operation in Philadelphia
15 eventually.
16    Q    Did you also discuss the ability of RO
17 Envelope Company to expand its jet printing business?
18    A    Yes.
19    Q    What was said about that?
20    A    One of the things that was said about that
21 that was very important to this overall operation was

Page 35

1  that they would have their salesmen in Baltimore, and I
2  think they had about four or five salespeople, to the
3  best of my knowledge, start to sell jet work, and they
4  would offer them a -- some sort of a bonus commission.
5  This is only a comparison, okay, that I'm giving you,
6  it's not necessarily fact. If they were paid two
7  percent on their regular normal work -- if they brought
8  in new jet work, they were going to get paid five
9  percent for that jet work. And that was one of the
10 ways we were going to expand because we could then
11 expand into Baltimore because now we had a full-time
12 jet shop that did nothing but -- you know, at that
13 location accept the jet work that they would be able to
14 sell in Baltimore.
15    Q    Who did you discuss the idea of merging the
16 jet shops with?
17    A    Dennis Stewart and Jay.
18    Q    And I think you identified Jay as the
19 person you discussed putting the folding machines at
20 Exton with?
21    A    Again, both Jay and Dennis Stewart.

Page 36

1     Q    Who did you discuss expanding the jet
2  printing with? Same two?
3     A    Jay and Dennis Stewart. And maybe John
4  Hutson was sitting in on some of those discussions
5  also.
6     Q    Did you also discuss your ability to expand
7  the jet business with customers in the Philadelphia,
8  New Jersey, Wilmington, New York area?
9     A    I'm not sure of the answer to that
10 question. I don't know.
11    Q    You don't recall.
12    A    I don't recall that.
13    Q    Did you ever see projections that Oles
14 prepared relating to expanding the RO Envelope Company
15 business?
16         MR. WRIGHT: Is this before the sale?
17         MR. COE: Yes.
18    A    No.
19    Q    I'm going to show you a document that has
20 been marked as Exhibit Number 1.
21    A    Hang on a second.

Page 37

1          MR. COE: For the record, this is Oles
2  A00320 through 352.
3     Q    Can you identify this document?
4     A    In what way would you like me to identify
5  it?
6     Q    Well, do you know what it is?
7     A    Well, it looks like a customer list.
8     Q    Is it a customer list of RO Envelope
9  Company? I'll represent to you that it is attached to
10 the asset purchase agreement that I have.
11    A    Yes.
12    Q    Do you recall providing Oles with a list of
13 your customers?
14    A    Personally?
15    Q    Yes.
16    A    No.
17    Q    Do you recall having anyone provide Oles
18 with a list of your customers?
19    A    No.
20    Q    Do you recall being asked for it?
21    A    No.

Page 38

1    Q   Do you recognize that the RO Envelope
2   Company customer list is one of the assets that Oles
3   purchased?
4    A   Repeat that please?
5    Q   Do you recognize that the customer list of
6   RO Envelope Company is one of the assets that was
7   purchased as of October 1st, 1999?
8    A   Yes.
9    Q   Did you ever discuss this customer list
10  with anyone from Oles prior to the acquisition?
11   A   No. Not specifically I'm going to say. In
12  other words, I didn't discuss this list and go over it
13  account by account. We discussed certain accounts that
14  we could possibly grow on.
15   Q   What accounts did you discuss that you
16  could possibly grow?
17   A   Something like Educational Testing Service.
18  CCI. That's Communication Concepts. Maybe the Peter
19  Group. I would have to go through the list, to be
20  quite honest with you, but it was like maybe ten
21  accounts that we discussed that we knew there was work

Page 39

1   at those accounts that we were unable to get that we
2   now could get because we could now be considered a
3   converter of a sort.
4    Q   Was Mellon one of them?
5    A   No, I think Mellon -- is Mellon on this
6   list?
7    Q   I'm not sure.
8    A   I would have to look and see.
9    Q   Well, regardless of whether they are on the
10  list or not, is that a potential customer that you
11  discussed with Oles prior to the sale of the business?
12   A   At RO Envelope Company, we -- let me think
13  about this for a minute. Okay. I noticed Mellon is
14  not on this list. Mellon Bank was an account that we
15  had for a period of I'm going to say ten years. Ten,
16  twelve years. Ten, eleven years. Whatever. In a
17  certain time, and I have to think it was about 1995 or
18  '96. We lost the Mellon Bank account due to the
19  fact -- I may be wrong with these dates now. I don't
20  want to get myself in trouble here. But we had lost
21  the Mellon Bank account because they had moved it to

Page 40

1   Pittsburgh. The purchasing all went to Pittsburgh.
2   They were only going to entertain bids from companies
3   that were $50 million in sales or better. Well, that
4   left us out. It actually left Oles Envelope Company
5   out too. Now, I did discuss that -- I believe, that
6   problem with Jay at the time. Jay said, "Well, maybe
7   we could put in a bid." And I said, "Well, your sales
8   aren't $50 million." And he indicated while there may
9   be $50 million between everybody that is in the
10  corporation, I don't know, but they still weren't $50
11  million. That I knew of.
12   Q   Do you recall anything else that you
13  discussed?
14   A   About Mellon?
15   Q   About Mellon.
16   A   No.
17   Q   Do you recall any other --
18   A   That account was gone before they purchased
19  the company.
20   Q   Do you recall any other potential customers
21  that you discussed with Oles representatives prior to

Page 41

1   closing?
2        MR. WRIGHT: Other than the ones he already
3   identified?
4        MR. COE: Right.
5        MR. WRIGHT: He has identified three or
6   four total I think.
7    Q   You said you thought there were around ten,
8   and you have named three?
9    A   I mean there were customers like Fiserv.
10  Put that one down. There were Baum Printing Company.
11  That was a very big potential conversion customer. I
12  mentioned ETS, I believe.
13   Q   Yes, you did.
14   A   There is other ones, but I just can't think
15  of them off the top of my head without going through a
16  list. If you have a document you want to show me it.
17  You want me to go through account by account, I'm sure
18  I'll be able to recollect something.
19   Q   I want to show you -- show you a document
20  that has been marked as Exhibit 2. My question is, is
21  this a document that was provided to you at any time

Page 42

1  prior to October 1st of 1999?
2       MR. WRIGHT: Take a minute to look at the
3  document carefully. To look at it as carefully as you
4  need to answer the question.
5   A   Absolutely not.
6   Q   Did you ever discuss with any
7  representative of Oles the projections they were making
8  regarding expanding sales at RO after acquisition?
9   A   No.
10  Q   Did they ever tell you that they were
11 making projections of expansion of sales at RO?
12  A   No.
13  Q   Did you understand that expanding sales at
14 RO was an important factor to Oles?
15  A   Yes.
16  Q   In acquiring RO?
17      MR. WRIGHT: Finish the question. I want
18 to interpose an objection. You can answer, and you
19 already did.
20  Q   And how did you understand that?
21  A   Well, I understood it that they obviously

Page 43

1  were making a purchase and they wanted to grow the
2  business in any way possible in order to produce more
3  profits for Oles Envelope Corporation.
4   Q   In the course of negotiations, was there
5  any discussion about your continued employment at RO
6  after acquisition?
7   A   Yes.
8   Q   Can you describe those discussions to me?
9   A   Well, my first thoughts on it were that I
10 would just stay there for a year. Because I -- once I
11 sold the company, I really wanted to retire. Then we
12 agreed on a two year in the final contract, that I
13 would stay there for two years.
14  Q   How did that come about? One year --
15  A   Part of the negotiations of the presale.
16  Q   And who were those negotiations with?
17  A   Dennis and Jay and whoever else was at that
18 particular closing meeting, or whatever. It wasn't
19 actually done at closing, by the way, it was done
20 before we came to closing.
21  Q   I understand. Were Dennis and Jay urging

Page 44

1  you to stay longer than a year, is that how it came
2  about?
3   A   Yes.
4   Q   Yes. Did they say why they wanted you to
5  stay longer than a year?
6   A   No. I mean they just felt that the
7  transition period would take a couple of years, I
8  guess.
9   Q   Did they tell you that they felt you were
10 important to the success of the business?
11  A   Yes.
12  Q   And you recognize that you had been
13 important to the success of RO Envelope Company,
14 haven't you.
15  A   Yes.
16  Q   Did you participate in any discussions
17 relating to Mr. Oechsle's continued employment after
18 acquisition?
19  A   You are going to have to repeat that
20 question again.
21  Q   Okay. Did you participate in any

Page 45

1  discussions with Oles personnel relating to
2  Mr. Oechsle's continued employment after acquisition?
3   A   Not to my knowledge.
4   Q   Did you talk to Mr. Oechsle about that
5  subject?
6   A   Yes.
7   Q   What did the two of you say about that
8  subject?
9   A   That he wanted to stay for four years.
10  Q   Why did he want to do that?
11  A   Because he was a lot younger than I was.
12  Q   Did you discuss with Oles personnel the
13 respective roles that you and Mr. Oechsle would play
14 after acquisition?
15      MR. WRIGHT: Again, discussions before the
16 actual consummation of the deal?
17      MR. COE: Yes.
18  A   Hard question to answer. It was all
19 discussed in the realm of what was going on, but the
20 basic premise of their purchase was that we would
21 continue doing the same jobs that we had done previous