**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)**

OLES ENVELOPE, LLC, <u>et al</u>.,          *

      Plaintiffs,          *

v.          *

GTD COMPANY, INC., <u>et al</u>.,          *     Civil Action No. WMN 02-2017

      Defendants.          *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

<u>**PRETRIAL ORDER**</u>

Plaintiffs and Counterclaim Defendants, Oles Envelope, LLC and Oles Envelope Corporation, and Defendants and Counterclaim Plaintiffs, GTD Company, Inc., Harold T. Robinson and David Oechsle, by their respective counsel, submit this Pretrial Order pursuant to this Court's July 17, 2003 Scheduling Order and Local Rule 106.

    a.    **Plaintiffs' Statement of Facts and Legal Theories**

        1.    <u>Facts</u>

            I.    <u>The Transaction</u>

This case arises out of an agreement whereby Defendants Harold Robinson ("Robinson") and David Oechsle ("Oechsle") sold the assets and goodwill of their envelope printing company, RO Envelope Company ("Ro") to Plaintiff, Oles Envelope, LLC ("LLC"), a subsidiary of Plaintiff Oles Envelope Corporation ("OEC").

The Asset Purchase Agreement was executed on September 30, 1999.  The Asset Purchase Agreement contained other agreements between the parties, including the Bill of Sale, Promissory Note, Assumption Agreement, Employment Agreements for

Robinson and Oechsle, and Guaranty Agreement.  Those other agreements are referenced in Article 4 and attached as Exhibits to the Asset Purchase Agreement.

Prior to October 1, 1999, Ro was a successful jet shop.  Its business was printing envelopes.  Robinson and Oechsle, the President and Vice President of Ro, were its key employees and its sole owners.  They founded the business as partners in 1984. Generally, Robinson acted as the salesman and Oechsle was responsible for production and the financial records.  The success of the company was primarily attributable to them.

OEC is a manufacturer and printer of envelopes.  OEC's headquarters are located in Baltimore, Maryland.  John R. Young ("Jay Young") is OEC's President and Chairman.

OEC engaged in negotiations with Robinson and Oechsle for the purchase of Ro. Those negotiations eventually resulted in the Asset Purchase Agreement, by which LLC purchased Ro's assets for $2,000,000.00 plus an assumption of Ro's liabilities.  The total cost to LLC was approximately $3,000,000.00.  The $2,000,000.00 purchase price was payable over five years in installments on October 1st of each year.  To date, OEC has paid $516,414.01 to Robinson and Oechsle as follows:

- OEC paid $87,500.00 to Robinson and Oechsle on October 1, 1999;

- OEC paid $100,000.00 to Robinson and Oechsle on October 1, 2000; and

- OEC paid $73,120.00 to Robinson and $ 68,294.01 to Oechsle on October 1, 2001.

No payments were made on October 1, 2002 and October 1, 2003.

Ro's price tag was justified only if LLC could substantially increase its sales. Robinson and Oechsle provided OEC with its customer list.  According to Robinson and Oechsle, only 100 of the 400 entities on the list were active Ro customers.  They assured

2

OEC that they could develop substantial new and active business for LLC.  OEC relied on their representations and generated sales projections.  Those projections were shared with Robinson and Oechsle, who agreed that the numbers were attainable.

After the sale, LLC began to operate as an independent subsidiary of OEC. Robinson was the President of LLC.  Oechsle was the Vice President of LLC.  They were responsible for all aspects of the operation.  Their duties and responsibilities were the same as when they owned the company.  They were entrusted to run the business.  They were allowed to run LLC with little interference from OEC.  They were expected to accomplish the business plan of substantially increasing sales.

Robinson and Oechsle also owned a freight company called Ro Express.  They operated Ro Express out of Ro's offices before October 1, 1999 and out of LLC's offices after October 1, 1999.  Robinson and Oechsle considered Ro Express their "retirement vehicle."  LLC agreed to use RO Express to deliver envelopes from October 1, 1999 to December 31, 2000, provided that Ro Express was comparable to other carriers in terms of price and scheduling.

At closing, Robinson and Oechsle created a new company called GTD Incorporated ("GTD").  GTD stands for "Gone to Disney."  GTD has never had any employees or business.  It has never performed any services or sent any invoices.  GTD was set up as a shell to receive payments from OEC for the sale of Ro.

## II.  The Embezzlement Schemes

### 1)    LLC's checks into the GTD account.

On November 30, 1999, just two months after the sale of Ro, Robinson and Oechsle opened up a new bank account at Wilmington Trust Bank in the name of GTD.

Robinson and Oechsle signed the signature card to open the GTD account. They were

the only individuals authorized on the account. They did not expect any money to go into

the account other than the October 1 payments made by OEC for the purchase of Ro.

     The first deposit into the account was in the amount of $3,149.55 on November

30, 1999. The source of funds was two checks from Lynx Graphics payable to "Ro

Envelope Company" in the amount deposited. Lynx was a customer of Ro. On October

1, 1999, LLC purchased all of Ro's accounts receivable. Thus, LLC's assets were used

to open the GTD account.

     At least twenty-three checks payable to Ro and/or LLC were deposited into the

GTD account owned by Robinson and Oechsle. The total face amount of the checks was

$71,357.81. Joseph O'Brien ("O'Brien"), a former bookkeeper for Ro and LLC, made

many of the deposits on instruction from Robinson and Oechsle. Those checks belonged

to LLC. Moreover, the Ro checks paid for envelopes. The checks did not contain any

amounts owed to Ro Express for freight.

     This embezzlement scheme directly benefited Robinson and Oechsle. They

withdrew money from the GTD account for their personal use. Moreover, some of the

money deposited into the GTD account was transferred to Ro Express, a business they

owned.

     *2)*    *LLC's checks into the Ro Express Operating Account.*

     There was a second embezzlement scheme. LLC checks were also deposited into

the Ro Express operating account at a time when Ro Express was struggling with its cash

flow. This embezzlement scheme directly benefited Robinson and Oechsle because it

4

allowed Ro Express to meet its financial obligations and, therefore, to continue its operations.

The first misappropriated amount into this account was of the funds remaining in Ro's old payroll account. When that account was closed, its balance of $2,524.09 was deposited into the Ro Express operating account. At least twelve checks payable to Ro and/or LLC were deposited into the RO Express operating account in the amount of at least $30,043.93.

> 3)    *LLC's checks into the "bogus" Ro Express account.*

O'Brien also deposited LLC checks into a First Union account ("bogus account") he opened in the name of Ro Express. At least seven checks payable to Ro and/or LLC were deposited into the bogus account in the amount of at least $74,136.77.

This embezzlement scheme directly benefited Robinson and Oechsle because the amounts deposited into the bogus account were used to pay Ro Express bills.

> 4)    *Manipulation of LLC's accounting records.*

The various embezzlement schemes were concealed by the voiding of invoices and by the issuance of credit notes on LLC's books. These actions erased accounts receivable balances. Only Oechsle knew how to delete invoices in LLC's computerized accounting system.

> 5)    *Total amount of embezzled funds unknown.*

As described above, LLC knows that at least $175,538.51 of its funds was diverted into bank accounts that were owned by and/or that directly benefited Robinson and Oechsle. Bank records are incomplete and/or illegible. For this reason, the total amount of the embezzlement remains unknown.

*6) LLC has been partially repaid.*

At this time, Robinson and Oechsle have partially repaid LLC for the embezzled amounts. The Plaintiffs expect that the Defendants will quantify the amount of their repayment.

### III.  Expense Account Abuses

During their employment with LLC, Robinson and Oechsle abused their LLC company expense accounts to the tune of at least $20,000.00. They charged their personal vacations to Disney World, including car rentals and hotel stays. They charged excessive and improper meals and gas. They charged Ro Express vehicle expenses. They also charged lodging at hotels near their homes. Moreover, Oechsle was "double-dipping" by charging expenses on the company card and also submitting receipts for cash reimbursement.

It is impossible to completely quantify the expense account abuses. LLC had a petty cash account called the "special account." Oechsle sought reimbursement from the special account. Many of his submissions, for which he was actually reimbursed, did not contain any receipt or other proof for the alleged business expenses. Thus, Oechsle was paid for expenses that he did not incur.

### IV.  Ro Express' Financial Troubles

Robinson and Oechsle were well aware of RO Express' chronic financial difficulties. They signed Ro Express tax returns in 1999, 2000 and 2001. Ro Express reported losses in each of those years. Moreover, Ro Express reported increases in loans from shareholders in each of those years.

Oechsle was putting his own money into RO Express to fund its operations.  He

transferred in at least $8,000.00 from his personal savings account.  Funds were also

transferred in from the GTD and bogus accounts.

### V.    Excessive Ro Express Charges to LLC

RO Express prepared daily shipping invoices for each delivery it made for LLC

on a particular day via Daily Trucking Schedules ("shipping logs").  The shipping logs

contained LLC job numbers, customer names, descriptions of the goods sold and the

charges for each delivery.  The shipping logs were submitted to OEC for payment on a

weekly basis.

Oechsle and Robinson defrauded LLC with respect to the freight costs Ro Express

charged to LLC.  Ro Express submitted duplicate charges for the same shipment.  A

significant number of deliveries were listed twice and charged twice.  Other jobs could

have been shipped for substantially less by UPS.  Sometimes the shipping charge

exceeded the cost of the envelopes shipped.  Ro Express inflated shipping charges.  RO

Express charged LLC for deliveries that were cancelled or picked up at the plant by the

customer.

In 2001, LLC stopped using Ro Express.  Instead, LLC utilized UPS and common

carriers for its shipping needs.  At that time, LLC's shipping costs decreased by over

$45,000, or almost 50%.

### VI.    Ro Express Used LLC's Resources

Ro Express operated out of LLC's offices.  Ro Express used LLC's employees to

conduct Ro Express business.  Ro Express used LLC's telephones and computer system.

## VII.    Competition with LLC

In the summer of 2001, after Robinson and Oechsle had departed from LLC, Ro Express began making deliveries for Rite Envelope ("Rite"). Rite was one of LLC's competitors. Through Ro Express, Robinson and Oechsle did business with LLC's competitor. In fact, Robinson and Oechsle were physically making the deliveries for Rite and to Rite's customers. Rite wrote checks to Robinson. Robinson deposited Rite's checks into his personal bank account. From these facts, it can be inferred that Robinson and Oechsle steered LLC customers to Rite.

## VIII.    The Demise of LLC

The entire premise of the acquisition was that LLC would grow and prosper under the control of Robinson and Oechsle and with the support of OEC.

Robinson and Oechsle were entrusted with all of LLC's assets. They were expected to safeguard LLC's assets. As the President and Vice President of LLC, they were responsible for operating all aspects of the business. They supervised LLC's employees. Moreover, they controlled their own expense accounts. They invoiced and collected payments from LLC's customers. Importantly, these functions were to be performed without supervision from OEC.

Robinson and Oechsle did not perform as expected. LLC did not grow or prosper under their direction. During their reign at LLC, Robinson and Oechsle focused on their own personal gain at the expense of LLC. They lost all interest in LLC as soon they signed the Asset Purchase Agreement. They were merely buying time until they were paid in full for the sale of their business.

Robinson and Oechsle defrauded LLC in various ways. They created embezzlement schemes. They created false expense reimbursements. They directed LLC employees to participate in illegal activities. Their efforts concentrated on saving Ro Express. Those efforts took time. That time and effort should have been invested in LLC. Because they did not devote their "full business time, attention, skill and energy" to LLC, the goodwill purchased by LLC was worthless.

By early 2001, it became clear to OEC management that its trust had been misplaced. Robinson and Oechsle had both charged improper expenses to the company. The circumstances of the "O'Brien embezzlement" to the bogus account raised further issues regarding Robinson's and Oechsle's integrity. They had failed to supervise and implement controls that would have safeguarded the company's assets. They ordered and/or allowed the embezzlement of LLC's money. For these reasons, OEC was compelled to request Oechsle's resignation and Robinson's early retirement. Thus, LLC's key executives, who maintained the customer relations, departed. Thereafter, customers took their business to LLC's competitors. LLC's sales plummeted. LLC's revenue decreased so much that the business could not be sustained. LLC ceased operations in July of 2002.

### 2.    Legal Theories

### Count I – Rescission

On February 10, 2204, this Court ordered judgment in favor of the Defendants with respect to LLC's claim for rescission.

## Counts II and III – Breach of Contract (LLC v. Defendants) & (OEC v. Defendants)

Robinson and Oechsle breached the Asset Purchase Agreement and their employment agreements with LLC by using their positions of trust to bilk their employer in a variety of imaginative ways.

In their employment agreements, Robinson and Oechsle promised to perform the duties incident to their positions as President and Vice President, respectively. In sum, Robinson and Oechsle agreed to the following terms: 1) they promised to devote their full business time, attention, skill and energy to the performance of the duties customary to their respective offices; 2) they were permitted to manage and operate Ro Express so long as their activities did not interfere with the employment duties owed to LLC; and 3) they would not participate or engage in any business with any competitor of LLC.

Robinson and Oechsle breached all of the above terms of their employment agreements. They did not devote their full time, attention, skill and energy to LLC. Instead, they spent considerable time, attention skill and energy in diverting LLC's assets for their own personal benefit. The Ro Express business interfered with LLC's operations. Robinson and Oechsle conducted business with and steered LLC's customers to Rite, LLC's competitor. For these reasons, Robinson and Oechsle breached their respective employment agreements.

In Article 5 of the Asset Purchase Agreement, Robinson and Oechsle promised to use their best efforts to accomplish the following: 1) to preserve LLC's management team; 2) to preserve the business; 3) to preserve the goodwill; and 4) to continue performance in the ordinary course of their obligations. As discussed above, Robinson and Oechsle did not perform the obligations set forth in their respective employment

agreements. During their tenure with LLC, Robinson and Oechsle participated in various schemes to defraud LLC. Their schemes destroyed the business. OEC was forced to terminate Robinson and Oechsle. The goodwill purchased was worthless. For all of the above reasons, Robinson and Oechsle breached the Asset Purchase Agreement.

The Asset Purchase Agreement includes an indemnity clause by which Robinson and Oechsle have agreed to indemnify LLC and OEC arising out of any breach of any covenant, including the fiduciary duties set forth in their employment agreements. Thus, the Defendants must indemnify the Plaintiffs for their losses.

### Count IV—Breach of Fiduciary Duty (LLC v. Robinson and Oechsle)

As President and Vice President of LLC, Robinson and Oechsle were fiduciaries. Moreover, Robinson and Oechsle's employment agreements with LLC created a fiduciary relationship between the parties. Accordingly, Robinson and Oechsle had the obligation to devote themselves to LLC affairs so as to promote the interests of LLC. They were obligated to neither directly, nor indirectly, use their positions to obtain any personal profit or advantage. Instead, the Defendants enriched themselves at the expense of LLC by pocketing proceeds from checks owned by LLC and by charging personal expenses to LLC. They also stole from LLC by misappropriating its resources and charging it with excessive and unjustified prices for freight.

Robinson and Oechsle were also obligated to safeguard LLC's assets. They were to adequately supervise LLC employees. They were to impose and enforce adequate controls and policies. Instead, Defendants actively participated in and/or ignored the illegal activities taking place in the office.

For all of these reasons, Robinson and Oechsle breached their fiduciary duties. They were disloyal and they acted in bad faith.

### b.   Defendants' Statement of Facts in Defense of Plaintiffs' Claims and Legal Theories

#### 1.   Background

Plaintiff and Counterclaim Defendant, LLC is a Maryland limited liability company, formed for the purpose of purchasing and owning the assets of the Defendants' former business, RO Envelope Co., Inc.  LLC is a wholly-owned subsidiary of Plaintiff and Counterclaim Defendant, OEC.  OEC is a Maryland corporation in the business of manufacturing and selling envelopes.  Jay Young is the President and Chief Executive Officer of Plaintiffs.  Mark Moderacki ("Moderacki") is the former Vice President of Finance and Chief Financial Officer of OEC, having joined OEC in approximately November 2000, more than a year after the purchase.  Steve Stacharowski ("Stacharowski") was, until March 2003 when his employment was terminated, the Vice President of Human Resources of OEC.  Vicki Young ("Vicki Young") is the daughter of Jay Young.  She has held various positions within OEC and, beginning on April 1, 2001, was promoted to Vice President and General Manager of LLC.  She held both of those positions until December 2001, when a new general manager was hired at LLC; however, she remained in the position of Vice President of LLC with management responsibility over that entity until it was shut down in July 2002.

Defendants, Robinson and Oechsle, are individuals residing in Pennsylvania. Robinson and Oechsle are the former sole stockholders of RO Envelope Co., Inc. ("RO Envelope"), a Pennsylvania corporation, which was, until the Asset Purchase Agreement was consummated, in the business of printing and selling envelopes and limited other

paper products out of a facility in Exton, Pennsylvania. Defendant, GTD is a

Pennsylvania corporation owned by Robinson and Oechsle, and is the successor-in-

interest by name change to RO Envelope. RO Express owned and operated by Robinson

and Oechsle out of the Exton, PA facility, until approximately February 2001.

Subsequent to the acquisition and through early 2001, RO Express provided freight or

delivery services to various businesses, including Oles LLC, its largest customer, and

thereafter it continued to provide freight services out of a different location to third

parties through mid-2002, at which time it ceased operations.

### (i). The Purchase Agreement and Related Agreements.

On September 30, 1999, Plaintiff LLC entered into an Asset Purchase Agreement

(the "Purchase Agreement") with Defendants Robinson and Oechsle, and their company,

RO Envelope. Under the Purchase Agreement, Plaintiff agreed to purchase the assets and

goodwill of RO Envelope for $2,000,000, plus the assumption of its debt. In accordance

with the Purchase Agreement, a small portion of the purchase price ($175,000) was paid

at closing to Defendants Robinson and Oechsle. LLC executed a Promissory Note in the

amount of $1,825,000.00 in favor of RO Envelope, which required the payment of the

remainder of the purchase price, through five (5) annual payments, to be made to RO

Envelope from 2000 through 2004. The acquisition documents provide that the deferred

purchase price was not contingent or conditional on any particular subsequent financial or

business performance. LLC also executed an Assumption Agreement at closing, by

which it assumed and agreed to pay various debts, liabilities and obligations of RO

Envelope. One of the liabilities expressly assumed is the Equipment Finance Agreement

with American Express Capital Finance L.L.C. previously entered into by RO Envelope

to finance the purchase of certain main frame computer equipment.  There is no dispute that this debt was assumed.

In connection with the purchase of RO Envelope, LLC's parent, Plaintiff OEC, executed a Guaranty Agreement in favor of Defendants in which OEC guaranteed the payment to Defendants of the deferred purchase price payable over five (5) annual payments in the amount of $1,825,000.  Defendants Robinson and Oechsle also executed individual Executive Employment Agreements.  Pursuant to the Employment Agreements, Robinson was employed as the President of Oles LLC for a term of two (2) years and Oechsle was employed as Vice President of Oles LLC for a term of four (4) years, each effective as of October 1, 1999.

The evidence will establish that the Defendants made no promises or commitments to LLC or OEC regarding the future financial performance of the business and that the pre-closing projections of OEC were created by OEC, for its internal use, not shared with Defendants, and that the assumptions underlying the projections were neither tested nor reasonable and were based on what Plaintiffs concede was "sketchy" information supplied by Robinson or Oechsle.  Moreover, those assumptions proved to be incorrect and unrealistic in many respects, in substantial part because of OEC's own failure and inability to execute upon its own plan or to implement the changes necessary to achieve the goals set forth in the projections.  The evidence will not support the use of the projections, or the assumptions therein, as a basis for any damage analysis for Plaintiffs.

**(ii).    Post-Closing Events and Chronology.**

After the closing on October 1, 1999, Robinson and Oechsle, acting as President and Vice President, respectively, continued to run what had previously been their business, operating as RO Envelope, under the ultimate direction and control of Oles and Jay Young.  They participated in regular meetings with Jay Young and other executives of Oles, including both OEC's President (Dennis Stewart) and its Chief Financial Officer (John Hutson) to review the financial results and various operational aspects of the company.  Both Mr. Stewart and Mr. Hutson had been heavily involved in the negotiations for the purchase of RO Envelope, and both of these men resigned from Oles in 2000.

The evidence will show that Robinson and Oechsle worked very hard to improve and grow LLC and generate new and expanded business for Oles, and in fact succeeded in both respects.  Robinson and Oechsle in fact acted in the interests of LLC and complied with all of their duties owed to Plaintiffs.  The evidence will establish that, while they were with LLC, the revenues of the company grew significantly and that a substantial amount of new business was generated for Oles (flexo and/or conversion work) by LLC from its customers.  The evidence will also show that while LLC was expanding in a difficult economic climate, the revenues of Oles dropped significantly and Oles lost substantial money (starting in 2000, a few months after the purchase, and continuing through at least 2002).

In January 2001, LLC's and RO Express' bookkeeper, Joseph O'Brien, resigned suddenly, after which it was immediately discovered that he was embezzling funds from LLC and RO Express.  O'Brien had opened up an unauthorized account in the name of

RO Express and diverted checks made payable to LLC into that account, as well as into an existing account for RO Express. All of this was done, as admitted by Mr. O'Brien, without the knowledge of either Robinson or Oechsle. Mr. O'Brien had also, with Mr. Oechsle's knowledge, deposited or caused to be deposited various checks payable to Ro into an account in the name of GTD. Mr. Oechsle understood that these checks were in payment of freight, in whole or in part, which was owed to Ro Express, and that the deposit of these checks was a way to direct the money to the correct entity (all but approximately $17,000 of the items deposited into GTD were immediately paid back to Ro by way of GTD checks, which Mr. Oechsle understood represented the amounts owed to Ro on the items).

On February 14, 2001, approximately one month after O'Brien resigned, Oechsle met with Stacharowski and Jay Young to discuss certain expenses Oechsle had submitted for payment or reimbursement (and which OEC or LLC had paid) over the prior seventeen (17) months since the acquisition, which Plaintiffs challenged as improper. The challenged expenses totaled in the aggregate $4,826.32, and Oechsle disputed Plaintiffs' claims that the expenses were not legitimately payable in many respects. About a week later on February 23, 2001, Oechsle resigned, at the request of Plaintiffs, as a result of the challenged expenses.

Jay Young placed his daughter, Vicki Young, in the position of Vice President and General Manager of LLC, effective April 1, 2001, in advance of Mr. Robinson's impending retirement. Ms. Young had never run a jet shop or printing business before, had never been a general manager of any company, and had no management experience with regard to running a print production shop. Mr. Young also decided to accelerate Mr.

Robinson's retirement date (which would have been September 30, 2001), by a few months such that Robinson would retire on June 30, 2001. Charlotte Robinson (Robinson's spouse), who performed various administrative functions for LLC, including customer service, job entry and invoicing, retired from LLC on June 1, 2001. In addition, Kimberly Robinson (Robinson's daughter) resigned from LLC in early September 2001 because of dissatisfaction with various decisions made by Vicki Young and what had become, under Vicki Young's management, an ineffective business operation. Kimberly Robinson had been a salesperson with LLC for 16 years, and was the leading salesperson, in charge of several of the company's largest customer relationships. Thus, in the months leading up to September 2001, four long-time key employees (Robinson, Oechsle, Charlotte Robinson, and Kimberly Robinson), as well as the bookkeeper (Joseph O'Brien), had left LLC.

The evidence will establish that Mr. Young discussed with other executives at Oles and was contemplating replacing Robinson and Oechsle in late 2000, at a point in time prior to any suspicion on the part of Moderacki or LLC/OEC that either of them had engaged in any misconduct of any sort, including that allegedly related to O'Brien's embezzlement scheme or expense account abuses. Mr. Young discussed "cleaning house" at LLC with his executive staff.

With Kimberly Robinson's departure in September, only one salesperson was left in the operation, Al Applebaum (another salesperson had previously been fired by LLC over Robinson's objection in March 2001 and not replaced). Al Applebaum was fired in January 2002 by Vicki Young for lack of productivity, which she testified had been a problem since at least the fall of 2001. LLC, by Vicki Young's own admission, did not

have a <u>single</u> productive salesperson on site for at least five months after Kimberly Robinson's departure.

After Robinson's last day at LLC at the end of June 2001, Vicki Young was fully responsible for operating LLC on a day-to-day basis, including having overall responsibility for all activities of LLC such as quoting, pricing, production, sales, customer relations, purchasing, warehousing and shipping. Ms. Young admitted that she had no experience in quoting, pricing, running a production operation, or running a jet shop. Moreover, she had no experience in the purchasing, warehousing or the shipping aspects of an envelope production or printing business. Ms. Young had always worked at OEC, the family business, except for brief stints as an evening receptionist and part-time faculty member at Villa Julie College.

Ms. Young presided as Vice President and General Manager of LLC for approximately nine months from April 1, 2001 through December 2001, and continued as Vice President of LLC for another seven months until the business was shut down in July 2002. In December 2001, LLC hired Wendy Jones as General Manager of LLC, and Vicki Young continued in her position as Vice President with management responsibility for and oversight over LLC. Although the business was clearly in trouble, Ms. Young testified that Ms. Jones was hired because Ms. Young, for personal reasons, wanted to stop commuting and return home to Baltimore. After the hiring of Ms. Jones, Vicki Young significantly decreased her presence in (and, the evidence will establish, her focus on) LLC. On April 10, 2002, Ms. Young prepared a performance evaluation of Ms. Jones. In the evaluation, Ms. Young states that "[a]t this point the major problem of the organization which has been causing the company to lose money is lack of sales

volume."  Ms. Young also states in the evaluation, which was provided to Ms. Jones, that "[w]e have an exciting future and I look forward to working with you to build this organization into a top notch jet shop…."  In point of fact, however, about nine or ten months prior to the actual closure of LLC (i.e. September or October, 2001, very shortly after Mr. Robinson retired), OEC and LLC's management had begun discussions about the shutdown of LLC.

During the time that Ms. Young ran LLC, sales decreased very significantly. Both Jay Young and Ms. Young admitted that Ms. Young was responsible for increasing the sales of LLC and that, during her tenure at LLC, sales in fact did not increase, but rather decreased substantially.  OEC's chief financial officer testified that, by 2002, LLC's "profits had eroded because sales had eroded [and] [s]ales had decreased so greatly" and that "there was a fairly precipitous drop . . . [in sales in] the late summer, early fall of 2001."  In fact, LLC's sales suffered a huge drop from about September 2001 through the time the business was closed, representing a 56.2% decrease from the prior year when Robinson and Oechsle were still running the business.  The drop in sales volume began in the late summer of 2001, about the time of Kimberly Robinson's resignation.  Vicki Young conceded and the evidence will otherwise establish, that the reasons for the drop in sales included the recession in the national economy generally and the printing and paper industries specifically, the September 11 terrorist attacks, the anthrax scare, lack of any productive salespeople at LLC, Kimberly Robinson's departure and taking of many of her customers to her new employer, poor or non-existent servicing of customers, excessive and non-competitive pricing, and a wholesale failure of effective management.

There will be no evidence that any specific wrongs which Plaintiffs allege were committed by Robinson or Oechsle caused the loss of any LLC customers or sales.

On or about July 22, 2002, over two months after LLC filed its complaint in this action, and over a year after Robinson (and seventeen months after Oechsle) had left the company, OEC shut down the LLC operation. Mr. Young made the final decision to shut down operations in early July 2002, and OEC only notified Wendy Jones, the General Manager of LLC, on the day of closing. Plaintiffs concede that the reason the business was shut down was because of its loss of customers, poor business environment and nonprofitable operations, and the evidence will not support any finding that the poor economic performance was a result of anything Robinson or Oechsle did before or after each of them left LLC (17 and 13 months before, respectively).

   2.    **Legal Theories in Support of Affirmative Defenses.**

Defendants' Answer to the Amended Complaint includes affirmative defenses of waiver, estoppel, laches, ratification, accord and satisfaction, unclean hands and Plaintiffs' own breaches of contract. With regard to the defenses of waiver, estoppel and laches, Plaintiffs' claims should be barred under these theories for several reasons. First, as this Court has already ruled in its Memorandum Opinion on Defendants' Motion for Summary Judgment (the "Opinion") dated February 10, 2004, Plaintiffs waived, are estopped or are otherwise subject to laches on any claim for rescission by waiting too long before seeking it. Thus, judgment on that claim has been summarily entered. Plaintiffs' have also waived, are estopped from asserting or are subject to laches on all of their claims, and are barred by accord and satisfaction. In 2001, Plaintiffs investigated claims of embezzlement, calculated the amount of the claimed losses with precision, and

requested Robinson and Oechsle to pay these sums.  The parties agreed to settle and

resolve such claims, through deduction of the full losses calculated by LLC from the

deferred payments of the purchase price for Ro made by LLC in 2001.  Robinson and

Oechsle readily agreed to repay pay the losses to LLC because of Joseph O'Brien's

diversion of funds from LLC to or for the benefit of Ro Express.  In addition, Plaintiffs

deducted an additional $4,826.32 from Oechsle's annual Purchase Agreement payment,

which was the full amount of the alleged wrongful expenses calculated by LLC at that

time.  Thus, Plaintiffs have been made whole on these claims by way of repayment from

Defendants, as a result of their previous assertion of an indemnity right under the

Purchase Agreement.  Having availed themselves of that remedy with full knowledge of

all relevant facts, Plaintiffs' effort to reassert the same indemnity obligation at a much

later time for further alleged damages is barred by waiver, estoppel, laches and accord

and satisfaction.  In addition, the additional $20,000 of further expenses now suggested

by Moderacki to be additional sums owed are far too speculative, and any claim for that

amount has been waived (or the claims are subject to estoppel) due to the parties'

previous agreements.

　　　　　With regard to Defendants' affirmative defense of ratification, as cited in this

Court's Opinion pertaining to Plaintiffs claim for rescission, case law is clear the

"[f]ailure to rescind within a reasonable amount of time is evidence, ***and may be***

***conclusive evidence***, of an election to affirm the contract."  Opinion, at p. 14.  Thus,

Plaintiffs failure to rescind the Purchase Agreement within a reasonable period of time

after discovering what they believed was embezzlement, serves to affirm or ratify the

Purchase Agreement, and Plaintiffs are not entitled to either rescission or rescissory damages.

Defendants also have a defense of unclean hands.  At trial, Defendants will show that Plaintiffs deleted invoices or directed LLC employees to delete invoices, and then failed to disclose such deletions while simultaneously contending that such deletions were evidence of Robinson's or Oechsle's alleged misconduct or effort to conceal the embezzlement.

Finally, the affirmative defense that Plaintiffs were in breach of the Asset Agreement, Note, Assumption Agreement and Guaranty, is illustrated (and specifically recognized by this Court) by Plaintiffs' failure make any other challenge to the validity of those agreements in their Opposition to the Motion for Summary Judgment.  This Court's Opinion recognizes that, but for the issue of indemnity or setoff, Defendants are entitled to full payment under the agreements.

> **c.**      **Similar Statements As To Any Counterclaim, Cross Claim Or Third-Party Claim**

Defendants have asserted a Counterclaim against Plaintiffs for breach of contract pertaining to the Purchase Agreement, Note, Guaranty and Assumption Agreement.  As previously stated, this Court has already found that Plaintiffs have failed to effectively challenge the validity of these agreements and that Defendants are entitled to payment under these agreements.  In addition, Defendants will show that Plaintiffs unilaterally deducted over $4,000 from Oechsle's annual payment under the Purchase Agreement without the knowledge or consent of Oechsle and in violation of the understanding reached at the time Oechsle resigned.

**d.**    **Amendments Required Of The Pleadings**

      1.    <u>Plaintiffs</u>

The Plaintiffs do not require any amendment to the pleadings.

      2.    <u>Defendants</u>

Defendants do not require any amendment to the pleadings.

**e.**    **Issues In The Pleadings To Be Abandoned**

      1.    <u>Plaintiffs and Defendants</u>

This Court entered summary judgment with regard to the Plaintiffs' rescission claim on February 10, 2004.

**f.**    **Requested Stipulations Of Fact**

      1.    <u>Plaintiffs</u>

The Plaintiffs request that the Defendants stipulate that their proposed trial exhibits, as listed in Schedule A, are authentic.

      2.    <u>Defendants</u>

(a)  Defendants request that Plaintiffs stipulate that their proposed trial exhibits, as listed in Exhibit B, are authentic.

(b)  In their Memorandum in Support of their Motion for Summary Judgment, Defendants argued that the evidence of record did not support the ten allegations that form the basis for all of Plaintiffs' claims.  In their Opposition, Plaintiffs offered no evidence to support the following allegations of wrongful conduct: (1) RO Express expenses; (2) time spent on RO Express business; (3) use of the "RO Envelope" name; (4) diversion of customers to Rite Envelope; (5) Kimberly Robinson's employment with Rite Envelope; and (6) enticement of customers to Rite Envelope.  In its Opinion on

the Motion, this Court stated that it "agrees that there is no evidence in the record supporting these six factual allegations…."  Opinion, at p. 11.  Although this Court declined to enter a Rule 56(d) order specifying the non-existence of these facts, this Court inferred that the issue regarding these unsupported allegations may be incorporated into the Pretrial Order.  Thus, Defendants seek a stipulation that there is no support or other evidence to support these six allegations.

> **g.    Details Of Damages Claimed Or Relief Sought**

> **1.    Plaintiffs**

OEC seeks compensatory damages from the Defendants in the amount of $2,084,000.00, plus attorneys' fees and costs.  LLC seeks compensatory damages from the Defendants in the amount of $2,100,000.00, plus attorneys' fees and costs.  The Plaintiffs' expert witness, Lawrence Signorelli, CPA, will provide testimony to support the Plaintiffs' damages claims.

Alternatively, the Plaintiffs seek the return of all compensation paid to the Defendants since September 30, 1999, including their salaries, expense reimbursements and all payments made pursuant to the Asset Purchase Agreement, plus all future payments owed to the Defendants pursuant to the Asset Purchase Agreement and attorneys' fees and costs.  Such damages exceed $2,500,000.00.

> **2.    Defendants**

Pursuant to their Counterclaim, Defendants seek payment by Plaintiffs of the remainder of the purchase price for the business in the amount of $1.425 million as provided for in the Purchase Agreement.  Defendants also seek payment of late charges, interest, attorneys' fees, costs and expert fees, as expressly provided for

under the Purchase Agreement Note and/or Guaranty.  In addition, because there is no dispute that LLC assumed an American Express debt under the Assumption Agreement and failed to pay it, Defendants seek and are entitled to judgment against LLC in the amount of the debt paid by Oechsle, or $3,600.00.

      **h.**    **Listing Of Documents And Other Exhibits To Be Offered Into Evidence Other Than Solely For Impeachment**

    <u>Plaintiff</u>

A listing of Plaintiffs' proposed trial exhibits is attached as Exhibit A. Plaintiffs reserve the right to introduce at trial any documents relied upon by the parties' expert witnesses and/or any documents needed for rebuttal or impeachment purposes.

    <u>Defendants</u>

A listing of Defendants' proposed trial exhibits is attached as Exhibit B.  Defendants reserve the right to introduce at trial any documents relied upon by either Mr. Oliner or Mr. Signorelli in preparation of their respective expert reports, as well as any documents needed for rebuttal or for purposes of impeachment.

      **i.**    **List Of Witnesses Other Than Those Expected To Be Called Solely For Impeachment**

      1.    <u>Plaintiffs</u>

      **John R. Young**
Oles Envelope Corporation
532 East 25th Street
Baltimore, Maryland 21218
410.243.1520

      **Mark Moderacki**
2260 Phillips Mill Road
Forest Hill, Maryland 21050
410.692.0206

**Steve Stacharowski**
6 Old Farm Lane
New Freedom, PA 17349
717.227.9836

**Vicki Young**
Oles Envelope Corporation
532 East 25th Street
Baltimore, Maryland 21218
410.243.1520

**Detective Philip Owen**
Uwchlan Township Police Department
717 N. Ship Road
Exton, Pennsylvania 19341
610.363.6947

**Joseph O'Brien**
2554 Clothier Street
Coatesville, Pennsylvania 19320
484.995.0472

**John Hutson**
5 Aintree Rd
Towson, Maryland 21286
410.583.9575

**Dennis Stewart**
1208 South Bouldin St
Baltimore, MD 21224
410.889-8686

2.    <u>Defendants</u>

Mr. Harold T. Robinson            Mrs. Charlotte Robinson
1413 Nectar Lane                  1413 Nectar Lane
West Chester, PA 19382            West Chester, PA 19382
(610) 692-6266                    (610) 692-6266

Kimberly Robinson                 Mr. David D. Oechsle
814 Edward Lane                   701 Stewarts Way
West Chester, PA 19382            Yardley, PA  19067
(610) 738-8184                    (215) 321-8615

Joseph O'Brien
2554 Clothier Street
Coatesville, PA 19320
(610) 280-3063

Linda Tipton
1860 Creek Road
Glenmoore, PA  19343-1612
(610) 942-1989

Jack Brennecki
376 East Broad Street
Malvern, PA  19355
(610) 647-8053

Al Applebaum
207 Paper Mill Road
Oreland, PA  19075
(215) 572-0879

Mick MacMullen
1310 Argyll Drive
Arnold, MD 21012
(410) 544-2191

Wendy Jones
Precision Forms & Graphics Ltd.
258 Wilmington Pike
Chadds Ford, PA  19317
(610) 459-3658

John Hutson
5 Aintree Road
Towson, MD  21286
 (410) 583-9575

Harold Newman
Rite Envelope
250 Boot Road
Downingtown, PA  19335
(610) 518-1601

Dennis Stewart
1208 South Bouldin Street
Baltimore, MD 21224
(410) 889-8686

Jeanne Knecht
3 Vintage Lane
Honeybrook, PA  19344
(610) 458-1390

Chuck Zurek
602 Buttonwood Street
Norristown, PA  19355
(610) 278-6323

Bill Hartman
153 Cliffview Drive
North East, MD  21901
(410) 287-8414

Tom McLean
821 Shadeland Avenue
Drexel Hill, PA 19026
(215) 796-6934

 Peter Morgan
156 Valley Stream Circle
Wayne, PA 19087
(610) 889-0793

Joan Barnes
149 East Trout Run Mews
Media, PA 19063

Andy Bell
Intelliscan
1039 West Bridge Street
Phoenixville, PA 19460
(610) 935-6173

Barbara Dorsey
Precision Forms
P.O. Box 266
St. Georges, DE  19733-0266
(484) 332-4280

Hugh Freil
Heritage Bus.Forms Vanguard Direct
1155 Phoenixville Pike, Suite 101
West Chester, PA 19380
(610) 344-0700

Steven D. Schwartz, C.P.A.
1241 Medford Road
Wynnewood, PA  19096
(610) 896-8345

Grace Greenlee
Client Logic, Inc.
999 North Dupont Blvd
Milford, DE 19963
301-422 3979

C. Douglas Sawyer
Mercantile Bank and Trust
2 Hopkins Plaza
Baltimore, MD 21201
(410) 237-5900

**j.**     **List Of Experts**

1.     <u>Plaintiff</u>

**Lawrence Signorelli, CPA**
Mihaly McPherson Signorelli LLC
1414 Key Highway
Suite C
Baltimore, Maryland 21230
410.528.1986

Mr. Signorelli will serve as the Plaintiffs' damages expert.  He will testify about the losses incurred by OEC and LLC as a result of the Defendants' activities and the closure of the LLC operation.

2.     <u>Defendants</u>

**Stephen Oliner, CPA, CFE, CVA**
Hertzbach & Company
HS&S Professional Building
10 Music Fair Road
Owings Mills, Maryland 21117

Mr. Oliner will serve as Defendants' expert.  He will rebut the damages analysis of Mr. Signorelli and testify that the alleged "embezzlement scheme" did not materially impact the financial performance and/or financial health of LLC or OEC and did not cause the demise of LLC.  He will also testify as to the

comparative trends between LLC and OEC with regard to each company's sales and operating income, and other matters continued in his expert report, previously supplied to Plaintiffs.

**k.    List Of Deposition Designations To Be Offered In Party's Case In Chief**

1.    <u>Plaintiffs</u>

**<u>Joseph O'Brien</u>**

pg. 5, line 14 to pg. 13, line 13
pg. 14, line 13 to pg. 20, line 2
pg. 20, line 7 to pg. 20, line 21
pg. 21, line 7 to pg. 21, line 18
pg. 21, line 19 to pg. 22, line 22
pg. 24, line 7 to pg. 24, line 17
pg. 24, line 24 to pg. 27, line 1
pg. 27, line 2 to pg. 28, line 8
pg. 28, line 9 to pg. 29, line 2
pg. 29, line 3 to pg. 29, line 13
pg. 29, line 14 to pg. 29, line 19
pg. 30, line 5 to pg. 30, line 7
pg. 30, line 12 to pg. 33, line 19
pg. 34, line 5 to pg. 35, line 22
pg. 38, line 1 to pg. 39, line 9
pg. 39, line 10 to pg. 40, line 12
pg. 42, line 5 to pg. 42, line 14
pg. 43, line 18 to pg. 46, line 1
pg. 46, line 9 to pg. 48, line 4
pg. 48, line 19 to pg. 49, line 18
pg. 49, line 20 to pg. 50, line 19
pg. 51, line 5 to pg. 51, line 19
pg. 54, line 10 to pg. 56, line 3
pg. 56, line 4 to pg. 57, line 21
pg. 58, line 16 to pg. 59, line 20
pg. 61, line 8 to pg. 62, line 8
pg. 62, line 9 to pg. 63, line 14
pg. 66, line 14 to pg. 67, line 17
pg. 73, line 22 to pg. 74, line 21
pg. 76, line 16 to pg. 79, line 20
pg. 81, line 18 to pg. 83, line 14
pg. 85, line 1 to pg. 85, line 8
pg. 87, line 18 to pg. 89, line 15
pg. 89, line 16 to pg. 96, line 6
pg. 96, line 17 to pg. 97, line 3

pg. 98, line 1 to pg. 102, line 23
pg. 103, line 23 to pg. 106, line 12
pg. 107, line 24 to pg. 109, line 2
pg. 116, line 12 to pg. 129, line 6
pg. 130, line 1 to pg. 130, line 16
pg. 137, line 19 to pg. 138, line 1
pg. 142, line 19 to pg. 143, line 17
pg. 152, line 17 to pg. 157, line 6
pg. 160, line 15 to pg. 161, line 20
pg. 185, line 24 to pg. 186, line 22
pg. 195, line 20 to pg. 196, line 23
pg. 197, line 12 to pg. 199, line 10
pg. 202, line 6 to pg. 202, line 14
pg. 203, line 1 to pg. 203, line 16
pg. 204, line 2 to pg. 204, line 21
pg. 212, line 1 to pg. 212, line 5
pg. 217, line 4 to pg. 220, line 15
pg. 235, line 2 to pg. 236, line 5
pg. 242, line 16 to pg. 245, line 23
pg. 287, line 7 to pg. 288, line 1
pg. 289, line 4 to pg. 290, line 7
pg. 290, line 10 to pg. 291, line 6
pg. 296, line 8 to pg. 298, line 11
pg. 298, line 15 to pg. 300, line 14

**<u>Detective Philip Owen</u>**

pg. 4, line 8 to pg. 7, line 7
pg. 7, line 8 to pg. 10, line 10
pg. 12, line 4 to pg. 13, line 6
pg. 14, line 4 to pg. 14, line 8
pg. 14, line 12 to pg. 19, line 16
pg. 19, line 17 to pg. 25, line 19
pg. 27, line 16 to pg. 28, line 18
pg. 28, line 19 to pg. 30, line 10
pg. 30, line 11 to pg. 31, line 15
pg. 32, line 1 to pg. 36, line 12
pg. 36, line 24 to pg. 37, line 22
pg. 38, line 14 to pg. 38, line 22
pg. 40, line 9 to pg. 42, line 7
pg. 42, line 8 to pg. 44, line 16
pg. 44, line 17 to pg. 47, line 10
pg. 48, line 1 to pg. 50, line 18
pg. 51, line 13 to pg. 53, line 8
pg. 53, line 12 to pg. 53, line 23
pg. 54, line 6 to pg. 57, line 9

pg. 57, line 17 to pg. 61, line 10
pg. 61, line 11 to pg. 63, line 12
pg. 64, line 4 to pg. 67, line 10
pg. 67, line 11 to pg. 70, line 12
pg. 70, line 20 to pg. 71, line 5
pg. 72, line 7 to pg. 73, line 2
pg. 74, line 2 to pg. 74, line 6
pg. 74, line 17 to pg. 75, line 10
pg. 76, line 8 to pg. 77, line 13
pg. 77, line 19 to pg. 78, line 13
pg. 78, line 14 to pg. 79, line 9
pg. 79, line 23 to pg. 81, line 3
pg. 81, line 17 to pg. 84, line 1
pg. 84, line 19 to pg. 86, line 22
pg. 87, line 18 to pg. 89, line 5
pg. 89, line 6 to pg. 94, line 3
pg. 95, line 9 to pg. 96, line 24
pg. 97, line 7 to pg. 98, line 17
pg. 98, line 18 to pg. 99, line 9
pg. 99, line 22 to pg. 104, line 6
pg. 104, line 22 to pg. 107, line 3
pg. 107, line 12 to pg. 108, line 16
pg. 109, line 14 to pg. 109, line 20
pg. 110, line 2 to pg. 110, line 6
pg. 110, line 14 to pg. 111, line 8

**<u>Linda Tipton</u>**

pg. 32, line 17 to pg. 36, line 1
pg. 43, line 15 to pg. 46, line 2
pg. 52, line 8 to pg. 53, line 1
pg. 68, line 22 to pg. 69, line 17
pg. 91, line 13 to pg. 92, line 15
pg. 115, line 16 to pg. 115, line 23

Plaintiffs reserve the right to read the depositions of those witnesses that both parties have listed and expect to call, but do not ultimately appear at trial.

2.    <u>Defendants</u>

Detective Phil Owen:  pg. 111, line 19 to pg. 198, line 14

Steve Stacharowski:
>    pg. 26, line 8 to pg. 35, line 13
>    pg. 58, line 7 to line 18
>    pg. 65, line 20 to pg. 66, line 7
>    pg. 70, line 9 to pg. 72, line 8
>    pg. 85, line 21 to pg. 86, line 8
>    pg. 104, line 18 to pg. 105, line 2

John Hummel:
>    pg. 19, line 3 to line 13
>    pg. 21 , line 18 to pg. 27, line 7
>    pg. 31, line 4 to pg. 33, line 1
>    pg. 32, line 2 to pg. 34, line 14
>    pg. 37, line 3 to pg. 39, line 4
>    pg. 73, line 14 to pg. 77, line 3
>    pg. 87, line 4 to line 19
>    pg. 90, line 12 to pg. 91, line 7

David Pollack:
>    pg. 11, line 20 to pg. 12, line 12
>    pg. 14, line 5 to line 21
>    pg. 18, line 18 to pg. 19, line 6
>    pg. 22, line 7 to pg. 35, line 5
>    pg. 37, line 2 to pg. 38, line 3

Defendants reserve the right to read the depositions of witnesses whom both parties have listed and expect to call, but do not ultimately appear at trial.

**l.    Other Pretrial Relief, Including Pending Motions**

1.    <u>Plaintiffs</u>

The Plaintiffs intend to file several Motions in Limine.  The Plaintiffs also intend to oppose the Motions in Limine filed by the Defendants.

2.    <u>Defendants</u>

Defendants intend to file (or have already filed by the time this Order is submitted) several Motions in Limine.  Briefly, the Motions seek exclusion of evidence, testimony or argument or statement relating to the following matters:

(a)    alleged improper charges for freight deliveries made by RO Express.

(b)    evidence relating to any criminal investigation or charges, the pendency of any criminal case or the disposition of any criminal case against or related to Oechsle.

(c)    evidence or any mention of the alleged $20,000 of unidentified and unsubstituted losses sustained by LLC as alleged by Moderacki in his September 4, 2003 Affidavit in Support of Plaintiffs' Opposition to the Motion for Summary Judgment, on the grounds that Plaintiffs have been reimbursed by Defendants for all identified losses sustained by LLC and that these claimed additional losses are wholly speculative.

(d)    the introduction of any evidence related to damages which are based or founded upon financial projections created by OEC prior to the purchase of RO Envelope and any testimony by Plaintiffs' damages expert, Lawrence Signorelli, on the grounds that such testimony is purely speculative and inadmissible under the Federal Rules of Evidence.

(e) any evidence regarding the so-called embezzlement scheme and any losses sustained by Plaintiffs as a result, on the grounds that Plaintiffs availed themselves of their indemnification remedy in 2001 and, with Defendants concurrence, repaid the identified losses in full.  Thus, this evidence does not directly relate to any claim for losses which is now asserted in the Amended Complaint, and this evidence is inadmissible under the Federal Rules of Evidence.

      **m.**      **Any Other Matters Added By The Court.**

_____/s/_____
Ward B. Coe, III, Bar No. 00282
Pamela M. Conover, Bar No. 22453
Jennifer Ryan Lazenby, Bar No. 25886
Whiteford, Taylor & Preston, LLP
Seven Saint Paul Street, Suite 1400
Baltimore, Maryland  21202
(410) 347-8700

Attorneys for Plaintiff Oles Envelope, LLC

_____/s/_____
Jefferson V. Wright, Bar No. 00990
Tessa Laspia Frederick, Bar No. 25374
Brian D. Craig, Bar No. 25710
Miles & Stockbridge P.C.
10 Light Street, Suite 1200
Baltimore, Maryland 21202
(410) 727-6464

Attorneys for Defendants and
Counterclaimants, GTD Company, Inc.,
Harold T. Robinson and David Oechsle

*300894v.5*

34